# 22-15634

IN THE

# United States Court of Appeals

### FOR THE NINTH CIRCUIT

⬦⬥

DJENEBA SIDIBE; JERRY JANKOWSKI; SUSAN HANSEN; DAVID HERMAN;
OPTIMUM GRAPHICS, INC.; JOHNSON POOL & SPA,
on Behalf of Themselves and All Others Similarly Situated,

*Plaintiffs-Appellants,*

*v.*

SUTTER HEALTH,

*Defendant-Appellee.*

────────────

*On Appeal From the United States District Court
for the Northern District of California
Case No. 3:12-cv-04854-LB,
The Honorable Laurel D. Beeler, Magistrate Judge*

## BRIEF FOR PLAINTIFFS-APPELLANTS

Matthew L. Cantor
　*Counsel of Record*
Jean Kim
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

James J. Kovacs
J. Wyatt Fore
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, NW
Suite 1300N
Washington, D.C. 20004
202-204-3500

Azra Z. Mehdi
THE MEHDI FIRM, PC
95 Third Street, 2nd Floor, No. 9122
San Francisco, California 94103
415-905-88809

David C. Brownstein
David M. Goldstein
FARMER BROWNSTEIN JAEGER
　GOLDSTEIN KLEIN & SIEGEL, LLP
235 Montgomery Street, Suite 835
San Francisco, California 94104
415-795-2050

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
　ALVAREZ & SMITH LLP
235 Pine Street, 15th Floor
San Francisco, California 94104
415-421-3400

Jill Manning
PEARSON, SIMON & WARSHAW, LLP
555 Montgomery Street, Suite 1205
San Francisco, California 94111
415-333-9000

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Respondents Djeneba Sidibe, Jerry Jankowski, Susan Hansen, and David Herman are not a "corporate party," do not issue stock, and are not controlled by any publicly held corporation. Plaintiff-Respondent Optimum Graphics, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock. Plaintiff-Respondent Johnson Pool & Spa is the operating entity under the private corporate entity Johnson Pools, Inc.; no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ......................................................1

INTRODUCTION .................................................................................1

ISSUES PRESENTED...........................................................................6

STATUTORY PROVISIONS ................................................................7

STATEMENT OF THE CASE ..............................................................7

I.      Industry Background .................................................................7

II.     Factual Background ...............................................................11

III.    Procedural History .................................................................23

      1.     Case Filing and Erroneous Dismissal. .................................23

      2.     The Substantially Similar State Cases...................................24

      3.     The Summary Judgment Order Holding That the Health Plans Are the Relevant Purchasers. ................................................25

      4.     Class Certification Orders Relying on Pre-2006 Evidence.................27

      5.     The Summary Judgment Order Relying on Pre-2006 Evidence.........27

      6.     Court's Reversal on the Relevant Purchaser Issue...........................29

      7.     The Court's Reversal in Evidentiary and Pre-Trial Rulings. ..............30

            a.     Exclusion of Pre-2006 evidence. ...........................30

            b.     Exclusion of Post-2006 Strategy Advantage Evidence. ..........38

            c.     Denial of Sanctions for Sutter's Destruction of Pre-2006 Evidence..............................................................38

      8.     The Court's Rulings Related to Anticompetitive Purpose.................40

      9.     The Court's Rulings Related to the Relevant Purchaser....................41

      10.    The Verdict and Final Judgment. ........................................44

SUMMARY OF ARGUMENT ..................................................................44

STANDARD OF REVIEW ....................................................................46

ARGUMENT ........................................................................................47

I.      The District Court Erred by Broadly Excluding Critical Evidence. ............47

        A.      The Excluded Evidence Was Neither Irrelevant Nor Collateral: It
                Was Probative of Key Issues.................................................48

        B.      The Excluded Evidence Should Not Have Been Excluded Under
                Rule 403. ...........................................................................56

        C.      Excluding This Critical Evidence Was Prejudicial to Plaintiffs. .........58

II.     The District Court Erred by Failing to Instruct the Jury to Determine
        Whether Sutter Had an Anticompetitive Purpose in Imposing the
        Challenged Restraints. .......................................................................58

III.    The District Court Erred by Failing to Identify Health Plans as the
        Relevant Direct Purchasers. .................................................................60

        A.      In Indirect Purchaser Cases, Juries Should Be Instructed to
                Evaluate Market Definition, Market Power, and Tying From the
                Perspective of Direct Purchasers. ..........................................61

        B.      As a Matter of Antitrust Law and Settled Economics, Health Plans
                Are the Relevant Purchasers for the Jury to Consider. .....................65

        C.      The District Court Erred in Holding That Determining the
                Relevant Purchaser Was a Factual Issue...............................67

        D.      The District Court Erred by Allowing Sutter's Expert to Testify
                in a Manner That Contravened the Settled Way to Define
                Hospital Markets. ................................................................69

IV.     Plaintiffs Request a New Trial...............................................................70

CONCLUSION .......................................................................................72

## TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Fed'n of Musicians of United States & Canada v. Paramount Pictures Corp.*,
  903 F.3d 968 (9th Cir. 2018) ................................................................46

*Am. Tobacco Co. v. United States*,
  328 U.S. 781 (1946)..........................................................................51

*Aryeh v. Canon Bus. Sol., Inc.*,
  55 Cal. 4th 1185 (2013) ......................................................................49

*Barranco v. 3D Sys. Corp.*,
  952 F.3d 1122 (9th Cir. 2020) .............................................................47

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
  963 F.3d 859 (9th Cir. 2020) ........................................................ 46, 47

*California v. Sutter*,
  84 F. Supp. 2d 1057 (N.D. Cal. 2000)..................................................33

*Cascade Health Solutions v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ..............................................................67

*City of Long Beach v. Standard Oil Co. of Cal.*,
  46 F.3d 929 (9th Cir.1995) .................................................................47

*Classen v. Weller*,
  145 Cal. App. 3d 27 (1983) ................................................................52

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)................................................................ 50, 51, 55

*Corwin v. L.A. Newspaper Serv. Bureau*,
  22 Cal. 3d 302 (1978) ........................................................... 49, 50, 59

*Corwin v. L.A. Newspaper Serv. Bureau*,
  4 Cal. 3d 842 (1971) ............................................................... 4, 50, 52

*Crawford v. City of Bakersfield*,
  944 F.3d 1070 (9th Cir. 2019) ........................................................ 48, 49

*Dimidowich v. Bell & Howell*,
  803 F.2d 1473 (9th Cir. 1986) .................................................49

*Dong Ah Tire & Rubber Co., Ltd. V. Glasforms, Inc.*,
  No. C 06-3359 JF (RS), 2009 WL 1949124 (N.D. Cal. July 2, 2009) ................72

*Drozd v. McDaniel*,
  No. 21-35584, 2022 WL 819786 (9th Cir. Mar. 17, 2022) ..................................47

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ........................................................ 54, 66

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022) ...................................66

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) ...................................66

*FTC v. Sanford Health*,
  926 F.3d 959 (8th Cir. 2019) .................................66

*Gametech Int'l Inc. v. Trend Gaming Sys., L.L.C.*,
  232 F. App'x 676 (9th Cir. 2007) .........................................56

*Gantt v. City of Los Angeles*,
  717 F.3d 702 (9th Cir. 2013) ........................................................ 46, 61

*Giles v. Gen. Motors Acceptance Corp.*,
  494 F.3d 865 (9th Cir. 2007) ................................................49

*Glover v. BIC Corp.*,
  6 F.3d 1318 (9th Cir. 1993) ...............................................71

*GN Netcom, Inc. v. Platronics, Inc.*,
  930 F.3d 76 (3d Cir. 2019) ...............................................58

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968)...............................................55

v

*Harrington v. Scribner*,
785 F.3d 1299 (9th Cir. 2015) ...............................................................59

*High Tech. Careers v. San Jose Mercury News*,
996 F.2d 987 (9th Cir. 1993) .................................................................68

*In re California Gasoline Spot Market Antitrust Litig.*,
No. 20-cv-03131-JSC, 2022 WL 3215002 (N.D. Cal. Aug. 9, 2022)..................61

*In re Cipro Cases I & II*,
61 Cal. 4th 116 (2015) ...........................................................................50

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)................49

*Jerden v. Amstutz*,
430 F.3d 1231 (9th Cir. 2005) ...............................................................47

*L.A. Mem'l Coliseum Comm. v. Nat'l Football League*,
726 F.2d 1381 (9th Cir. 1984) ...............................................................61

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) ......................................................... 47, 58

*Ohio v. American Express*,
138 S. Ct. 2274 (2018)................................................................. 62, 67

*Olean Wholesale Grocery Coop, Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ......................................................... 50, 62

*Pac. Coast Agric. Exp. Ass'n v. Sunkist Growers, Inc.*,
526 F.2d 1196 (9th Cir. 1975) ...............................................................50

*Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*,
682 F.2d 802 (9th Cir.1982) ..................................................................72

*PLS.com v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) ..................................................................68

*Samsung Elecs. Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) ....................................................... 49, 56

*Sidibe v. Sutter Health*,
   No. 12-cv-04854-LB, 2019 WL 2078788 (N.D. Cal. May 9, 2019) ........... *passim*

*Sidibe v. Sutter Health*,
   No. 12-cv-04854-LB, 2020 WL 4368221 (N.D. Cal. July 30, 2020) .......... *passim*

*Sidibe v. Sutter Health*,
   No. 12-cv-04854-LB, 2021 WL 879875 (N.D. Cal. Mar. 9, 2021) ............ *passim*

*Sidibe v. Sutter Health*,
   333 F.R.D. 463 (N.D. Cal. 2019) ................................................................. *passim*

*St. Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health Sys.*,
   778 F.3d 775 (9th Cir. 2015) ....................................................................... *passim*

*Tattersalls, Ltd. v. DeHaven*,
   745 F.3d 1294 (9th Cir. 2014) .............................................................................46

*Telcor Communications, Inc. v. Southwestern Bell Telephone Co.*,
   305 F.3d 1124 (10th Cir. 2002) ..................................................................... 63, 64

*Thurmond Industries v. Pay 'n' Pak Stores*,
   875 F.2d 1369 (9th Cir. 1989) .............................................................................68

*UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*,
   169 Cal. App. 4th 357 (2008) ........................................................................ 52, 66

*United States v. Apple*,
   791 F.3d 290 (2d Cir. 2015) ................................................................................50

*United States v. Cherer*,
   513 F.3d 1150 (9th Cir. 2008) .............................................................................57

*United States v. Curtis*,
   568 F.2d 643 (9th Cir. 1978) ..............................................................................48

*United States v. Evans*,
   728 F.3d 953 (9th Cir. 2013) (vacating ..............................................................49

*United States v. Haischer*,
   780 F.3d 1277 (9th Cir. 2015) ............................................................................56

*United States v. Hankey*,
  203 F.3d 1160 (9th Cir. 2000) ...............................................................56

*United States v. Microsoft*,
  253 F.3d 342 (D.C. Cir. 2001 ...............................................................63

*United States v. W.R. Grace*,
  504 F.3d 745 (9th Cir. 2007) ...............................................................46

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ........................................................... 47, 67

*Vasquez v. Indiana University Health*,
  40 F.4th 582 (7th Cir. 2022) ...............................................................66

*Wilk v. Am. Med. Ass'n*,
  719 F.2d 207 (7th Cir. 1983) ...............................................................59

## Statutes

Cal. Bus. & Prof. Code § 16750(a).........................................................61

## Rules

Cal. R. Ct. 8.548(a) .............................................................................69

Fed. R. Evid. 401 and 402.............................................................. 48, 49

Fed. R. Evid. 403 ........................................................... 30, 32, 49, 56, 70

Fed. R. Evid. 702 ...............................................................................69

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the federal antitrust claims under 28 U.S.C. §§ 1331 and 1337. The court also had supplemental jurisdiction over the pendant California state law claims under 28 U.S.C. §§ 1332(d) and 1367. The court entered a final judgment disposing of all parties' claims on March 29, 2022. 1-ER-2–6. Plaintiffs noticed this appeal on April 26, 2022. 6-ER-1080–86. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## INTRODUCTION

Plaintiffs-Appellants represent a certified Class of millions of businesses and individuals who paid inflated health insurance premiums because of Defendant-Appellee Sutter Health's anticompetitive conduct.[1] They sued under California's Cartwright Act, asserting claims for unreasonable restraints of trade and per se illegal tying, which were tried to a jury. During pre-trial proceedings and trial, the district court (Beeler, M.J.) committed substantial errors, barring the jury from seeing vast amounts of critical evidence and depriving it of necessary instructions under settled law—resulting in a verdict adverse to Plaintiffs. Plaintiffs appeal

---

[1] The Class comprises Northern California employers and individuals who paid health insurance premiums to Aetna, Anthem Blue Cross, Blue Shield of California, Health Net, and United Healthcare (collectively, the "Class Health Plans").

1

those erroneous decisions and that adverse jury verdict. Excerpts of Record ("ER") 1-ER-2–139.

* * *

This case concerns systemwide, "all or none" contract practices that Sutter forced on health plans (i.e., insurers) to reap supra-competitive hospital prices. It concerns how Sutter, which owns the "only game in town" hospital in numerous Northern California markets, decided, in the late 1990s, to make a sea change in how it contracted to participate in health insurance provider networks.

From that point on, rather than continue to contract with health plans on a hospital-by-hospital basis, Sutter decided to give them an "all or none" ultimatum. It told them that, if they did not submit to a single, systemwide contract for *all* Sutter hospitals, they would get *none of them* for their networks.

Sutter deployed this strategy for a single anticompetitive reason: to "increase[]" its "leverage" over health plans and, thereby, achieve "better pricing." 2-ER-177–79; 2-ER-246:12–247:19. And Sutter had no doubt that this strategy would work, predicting that it would result in additional revenues of about $200 million per year. 2-ER-181–83.

By 2002, all the Class Health Plans acquiesced to Sutter's "all or none" demands and began to pay much higher hospital prices to Sutter, just as Sutter expected. 2-ER-412 (expert analysis comparing Sutter hospital prices before and

2

after imposition of systemwide contracts); *see also* 7-ER-1326–27 (Sutter's future CEO admitting in 2006 that "it force[s]" health plans "to pay us more").

But that was not all Sutter did. To ensure that its prices would stay high, Sutter used its "all or none" tactics to force new, anticompetitive contract clauses on health plans. These clauses, all first imposed by 2005, effectively prevented Class Health Plans from steering their enrollees away from Sutter to lower-priced, quality hospitals.

Sutter forced the Class Health Plans to enter into these anticompetitive, systemwide contracts for many years. And, by doing so, it caused them to pay supra-competitive hospital prices throughout that time. This harmed the Class Members because Sutter's inflated prices were passed on to them in the form of higher insurance premiums.

By 2012, Plaintiffs sued, asserting an antitrust theory substantially similar to one that the State of California and another class later asserted and successfully litigated against Sutter. But while the law governing these cases was the same, their outcomes were not, given repeated errors by the court below. It first dismissed the suit entirely, requiring a reversal. Then, after explaining its "skepticism" over this reversal, it sent the case to trial, but only after issuing Orders contrary to law and numerous rulings that it previously rendered in Plaintiffs' favor.

The court committed three primary errors that doomed Plaintiffs' case. ***First,*** it erroneously barred the jury from seeing or hearing evidence prior to January 1, 2006, *including all the evidence cited above*, as "irrelevant," "compound" and "confusing." No contemporaneous *admissions* from Sutter executives that it could and, indeed, did force health plans into these arrangements were allowed at trial. Nor was the evidence concerning Sutter's rationale for and initial implementation of its systemwide restraints. The jury was barred from seeing over 100 pieces of evidence from before 2006 – a cut-off date that the court admitted was "arbitrary" – contrary to California law that holds that the "purpose" of restraints and evidence from "before and after" they were imposed is crucial to an analysis under antitrust's Rule of Reason. *Corwin v. L.A. Newspaper Serv. Bureau*, 4 Cal. 3d 842, 854 (1971).

Remarkably, the court excluded this evidence after repeatedly relying on it. In fact, it relied on over 50 pieces of pre-2006 evidence in its summary judgment and class Orders, showing that such evidence was neither "irrelevant" nor "confusing."

***Second,*** the court erred by failing to instruct the jury to determine, as a necessary element of Plaintiffs' Rule of Reason claim, whether Sutter's restraints were motivated by an anticompetitive purpose, violating settled California law and jury instructions. The court erased the word "purpose" from the form instructions

4

without explanation, and, consequently, failed to advise the jury to conduct the analysis that California law unambiguously requires.

**Third,** on the threshold issues of market definition, market power and tying, the court issued instructions that (1) ignored settled legal and economic principles and (2) were incomprehensible for lay jurors. Those principles hold that, in a hospital market power case – particularly one brought by indirect purchasers such as this one – these issues must be analyzed from the perspective of direct purchaser health plans. This means that, to assess the relevant market here, jurors had to focus on the hospital options available to health plans, not to patients. That is because, in health care markets, prices are determined through negotiations when hospitals (or other providers) are sellers and *health plans are buyers*—because only health plans (not patients) negotiate with hospitals over prices and enter into network contracts with them. *See, e.g.*, *St. Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775 (9th Cir. 2015) ("*St. Luke's*"). For these reasons, Plaintiffs asserted relevant markets for inpatient hospital services ("IHS") *sold to commercial health plans.*

Earlier in the case, the court correctly identified health plans as the relevant purchasers for antitrust analysis. But it refused to do that for the jury. Accordingly, the jury was left adrift over how to assess the concepts of relevant markets and market power. And Sutter was given legally impermissible leeway to

5

confuse the jury (through the sheen of expert testimony no less) by directing it to focus on patient, rather than health plan, options when assessing these issues. As a result, the jury was never asked to answer the questions raised by Plaintiffs' claims: whether the asserted relevant markets for IHS sold to *health plans*, as opposed to patients, existed and, if so, what Sutter's position was in *those* markets.

To accurately assess whether the Cartwright Act has been violated, jurors cannot be prevented from seeing evidence about the defendant's purpose to achieve anticompetitive goals through the exercise of market power. They also cannot be confused with arguments that have been consistently rejected in hospital market power cases. This Court should reverse and remand for a new trial.

### ISSUES PRESENTED

1. Whether the court erred in excluding vast amounts of evidence, including Sutter admissions, from when Sutter designed and first imposed the anticompetitive restraints at issue, including evidence of (1) Sutter's market power; (2) the anticompetitive purpose of those restraints; and (3) the anticompetitive effects that they caused.

2. Whether the court erred by refusing to instruct the jury that it must determine whether Sutter's conduct was motivated by an anticompetitive purpose when assessing Plaintiffs' Cartwright Act claim under the Rule of Reason.

3. Whether the court erred in refusing to hold and/or instruct the jury that the

relevant purchasers in this case – for purposes of assessing market definition, market power, and tying – are health plans (who negotiate prices and pay for hospital services) rather than individual patients.

## STATUTORY PROVISIONS

The Addendum reproduces the pertinent statutory provisions.

## STATEMENT OF THE CASE

### I.    Industry Background

United States hospitals compete in two distinct stages.  At the first stage, they compete by bargaining with health plans to be included in their provider networks.  At the second stage, they compete by enticing patients, including commercially insured enrollees, to choose their hospital services.  Gregory Vistnes, *Hospitals, Mergers and Two-Stage Competition*, 67 Antitrust L.J. 671, 678, 681-82, 692 (2000).  This case is about how Sutter leveraged its substantial market power at the first stage of hospital competition to force health plans to pay higher prices—higher prices that were passed on to Class Members.

1.  The line between these two stages is seen through common experience, and in established economic literature and precedent.  At the first stage, hospitals compete to be included in provider networks that health plans assemble for the benefit of their enrollees.  A hospital wants to be included in such networks so that a greater volume of the health plans' enrollees will choose that hospital for treatment.  A health plan's choice to include hospitals in its network is based on

several factors, including the prices the hospitals charge, the quality of their services, and patient insistence for them. 7-ER-1402–04 (*Sidibe v. Sutter Health*, 2019 WL 2078788, at *4-5 (N.D. Cal. May 9, 2019)).

Notably, the only breaks given on hospital prices occur at the first stage— where hospitals enter into network contracts with health plans. As Sutter's expert, Dr. Gautam Gowrisankaran, previously explained to this Court, "the locus of price competition for healthcare providers is [] centered on competition among providers for inclusion in insurers' networks." *Amici Curiae* Br. of Economics Professors, ECF No. 80-1, *St. Alphonsus Med. Ctr. – Nampa, Inc. v. St. Luke's Health Sys.*, No. 14-35173, at 10 (9th Cir. Aug. 20, 2014); 5-ER-949:16–950:9.

Given this competitive dynamic, if there are multiple hospital options in a market, hospitals offer lower prices to avoid being excluded from health plan networks, or, if included, from having the health plans "steer" their enrollees away from them (to lower-priced, quality hospital options). Conversely, if there is a "must have" local hospital available in a market, that local hospital has "market power" over health plans and can impose higher prices and onerous contract terms. 7-ER-1397–98.

Unlike health plans, patients do not seek to purchase the entire bundle of any hospital's services; rather, they choose in-network hospitals for particular procedures. And they rarely make this choice on the basis of price because they

8

are not directly paying the costs for these procedures. As the court explained, "[w]hile hospital services are delivered to the health plan's enrollees (i.e., patients), the health plan buys the services that the hospital sells." 7-ER-1403 (citing *St. Luke's*, 778 F.3d at 784).

Since health plans, not patients, directly pay for hospital services, economists and courts focus on the purchasing behavior of health plans when defining hospital markets. "[B]ecause patients are 'largely insensitive' to price, antitrust analysis focuses on the interactions between hospitals and health plans, not hospitals and patients." 7-ER-1442 (citing *St. Luke's*, 778 F.3d at 784 n.10).

2. When hospitals with market power impose supra-competitive prices and anticompetitive terms on health plans, however, they harm consumers downstream. That is because "in network" hospital access is provided by health plans in exchange for payment of a premium,[2] which is paid by either the enrollee's employer, a member of the enrollee's family, and/or the enrollee. That premium is comprised of a projected, blended average of all the medical, including hospital,

---

[2] In non-emergency situations, commercially insured patients who visit a health plan's out-of-network, rather than in-network, hospitals, generally pay higher out-of-pocket costs for their visit. *See generally* 7-ER-1351–52 (*Sidibe v. Sutter Health*, 333 F.R.D. 463, 475-76 (N.D. Cal. 2019)).

costs that a health plan expects to incur in the upcoming year. That projection is based on the health plan's historical experience paying those same costs.

Accordingly, when hospital expenses for a health plan go up, premiums go up too – these expenses are "passed on." 4-ER-843:19–844:23 (actuarial expert: hospital costs are included in premium calculation under actuarial principles and regulations, including the Affordable Care Act); 5-ER-1067 (Sutter "reli[es] upon . . . pooling [its] more expensive product offering with lower-cost non-Sutter providers in an insurance wrapper"); 5-ER-986 (showing medical expenses included in premium); 5-ER-897:3–899:24. Premium payers – the Class Members here – are thus "*indirect* purchasers" of hospital services, *see* 3-ER-501–02 (*Sidibe v. Sutter Health*, 2020 WL 4368221, at *9-10 (N.D. Cal. July 30, 2020) (emphasis added)), who suffer harm when hospitals engage in anticompetitive practices that raise price.

3. In Northern California, hospitals owned by one healthcare company – Kaiser Permanente – operate outside this two-stage paradigm. Kaiser is a "closed" health insurance company that owns both a health plan and its own network of hospitals and providers. Patients covered by non-Kaiser health plans cannot access Kaiser hospitals in-network; only enrollees covered by the Kaiser Health Plan can access them. And that is because Kaiser hospitals have never offered to participate in non-Kaiser health plan networks; they do not sell their services, in network, to

10

non-Kaiser health plans. 5-ER-952:17–954:15 ("Q. Kaiser hospitals do not compete for inclusion in networks offered by Blue Shield; right? A. That's right" and same for Aetna, Anthem, Health Net, United); 5-ER-924:7-10; 7-ER-1469:24–1470:9; 7-ER-1488:1-4; 5-ER-867:4-14; 5-ER-852:2-6; 7-ER-1501:20-1502:10.

This means that health plans cannot "substitute" Kaiser hospitals for other hospitals. 7-ER-1523:5–1524:10. Therefore, health plans could not drop Sutter and switch to Kaiser when Sutter raised prices or imposed anticompetitive terms. 5-ER-965:24–966:11.

## II. Factual Background

1. Sutter owns twenty-four hospitals in Northern California. In several geographic markets, those hospitals are the "only game in town." To profitably market and sell health insurance in those markets, health plans need to include these Sutter hospital in-network.

These hospitals include Sutter's rural hospitals in Crescent City, Lakeport, and Amador, which are the "sole practical resource[s]" for acute and emergency care in their communities. *See* 5-ER-1041; 5-ER-992 ("Rural Hospital" is the "sole practical resource"); 5-ER-926:15-17; 8-ER-1607; 12-ER-2494. They also include "must have" hospitals necessary for health plans to offer a marketable product, such as Sutter's Alta Bates and Summit hospitals in Berkeley/Oakland. *See* 7-ER-1587 (United: "hospital services [are sold] in the following submarkets .

11

. . Berkeley, Oakland . . .”); 5-ER-904:24-908:16 (Sutter has a “stranglehold”
there); 7-ER-1468:11-23 (“Alta Bates . . . in Oakland was . . . critical to being
marketable to employer groups.”); 7-ER-1487:4-17 (“[Alta Bates] was a must have
. . . .”). As Aetna put it, Sutter is “often . . . one of two options
. . . in a given area” and as a result, “[t]hey are the true 800 pound gorilla.” 7-ER-
1586.[3]

    2. Throughout “the 1990s, as a general matter each Sutter hospital . . .
negotiated its own contract with network vendors.” 2-ER-238.[4] In the late 1990s/
early 2000s, however, Sutter realized it could leverage its “must have” hospitals to
force health plans to accept other anticompetitive contract terms and to pay supra-

---

    [3] Tying involves conditioning the purchase of one product (the “tying”
product) on the purchase of another (the “tied” product). *See infra* part III.5.
Plaintiffs alleged eleven relevant geographic markets, seven Tying Markets
(defined as the Crescent City, Jackson, Lakeport, Auburn, Tracy, Antioch and
combined Berkeley/Oakland Hospital Service Areas as drawn by *The Dartmouth
Atlas of Healthcare* (“HSAs”)) and four Tied Markets (the San Francisco,
Sacramento, Modesto, Santa Rosa HSAs). 7-ER-1522:2-20; 3-ER-557–59; 5-ER-
1070–76; 7-ER-1592–1600; 7-ER-1529:16–1567:3. In Tying Markets, the Sutter
hospital had significant market power because there are few or no other hospital
alternatives for health plans. In Tied Markets, there are alternatives to Sutter
hospitals and health plans can steer their enrollees away from Sutter. 7-ER-
1522:10-20; *see also* 3-ER-551.

    [4] Highlighted citations reference evidence that the court excluded from trial.

competitive prices at its other hospitals. To do so, it "began requiring health plans to enter into 'systemwide contracts.'" 7-ER-1347.

At that time, Sutter hospitals stopped contracting with health plans individually. This made it impossible for health plans to include *any* Sutter hospitals in their networks unless they agreed to a single, systemwide contract with *all* of Sutter's hospitals—including those located where they had no hospital choice. All the health plans acquiesced to this systemwide demand.

Consider the experience of Anthem Blue Cross. In 2001, Sutter terminated all individual hospital contracts with Anthem and demanded a systemwide contract. 7-ER-1311:21–1312:5. "[Sutter] was pretty clear. It was, 'You need to contract with all of us or we don't have a contract.'" 3-ER-519:8-22. Anthem tried to resist without a Sutter contract, but "folded" to Sutter's demands after only six weeks. 3-ER-470 (*Sidibe v. Sutter Health*, 2021 WL 879875, at *2 (N.D. Cal. Mar. 9, 2021)).

Sutter then deployed the same strategy against other Class Health Plans. They too were coerced into contracting with Sutter's entire system of hospitals under one contract. According to Blue Shield, "beginning with the negotiations leading to the 2002 Systemwide . . . inclusion of one Sutter hospital suddenly required inclusion of all Sutter hospitals . . . , and one systemwide agreement would govern all of the relationships between Blue Shield and each Sutter

13

provider." 2-ER-372–74; *see also* ER-359–62; 2-ER-383–402. Likewise, Health Net explained that "[Sutter] told us [around 1999] that they were about to start negotiating as a system and they would be terminating all our Health Net contracts with all the Sutter affiliates." 2-ER-408:2-15. "It was not a discussion . . . we were told that that's what was going to happen." 2-ER-408:18-23.

At that time, Sutter drafted a unique "model" systemwide template contract that it would insist health plans use. 2-ER-201–04. "[N]o other provider in California" used its own template, 7-ER-1504:7-18, because health plans typically used their own. *See* 7-ER-1469:11-23; 7-ER-1480:12–1481:13. Class Health Plans confirmed that Sutter alone had the leverage to make such a demand. *See, e.g.*, 7-ER-1504:7-18.

Evidence from the late 1990s/early 2000s confirms that Sutter moved to systemwide contracting for the purpose of exercising market power over, and extracting supra-competitive prices from, the Class Health Plans. A 1997 Sutter strategy memo stated that Anthem "can be expected to resist system-wide negotiations **because of the increased leverage** that twenty-one hospitals can achieve by working together." 2-ER-177–78 (emphasis added). Sutter's former CFO and chief architect of systemwide contracting, Robert Reed, admitted that Sutter imposed systemwide contracts to get "better pricing." 2-ER-246:12–247:19. Mr. Reed touted, in a 1998 memo, that Sutter would reap substantial, additional

14

revenue from systemwide contracting. He concluded that "[t]he estimated future benefit when" – not if – "all HMOs and PPOs contract on a system basis is estimated at $198,000,000 per year." 2-ER-183.

Sutter was able to secure systemwide contracts (and the higher prices that it generated) by coercing the health plans. Sutter business consultant documents show that future Sutter CEO Sarah Krevans told a business consultant that "[r]elated to the health plans, we **force** them to pay us more." 7-ER-1326 (emphasis added). "They do pay us more, and they don't like us . . . . **Mainly, we pushed them because we could**." 7-ER-1326–27 (emphasis added).

3. Sutter did not stop at merely forcing systemwide contracts on health plans; it used these contracts to impose anticompetitive terms as well. These terms, the so-called "Equal Treatment," "Tiered Products," and "Non-Par Rate" clauses, are archetypical anti-steering provisions designed to insulate Sutter from price competition, specifically in markets where competitors charged health plans lower hospital prices.

By the early 2000s, many employers and individuals began to demand lower-premium health insurance products. However, health plans faced a problem: they could not offer these lower-premium products unless they could concomitantly lower the cost of their enrollee's health care, for which they had to

15

pay. This was difficult because their enrollees did not generally consider the price of services when choosing hospitals.

So, health plans came up with a solution. They began to develop "narrow" and "tiered" network products that incentivized enrollees to visit lower-priced, quality hospitals. These products aim at keeping health plan costs down so that health plans could offer lower-premium options to consumers. *See, e.g.*, 5-ER-1037–38 (Anthem sought to introduce narrow and tiered products to control the "surge in health care costs, particularly hospital costs.").

"Narrow" network products do this by excluding higher-priced hospitals from the covered network altogether. "Tiered" network products use a monetary incentive structure to steer enrollees away from higher-priced to lower-priced hospitals: they often offer enrollees lower co-payments if they visit lower-cost hospitals placed in a preferred or first tier. *See, e.g.*, 3-ER-472.

These products, when deployed, spurred fierce price competition: hospitals often gave discounts to participate in these products to ensure that patient volume would not be steered away from them. 5-ER-934:4-19 (UC Davis offered discounted rates to participate in narrow networks); 5-ER-859:16-22 (Adventist lowered its rates to get access to health plans' narrow networks); 7-ER-1498:6-17 (U.C.S.F. witness stating same); 5-ER-974:11–975:13 (Sutter expert, Dr. Robert Willig: hospitals "negotiat[e] lower prices . . . in exchange for . . . patient

volumes."). These products stopped hospitals from significantly increasing their prices. Sutter itself relied upon this industry dynamic in 1999 when, as a defendant in an antitrust case brought by the California Attorney General regarding Sutter's then-proposed acquisition of Summit Hospital (in the East Bay), it argued that these products would prevent Sutter from raising Summit's prices post-merger. 2-ER-188–99 & ¶ 30; *see also* 2-ER-189–91 (Sutter's expert opined that redirecting a small percentage of patients away from Sutter "would be sufficient to prevent a 5% price increase"). The lower hospital prices generated by these narrow and tiered network products enabled health plans to offer lower-premium insurance products.

But Sutter would have none of it. Correctly perceiving these lower-cost products as a threat to its ability to charge supra-competitive prices, Sutter used its market power to substantially hinder their growth in Northern California. It did so because it was concerned that their proliferation would cause the hospital "price environment" to "drop," forcing Sutter to drop its prices, too. *See* 5-ER-989; 5-ER-890:1-13. Accordingly, between 2001 and 2005, Sutter began demanding that health plans accede to provisions in systemwide contracts that prevented steering and hospital tiering.[5] 7-ER-1347–51, nn.18-24 (citing evidence of Sutter imposing

---

[5] Sutter also insisted on price secrecy clauses that prevented health plans from telling their members about Sutter's higher prices. *See, e.g.*, 5-ER-856:6-18; 5-ER-878:12–879:18*;* 7-ER-1473:24–1474:10.

17

terms, including equal treatment anti-steering provisions, over health plan objections); 2-ER-404–05 (2003 Health Net letter objecting to "enforcement [of equal treatment provision] by Sutter in a manner that would suppress competition . . ."); 2-ER-288–89 ("equal treatment" anti-steering term in 2004 Anthem draft contract); 2-ER-255 ("equal treatment" and anti-tiering term in 2005 Aetna contract); 2-ER-222 ("equal treatment" and tiered products/anti-tiering term in 2004 United contract); 5-ER-919:25–920:17 (Sutter Chief Contracting Officer Melissa Brendt admitting that equal treatment provisions stopped steering); 5-ER-876:18–877:7 (Sutter anti-tiering provisions "negatively impacted" Blue Shield's ability to issue tiered network products).[6]

Then, by 2004, Sutter further leveraged its market power by insisting upon a "non-par" penalty provision that made it impossible for health plans to construct lower-premium networks that excluded (or tiered) Sutter hospitals. *See* 7-ER-1475:17-24 ("[T]he penalty provision . . . was so egregious that no matter what provider network configuration [Aetna] tried to create in Northern California, we could never achieve the price differential that was needed to make the product

---

[6] Health plans wanted to place Sutter high-priced hospitals in non-preferred tiers, but Sutter would almost always refuse to allow tiering for its hospitals. During the term of a contract, Sutter's anti-tiering clauses prevented health plans from doing so, unless Sutter agreed otherwise, which it very rarely, if ever, did. *See* 5-ER-853:2–855:15; 7-ER-1471:2-8; 7-ER-1489:24–1490:1.

attractive to a purchaser."); 7-ER-1491:5–1492:12, 1493:6-23 (same for other

insurers). "[H]ealth plans could not build [lower-premium] narrow networks that

excluded Sutter because there were no costs saved in the narrow network

(compared to a network that included Sutter hospitals)" due to this provision. 3-

ER-470.

Here's how the "non-par" penalty provision worked. In healthcare, many

patients end up at out-of-network hospitals for non-economic reasons. 7-ER-

1347–48. They may be unconscious or in dire circumstances; no ambulance will

take a heart-attack patient who needs immediate stenting to a more-distant

hospital—even if only a few minutes are at stake. In such emergency scenarios,

health plans generally pay so-called non-contracted "reasonable and customary"

rates for hospital services. 5-ER-869:23–870:21.

But in 2004, Sutter started using its systemwide contract to impose

*contractual*, out-of-network (or "non-participating") rates that were substantially

higher than the non-contractual, reasonable and customary charges health plans

paid for out-of-network services at other hospitals. 2-ER-273; 2-ER-284; 2-ER-

368. Simply put, these rates were "a lot more than what [insurers would] normally

pay" for out-of-network services elsewhere. 7-ER-1507:18-24; *see also* 7-ER-

1497:1-4; 5-ER-869:12–873:15. Sutter thus began to use its contracts to impose

not only higher in-network prices, but exorbitant out-of-network prices as well.

19

The higher non-par, out-of-network rates that Sutter required for emergency, out-of-network services, like all medical expenses, were passed on to premium payers. Accordingly, they caused premiums for narrow network products to be much higher than they otherwise should have been when health plans tried to exclude higher-priced Sutter hospitals from them. This hindered their growth, because no consumer is going to buy a narrow network product, which limits the hospitals that they can choose, unless that product offers a lower premium. *See* 5-ER-976:3-10 (for narrow networks to be "successful," they must offer lower premiums).

In fact, Sutter's non-par rates were so high that health plans often concluded that it made no business sense to launch narrow networks that they had considered. *See* 7-ER-1591 ("Sutter penalty significantly wipes out savings" and made it very difficult for health plans to launch narrow and tiered networks because they would not be affordable); 3-ER-470.

As the timeline below shows, Sutter imposed systemwide contracting and all of its anticompetitive clauses on the Class Health Plans before January 1, 2006.

20



2-ER-175.

Expert analysis confirmed that Sutter's practices resulted in higher prices. Dr. Tasneem Chipty – who was the expert for the United States in a prior case concerning hospital-imposed anti-steering clauses (*see* 7-ER-1516:16–1521:22) – studied pricing data from the periods before and after Sutter imposed systemwide contracts to determine whether that move had any impact on Sutter's hospital prices. That study showed that prices at Sutter's Tied and Alta Bates Hospitals, skyrocketed relative to benchmarks of other Northern California hospitals by 2002, once systemwide contracting was imposed on the Class Health Plans—and remained higher thereafter. 2-ER-412.

4. The anticompetitive contracting strategy that Sutter launched in the pre-2006 period stuck hard thereafter. From 2006 on, Sutter continued to force Class

21

Health Plans to submit to its systemwide, anticompetitive contracts. 8-ER-1605–1755; 9-ER-1757–1997; 10-ER-1999–2247; 11-ER-2249–2490; 12-ER-2492–2727. Health plans attempted to resist Sutter's contractual practices, but no plan was successful in getting even one of Sutter's anticompetitive terms dropped. *See, e.g.*, 5-ER-874:1-7; 5-ER-853:20-24; 7-ER-1510:1-16. The threat of losing individual, must-have Sutter hospitals was simply too great. *See* 5-ER-868:3-23; 7-ER-1471:18–1472:5; 7-ER-1482:19-1483:7; 7-ER-1483:15-20; 7-ER-1508:5-15; 7-ER-1492:2-5. As one witness testified, "[United] wanted to approach each market, each geography individually . . . . everything sort of gets forced into that one agreement, whether we'd like it to or not." 7-ER-1503:11–1504:3.

Having used these practices to cause anticompetitive effects, Sutter's ongoing conduct continued to sustain them. Regression analyses from the 2009-2017 period demonstrate that the inflated prices that Sutter first imposed in the early 2000s persisted for many years. *See, e.g.*, 7-ER-1601; 7-ER-1574:11–1575:6. And other expert analysis shows that Sutter's conduct continued to strangle the growth of the tiered and narrow network products that Northern Californians wanted. While these products flourished in Southern California, they grew at a snail's pace in Northern California. *See* 7-ER-1602 (comparing growth rates of Anthem narrow/tiered products in Southern and Northern California); 7-ER-1570:7–1573:25.

22

5. Sutter imposed these practices upon health plans for approximately two decades. But, in the end, the Class Members paid the bulk of the inflated hospital prices, because insurers base premiums on their medical expenses. *See, e.g.*, 4-ER-843:4–846:18; *see also* 5-ER-893:1-13; 5-ER-1078. Dr. Chipty calculated that 97% of Sutter hospital overcharges were paid by Class Members in the form of higher premiums. 5-ER-1076; 3-ER-488. The Class suffered approximately $411 million in damages between 2011 and 1Q 2020. 5-ER-1077; 7-ER-1603.

## III. Procedural History

### 1. *Case Filing and Erroneous Dismissal.*

This case – filed on September 28, 2012 – was the first to challenge Sutter's anticompetitive contracting practices. Plaintiffs alleged that Sutter illegally tied its must-have hospitals to its other hospitals through systemwide agreements, and that these systemwide agreements unreasonably restrained trade. They, on behalf of the Class, sought damages and injunctive relief under the Cartwright Act, along with injunctive relief under California's Unfair Competition Law and Section 1 of the Sherman Act.

The trial court (Beeler, M.J.), dismissed the case, holding that Plaintiffs failed to allege plausible geographic markets. 3-ER-598–619. This Court summarily reversed, 3-ER-593–97, and denied rehearing *en banc*. 3-ER-592.

After remand, the trial court made clear that it remained "skeptical" and was "concerned with the Ninth Circuit's view of the case." 4-ER-718:22–719:1.

### 2. *The Substantially Similar State Cases.*

While Plaintiffs' appeal was pending, a different class sued Sutter for the same antitrust violations in San Francisco Superior Court. *UFCW & Emps. Benefit Trust v. Sutter Health*, Case No. A152608 (Cal. Sup. Ct., Apr. 7, 2014) ("*UEBT*"); 3-ER-476 (noting that *UEBT* involved "similar facts"). The primary difference between the two cases was that *UEBT* class members were self-insured entities who directly purchased Sutter's services, while Class Members here indirectly purchased them by paying premiums to their insurance companies. See 7-ER-1380 n.121; 4-ER-622:22–623:16, 624:24–627:3.

Thereafter, in 2018, the California Attorney General sued Sutter, also challenging the same anticompetitive conduct. *See People of the State of California, ex rel. Xavier Becerra v. Sutter Health*, Case No. CGC-18-565398 (Cal. Sup. Ct. Mar. 29, 2018). Sutter ultimately settled those state cases in October 2019, on the eve of trial, for $575 million and injunctive relief overseen by a court-appointed monitor. Katie Thomas, *Sutter Health to Pay $575 Million to Settle Antitrust Lawsuit*, N.Y. Times, Dec. 21, 2019 at B3.

Given the significant overlaps between this case and *UEBT*, Plaintiffs, after remand, sought, and Sutter produced, all the documents that it produced in *UEBT*.

24

That discovery included documents containing material admissions by Sutter dating back to the early 1990s. It did not include, however, vast amounts of relevant pre-2006 materials that Sutter personnel had destroyed after receiving a litigation hold and during the pendency of this case (*see infra* pp. 38-40). As a result, there was almost a total overlap between the document discovery record in the state cases and this case.

**3.     *The Summary Judgment Order Holding That the Health Plans Are the Relevant Purchasers.***

Initially, the court's post-remand orders seemed to conform to the settled approach for defining hospital markets in antitrust cases.

After Plaintiffs filed the operative complaint, Sutter filed a summary judgment motion on market definition grounds, which the court denied. 3-ER-520–47; 7-ER-1393–1462. In that Order, the court recognized that, to define the hospital services markets at issue here, one must look to the economic options afforded to health plans, not patients, as health plans are the relevant purchasers. In so holding, it relied on this Court's "binding" opinion in *St. Luke's*. 7-ER-1442–43 n.196. The court then relied upon this legal (and economic) principle to (correctly) analyze whether Plaintiffs' evidence could satisfy the well-established test for defining markets—the so-called "hypothetical monopolist" or "SSNIP" test.

25

A SSNIP test defines a "relevant market" by asking whether a hypothetical monopolist controlling every product or service in a proposed market could profitably impose a "small but significant, non-transitory increase in price" (or SSNIP). If a significant number of buyers of the hypothetical monopolist's services would substitute for other services in response to a price increase and thereby render that price increase unprofitable, then the proposed market is not a relevant market—the relevant market must be broader. Suppose, for example, that a hypothetical monopolist controlling all the hospitals in Area 1 raised its prices to health plans. If health plans would respond to this price increase by contracting with hospitals located in Area 2, then a proposed Area 1 geographic market for hospital services would be too small: the relevant market also would include the substitute hospitals in Area 2. 7-ER-1525:4–1528:23, 1529:16–1545:14; 5-ER-1070–75.

The court applied this SSNIP test in its summary judgment Order by looking at the hospital substitutes available to health plans, not to patients. Citing *St. Luke's*, it held that "the consumers responding to a hypothetical monopolist hospital's SSNIP are *health plans*, not the health plan enrollees (i.e., patients) because *health plans* (not enrollees) directly pay the hospital's price increases." 7-ER-1441 (emphasis added). And, applying the SSNIP test that way, the court held

that Plaintiffs' proposed geographic markets for IHS sold to commercial health plans were supported by record and economic evidence.

### 4. *Class Certification Orders Relying on Pre-2006 Evidence.*

Next, the court certified a class of indirect purchasers under Rule 23(b)(2), 7-ER-1340–92, and later under Rule 23(b)(3), 3-ER-485–507. In certifying the Class, the court (correctly) relied on substantial evidence from the pre-2006 period, when Sutter was formulating and executing its systemwide contracting plan. The court cited Sutter's assertions, made in federal court in 1999, that responded to the California Attorney General's challenge to the Alta Bates/Summit merger, concluding that they "support[ed] the plaintiffs' position that in the but-for world, Sutter would have lowered its prices, not raised them." 7-ER-1376–77 n.117.[7]

### 5. *The Summary Judgment Order Relying on Pre-2006 Evidence.*

The court relied again on pre-2006 evidence in disposing of a second summary judgment motion from Sutter. Sutter argued that Plaintiffs' tying claim should fail because Sutter did not condition buying services from its must-have hospitals ("Tying Hospitals") on buying services from its hospitals located in areas that offered health plans more hospital choices ("Tied Hospitals"). The court denied the motion, finding triable disputes of material fact about whether Sutter

---

[7] This Court denied Sutter's Rule 23(f) petition seeking review of the district court's Class Orders. 3-ER-484.

forced health plans to accept systemwide contracts.  3-ER-468–69.  There, the

court highlighted evidence from the time when Sutter began forcing health plans to

switch to systemwide contracts:

> **Before 2002**, insurers negotiated with Sutter hospitals individually when they assembled their provider networks.  **Then, Sutter moved to systemwide contracts, forcing insurers to participate** . . . when one insurer (Anthem) pushed back [in 2001], Sutter terminated its individual hospital contracts with Anthem.  Anthem then **folded** and entered into a systemwide contract.

3-ER-470 (emphasis added).[8]  In fact, between its Orders denying summary

judgment and Orders certifying the Plaintiff classes, the court relied on **no less**

**than fifty pieces** of pre-2006 evidence and testimony.  *See, e.g.*, 3-ER-470 nn.4-5

(citing Blue Shield testimony concerning move to systemwide agreements); 3-ER-

470 n.6 (1997 Sutter memo concerning systemwide strategy; 1998 Sutter

termination letter to Anthem; Sutter CEO's testimony regarding termination of

Anthem in 1998); 3-ER-470 n.8 (Aetna testimony concerning Sutter's forcing of

systemwide terms in 2003); 3-ER-472 n.12 (testimony concerning termination of

Blue Shield tiered network product, originally launched in 2001, due to Sutter's

systemwide terms); 3-ER-472 n.12 (United's pre-2006 systemwide agreements

---

[8] Sutter also argued, at the summary judgment stage, that evidence prior to September 2008 was not relevant because Plaintiffs could not "sue over alleged incidents" that occurred "well more than four years before plaintiffs filed suit."  7-ER-1337–38.  The court declined to so hold in its summary judgment Order.

with Sutter); 3-ER-472 n.13 (Chipty expert opinion citing foreclosure of Blue Shield's 2001 tiered network); 3-ER-472 n.15 (2001 Sutter letter opposing tiered network design); 3-ER-472 n.16 (2003 Sutter letter to Anthem enforcing systemwide terms); 3-ER-476 n.28 (pre-2006 systemwide contracts); 3-ER-479 n.34 (Sutter's 1999 Proposed Findings of Fact in Alta Bates-Summit merger cases); 7-ER-1347–51, nn.18-24; 7-ER-1376–77 n.117.

### 6. *Court's Reversal on the Relevant Purchaser Issue.*

As the case got closer to trial, the court began to change its tune on whether antitrust analysis in this case should focus on health plans as the relevant purchasers. Plaintiffs sought summary judgment in 2020 on whether Sutter's Tying Hospitals, on the one hand, and Tied Hospitals, on the other, were distinct products for health plan purchasers. Sutter did not dispute that these were separate products, but argued that patients, not health plans, were "purchasers" of hospital services. 3-ER-508–515. This time, the court – notwithstanding its prior recognition that health plans were, in fact, the relevant purchasers of hospital services, *supra* pp. 25-27 – declined summary judgment on the relevant purchaser issue and held only that Sutter's tying and tied hospitals were distinct products. 1-ER-139. The court did not explain its change of course.

**7.** *The Court's Reversal in Evidentiary and Pre-Trial Rulings.*

The court thereafter continued its about-face from its prior holdings, preventing Plaintiffs from putting on critical evidence through several *in limine* rulings. It ruled, in fact, in favor of Sutter on every single one of the parties' thirteen pre-trial motions *in limine*. 1-ER-105–13. These rulings broadly barred Plaintiffs from offering the jury evidence from before an "arbitrary" cut-off date of January 1, 2006 (1-ER-110–11), even though the court had relied on substantial evidence from this same period in it its summary judgment and class Orders.

*a.* <u>Exclusion of Pre-2006 evidence.</u>

The court first broadly excluded pre-2006 evidence under Fed. R. Evid. 403 as "confusing" and "cumulative." 1-ER-110-11. In that Order, the court nominally reserved the possibility that Plaintiffs could make offers of specific pre-2006 evidence that it would consider. 1-ER-111.

Thus, immediately after the court issued its pre-2006 exclusion Order, Plaintiffs made an Offer of Proof identifying twenty-three pieces of essential, non-duplicative evidence from the pre-2006 period. 2-ER-144–412. That evidence confirmed Sutter's view that it could force health plans into systemwide agreements and to pay higher prices, established the purpose and history of the restraints, and identified how they caused anticompetitive effects. *See* 2-ER-155–73. This evidence included:

30

- Sutter admissions that the purpose of systemwide contracting was to exercise market power—to use "the increased leverage that twenty-one hospitals can achieve by working together" to get "better pricing." *See* 2-ER-177–79, 2-ER-245–51 and *supra* pp. 14-15.

- Sutter internal reports that showed that Sutter would realize hundreds of millions of dollars in additional revenue by deploying its systemwide strategy. *See* 2-ER-181–83.

- Sutter admissions of the pro-competitive benefits of narrow and tiered network products that Sutter made in federal court when defending its own merger in 1999-2000. *See* 2-ER-188–90.

- Documents and testimony describing how Sutter *forced* the Class Health Plans to accept the first systemwide contracts and anticompetitive terms in the early 2000s. *See* 2-ER-175, 2-ER-201–43, 2-ER-252–410; 7-ER-1309–23 and *supra* part II.2.

In a two-page Order, the court denied Plaintiffs' Offer of Proof in its entirety and precluded them from introducing any of these twenty-three pieces of evidence. 1-ER-92–93. The court – reversing course entirely – now held that this evidence was "old" and, contrary to the facts, that "a great deal of" it "is about contracts that do not have the alleged anticompetitive terms." 1-ER-93. The court also suggested that pre-2006 evidence "does not address (except in an attenuated

31

manner) the main issue in the case: whether the systemwide contracts during the relevant period are anticompetitive." *Id.* It claimed that the evidence was "confusing" and substantially outweighed by prejudice under Rule 403, without articulating how admissions of market power and evidence of the history and purpose of the restraints would confuse the jury or prejudice Sutter. *Id.*[9]

The court never justified why it picked 2006 to distinguish between admissible and inadmissible pieces of relevant evidence, other than to state that the period before 2006 was more than five years before the damages period began in this case.[10] Rather, it stated that this date was "arbitrary." 4-ER-817:12-24.

The denial of that Offer of Proof closed the door on Plaintiffs' proving their case with critical, contemporaneous Sutter admissions. It prevented Plaintiffs from showing Sutter statements, made in court prior to 2006, that demonstrated that health plan steering was pro-competitive, not anti-consumer, as Sutter would later claim at trial. It precluded Plaintiffs from showing the jury the Findings of Fact

---

[9] The court's Order suggests that it explained "on the record" why the evidence would be confusing, but it did not do so. *See* 1-ER-110–11; 1-ER-92–93; *see also* 4-ER-729–831.

[10] The period before 2006 was only three years before the period relevant to Dr. Chipty's overcharge calculations. Dr. Chipty calculated damages for 2011-1Q 2020. Her IHS overcharge calculations concern 2009-2017, as there is typically a two-year period between when medical expenses are incurred by a health plan and when those medical expenses impact premiums. 4-ER-845:25–846:7 (Plaintiffs' actuarial expert testimony); 7-ER-1583:15–1584:12.

that Sutter submitted in the case concerning its merger of Alta Bates Medical Center with Summit Hospital brought by the California Attorney General. There, the Attorney General claimed that the merger would result in higher hospital prices in the East Bay. In defense, Sutter and its experts argued that the merger would not cause higher prices because health plans could defeat any post-merger price increase by steering or "redirect[ing] patients away from higher-priced hospitals." 2-ER-189–92 at ¶ 56. *See California v. Sutter Health*, 84 F. Supp. 2d 1057, 1080 (N.D. Cal. 2000) (denying injunction to stop merger and relying on Sutter's steering-related arguments). Sutter advanced these legal positions at virtually the same time that it began forcing its anti-steering provisions on Class Health Plans.

That denial also prevented Plaintiffs from cross-examining Robert Reed, Sutter's former CFO and the architect of Sutter's systemwide contracting strategy, about the purpose and effect of that strategy. Plaintiffs were barred from publishing his admissions about how Sutter's systemwide contracts were designed to reap "better pricing." *See supra* p. 14-15. And it prevented Plaintiffs from showing evidence that Sutter *knew* that it was tying individual hospitals together through systemwide contracts. 2-ER-178 (Sutter internal memo: health plans "'valued their individual relationships with the hospitals' and did not want to negotiate through Sutter Health.").

33

That denial also prevented Plaintiffs from offering evidence from health plan executives regarding Sutter's pre-2006 imposition of its systemwide agreements. Anthem's Steve Melody would have testified about (1) Sutter's unilateral termination of Anthem's individual hospital contracts with Sutter in 2001 (7-ER-1310–22); (2) how Sutter, upon termination of these contracts, demanded that Anthem enter into Sutter's systemwide contract through which Sutter increased prices at certain Sutter hospitals by 40% to 50% (7-ER-1319:18–1320:4); (3) the impact on Anthem of not having any Sutter hospitals in its network for just six weeks (7-ER-1311:21–1313:25); and (4) Anthem's conclusion that it had no choice but to submit to Sutter's systemwide demands in 2001. 7-ER-1315:21–1321:20. Blue Shield's David Joyner would have told the jury about the sea change in Sutter's contract practices in 2002, 2-ER-372–82, and he would have explained how systemwide contracting led to "dramatically" higher prices. 2-ER-373 at ¶ 6. And Health Net's Jenny Vargas, who testified at trial only to post-2006 matters, would have testified about how Sutter forced systemwide contracts on health plans in the pre-2006 period ("it was not a discussion"), 2-ER-408, and how she complained in 2003 that Sutter's anti-steering provisions "would suppress competition." 2-ER-404.

Finally, and critically, that denial prevented Plaintiffs from showing the jury "before and after" evidence – including Dr. Chipty's before and after analysis, *see*

==*supra* p. 21 – demonstrating how prices increased substantially after Sutter imposed its anticompetitive terms.==

At trial, the court repeatedly confirmed that its pre-2006 exclusion Order was an "absolute" bar to Plaintiffs offering (or mentioning) pre-2006 evidence, despite having previously stated that "I'm not inclined to issue any categorial exclusion of evidence proceeding before 2006." 5-ER-862:14-22; 5-ER-863:3–866:1; 4-ER-733:23–734:7. By that point, the court refused to assess whether the probative value of any particular piece of pre-2006 evidence was substantially outweighed by jury confusion. Instead, it merely instructed the jury to disregard any reference to pre-2006 evidence as irrelevant. 5-ER-902:22-25; 5-ER-857:23–858:20; 5-ER-874:19–875:9; 7-ER-1478:17–1479:6 (Court: "[T]he jury knows this – the time period that we've deemed relevant for the lawsuit begins from 2006, forward."); 5-ER-935:7–936:8 (Court: "the relevant time period is at least no earlier than 2006"); 5-ER-964:6-16.

The court went so far as to require Plaintiffs to redact any reference to data or statements relevant to pre-2006 period from documents created after 2005. 5-ER-862:20–866:1 ("The Court: My preclusive ruling is absolute . . . . And so the reason I excluded the pre-2006 date (sic) is I don't think it is relevant."). In total, the court excluded more than 100 exhibits that Plaintiffs proffered as part of the

pretrial order (1-ER-78–91), in addition to testimony from multiple witnesses who would have testified about pre-2006 events.

The effect on the trial went beyond excluding affirmative evidence. It also prevented Plaintiffs from using pre-2006 evidence to rebut contrary testimony or impugn Sutter's credibility. For example, Sutter's chief contract negotiator and central witness, Melissa Brendt, worked in Sutter's contracting division when Sutter first imposed its systemwide contracts and contractual restraints. She testified that all the Class Health Plans' complaints about the systemwide contract and the challenged terms came after 2012 (i.e., after this lawsuit was filed). Not so. *See* 5-ER-930:11–931:5; 5-ER-932:12–933:20. Plaintiffs would have cross-examined Brendt with extensive pre-2006 evidence of the Class Health Plans (unsuccessfully) resisting the move to systemwide contracting and Sutter's inclusion of its anticompetitive restraints. *See supra* part II.2-3. But the court prevented that cross; it even intervened to head off any reference to those early complaints:

> **The Court:** So we should be careful. You're not supposed to talk about anything before 2006 . . . just to make it clear for the record. So I don't want her to give any answer that she could tell you something about pre-2006 . . . She must have it in her head, but we don't want her—she can't talk about it in court."

5-ER-932:20–933:23.

Ms. Brendt also suggested that Sutter insisted on systemwide contracting for a benign reason—to have "consistent terms" across hospitals. 5-ER-915:17–916:5; 5-ER-918:2–20; 5-ER-971:3–972:7 (Sutter expert, relying on Ms. Brendt's testimony, claimed that it makes "economic sense" for systemwide contracting, since it is efficient). She offered that testimony knowing full well that the court prevented Plaintiffs from offering the evidence showing Sutter's true, anticompetitive motive for imposing systemwide contracting—to "leverage" and achieve "better pricing." The court prevented relevant and probative cross-examination, despite having predicated its Offer of Proof denial on an incorrect determination that Sutter would not "offer any reasons for its systemwide contracting" at trial. 1-ER-92–93.

At trial, Sutter also claimed that narrow and tiered network products were harmful to consumers. 4-ER-841:10-19 (Sutter Opening: "there are a lot of patients who don't like" narrow and tiered network products). Because of the court's evidentiary exclusion Order, Plaintiffs were barred from cross-examining Ms. Brendt (or any Sutter witness) on this point with Sutter's admissions in the Alta Bates/Summit Hospital merger proceedings that these products enable pro-competitive, price-lowering health plan steering.[11]

---

[11] The court also excluded these Sutter admissions from the Alta Bates/Summit merger proceedings in its Order granting Sutter's motion *in limine*

     b.    *Exclusion of Post-2006 Strategy Advantage Evidence.*

The court also prevented Plaintiffs from using evidence created after January 1, 2006, that, the court stated, relied on information from prior to 2006. That included evidence from Sutter consultant, Strategy Advantage, that contemporaneously captured Sutter executive admissions of its power to "**force**" health plans. 1-ER-111-12; *see supra* part II.2. These admissions of market power – an essential element of Plaintiffs' claims – would have strongly contradicted Sutter's arguments at trial. *See* 4-ER-842:16-25 (Sutter counsel: "I think I've heard the word 'forced' this morning. Sutter forced them to agree to these terms [] and agree to the prices. That's not what happened.").

The court excluded these admissions, even though the Strategy Advantage evidence was prepared after 2006. According to the court, the statements recorded therein "look[ed] back at years that precede the class period by over five years," and so "[a]ny marginal relevance to the relevant time period [wa]s substantially outweighed by the danger of confusion . . . ." 1-ER-112.

     c.    *Denial of Sanctions for Sutter's Destruction of Pre-2006 Evidence.*

The court's arbitrary date of January 1, 2006 also was relevant to Plaintiffs' motion for sanctions related to Sutter's intentional destruction of 192 boxes of

---

to exclude references to "other litigations" because they were "twelve years earlier." 1-ER-110. Plaintiffs appeal this Order as well.

documents that its contracting department prepared between 1995 and 2006. This destruction occurred in 2015, after Sutter's legal department had issued a document preservation notice. *See* 3-ER-424-25; 3-ER-431.

Plaintiffs' motion requested that an instruction be given to the jury requiring them to infer that the destroyed documents were adverse to Sutter's position in this case. The court denied it, holding that, while Sutter's destruction was intentional, the destroyed documents "predate the class period by years" and it was not done "in bad faith." 1-ER-132-38. Moreover, the court granted Sutter's counter-motion to exclude evidence of its document destruction on relevance grounds. 1-ER-112.

Importantly, those rulings were the opposite of rulings in the substantially similar state cases. There, it was held that Sutter should either be sanctioned for its spoliation through an adverse inference instruction, or that evidence of Sutter's destruction should be admitted at trial before the court decided whether to issue such an instruction. 3-ER-447–67 (*UFCW & Emps. Benefit Trust v. Sutter Health*, No. 1C06105725 (Cal. Sup. Ct., Nov. 13, 2017); *People of the State of California, ex rel. Xavier Becerra v. Sutter Health*, Case No. CGC-18-565398 (Cal. Sup. Ct., June 6, 2013)). If admitted, that evidence would have shown that, more than two years after this litigation was filed and in violation of its own litigation holds, Sutter's Melissa Brendt directed her assistant to tell storage personnel to destroy pre-2006 documents. 3-ER-423–25. And it would have shown that, immediately

after Ms. Brendt's assistant did so, she sent an email saying: "I've pushed the button . . . if someone is in need of a box between 3/15/95 and 11/23/05 . . . I'm running and hiding . . . 'fingers crossed' that I haven't authorized anything that the FTC will hunt me down for.'"  3-ER-425; 3-ER-430–45.

Only after the court was confronted with Sutter's broad destruction of pre-2006 documents in Plaintiffs' sanctions motion did it reverse course and hold that all evidence from this period – which it previously relied upon in its summary judgment and class Orders – was "irrelevant."

### 8. *The Court's Rulings Related to Anticompetitive Purpose.*

In addition to barring evidence that showed Sutter's anticompetitive purpose, the court refused to task the jury to determine whether Sutter's "purpose" was to restrain trade at all.  Over Plaintiffs' objection, the court struck the word "purpose" from the California model instructions that require the jury, as an essential element of a Rule of Reason claim, to assess whether Sutter's conduct was motivated by an anticompetitive purpose.  *Compare* CACI model instruction 3405(2) ("That the **purpose or** effect of [Sutter]'s conduct was to restrain competition") (emphasis added) *with* Final Jury Instruction predicated on CACI 3405(2), 1-ER-20 ("That the effect of Sutter's conduct was to restrain competition"); *compare also* CACI model instruction 3411 ("In deciding whether [Sutter]'s challenged restraint had an anticompetitive or beneficial **purpose or**

effect on competition") *with* the Final Jury Instruction predicated on CACI 3411(b), 1-ER-20 ("In deciding whether Sutter's challenged restraint has an anticompetitive or beneficial effect on competition"). The court did not explain why it removed the word "purpose" and refused to instruct the jury to complete this required analysis of Plaintiffs' Rule of Reason claim.

### 9. *The Court's Rulings Related to the Relevant Purchaser.*

The court also changed course on the relevant purchaser issue. Prior to trial, the court ruled that, to prevail on either their tying or Rule of Reason claims, Plaintiffs would have to show that Sutter possessed market power in the relevant market. 1-ER-98–101. Accordingly, the jury was required to assess whether Sutter had the power to push the health plans around when they bargained over their hospital contracts.

In this regard, the court held that "market power ordinarily is shown by delineating a relevant market and establishing that the defendant plays enough of a role *in that market* to impair competition significantly." 1-ER-100 (emphasis added). Thus, consistent with the Plaintiffs' market allegations and the court's own prior holdings, Plaintiffs asked the court to issue clear jury instructions identifying "health plans" as the relevant consumers or buyers of hospital services in the market under consideration. Put otherwise, Plaintiffs asked the court to

41

instruct the jury to focus on whether hospitals, not patients, had available substitutes for Sutter's hospitals. *See supra* part III.3.

This mattered because of Kaiser. Sutter's first defense at trial was predicated on Kaiser being part of the relevant market. It argued that Kaiser hospitals should be in the relevant market because Kaiser hospitals were substitutes *for patients* who chose Kaiser insurance over other non-Kaiser insurance products. *See, e.g.*, 4-ER-839:19–840:12 (Sutter Opening: "plaintiffs define the market in such an odd way, in order to try to exclude Kaiser from the market . . . . people . . . can select Kaiser . . . ."); 3-ER-415-19. But Plaintiffs' allegations were that *health plans* were being pushed around by Sutter, and it is undisputed that health plans cannot substitute Kaiser hospitals for Sutter hospitals. *See supra* part I.3. Plaintiffs therefore wanted the jury to know that its job was to determine whether Plaintiffs had proven a relevant market for IHS sold to *health plans*, not patients.

Departing from its own, earlier analysis that it was bound to hold that health plans were the relevant purchasers for market definition analysis, the court denied Plaintiffs' request. Instead, now claiming that the relevant purchaser was an issue of fact, it issued market definition, market power, and tying instructions that only generically referred to "buyers," "consumers," and "customers," without identifying who those buyers/consumers/customers were. 1-ER-95–96. *See, e.g.,* 1-ER-17 ("Product Market" instruction: "In deciding whether services are

42

reasonable substitutes, you may consider whether a small increase in the price of one service would cause a considerable amount of *customers* of that service to switch to a second service.") (emphasis added); 1-ER-18 ("Geographic Market" instruction: "[A] geographic market is the area where *buyers* turn for alternate sources of supply or where sellers normally sell.") (emphasis added); 1-ER-19 ("Tying Claim" instruction: asking jury whether "Sutter will sell inpatient hospital services at one or more tying hospitals only if the *buyer* also purchases inpatient hospital services at one or more tied hospitals") (emphasis added); 1-ER-19–20 ("Tying – Economic Power Explained" instruction). It also denied Plaintiffs' request to identify the health plans as relevant consumers in the verdict form.

The court also denied Plaintiffs' *Daubert* motion to exclude Dr. Gowrisankaran's opinion that Kaiser hospitals were part of the relevant market. 1-ER-117–18. Plaintiffs argued that Dr. Gowrisankaran's opinion did not answer the salient question in the case, which was whether health plans had hospital alternatives to Sutter. Dr. Gowrisankaran focused his opinion on patient consumption of hospital services, not health plan substitution patterns, and admitted that he did not "evaluate any market definition from the perspective of thinking of insurers as the ultimate consumers." 5-ER-955:12–959:8.

43

**10.**     ***The Verdict and Final Judgment.***

Given the severe limitations that the court placed on Plaintiffs' evidence and its erroneous instructions, the jury unsurprisingly returned a verdict for Sutter.  In so doing – without seeing Sutter's admissions on forcing and understanding that market definition and market power are evaluated by focusing on health plan, not patient, substitution options – it answered "No" to: "Did Sutter *force* the class health plans to agree to contracts that had terms that prevented the plans from steering patients to lower-cost non-Sutter hospitals within the plan network?"  5-ER-979:24–980:4 (emphasis added).  And, without seeing evidence related to Sutter's move from individual hospital to systemwide contracting – including its rationale for doing so and health plan reaction when confronted with same – and without understanding who the relevant buyer was, it answered "No" to: "Did Sutter sell inpatient services in one or more of the tying hospitals only if the *buyer* also purchased inpatient services at one or more of the tied hospitals?" 5-ER-979:19-23 (emphasis added).

Final judgment was entered on March 29, 2022, and this appeal ensued. 1-ER-2–6.

## SUMMARY OF ARGUMENT

The district court made three primary errors, each of which mandates reversal.  ***First***, this Court should reverse because the district court inexplicably

44

prevented Plaintiffs from admitting critical evidence to the jury that it needed to see and hear.  Evidence, including stark admissions, from the period when Sutter devised and imposed its systemwide contracts and anticompetitive terms demonstrate that (1) Sutter had the market power necessary to force health plans to accept terms they did not want; (2) Sutter used that power for the purpose of increasing prices; and (3) Sutter's systemwide contracts and their restrictive terms actually had their desired, anticompetitive effects.  Part I below explains that the court's exclusion Orders are erroneous under California antitrust standards and basic rules of evidence.

*Second*, this Court should reverse because the court below failed to instruct the jury, contrary to blackletter Cartwright Act law, that it was required to determine whether Sutter's *purposes* were anticompetitive when evaluating Plaintiffs' Rule of Reason claims.  California cases are unanimous on this point; thus, the subject pattern instructions task jurors to determine whether a defendant had an anticompetitive purpose in assessing whether it restrained trade.  Part II below explains that the court wrongly changed that pattern instruction, harming Plaintiffs' case.

*Third*, this Court should reverse because the court below failed to instruct the jury to evaluate Plaintiffs' claims of market definition, market power, and tying from the perspective of the health plans—the relevant direct purchasers.  Part III

45

explains that the court's failure to so hold as a matter of law or to so instruct, consistent with Plaintiffs' claims, is contrary to the law on market definition in indirect purchaser and hospital market power cases and the framing of antitrust jury instructions. As a result of this error, the jury was never advised about the questions that it was being asked to evaluate: were there, consistent with Plaintiffs' theory, relevant markets for IHS sold to health plans, and, if so, did Sutter have market power in *those* markets?

## STANDARD OF REVIEW

Rulings excluding evidence are generally reviewed for abuse of discretion. But this Court reviews *de novo* "rulings on the admissibility of evidence in which issues of law predominate." *United States v. W.R. Grace*, 504 F.3d 745, 754 (9th Cir. 2007) (reversing exclusion). Moreover, a legal error in a district court's decision to exclude evidence is an abuse of discretion. *Tattersalls, Ltd. v. DeHaven*, 745 F.3d 1294, 1297 (9th Cir. 2014); *Am. Fed'n of Musicians of United States & Canada v. Paramount Pictures Corp.*, 903 F.3d 968, 975 (9th Cir. 2018).

This Court likewise reviews "'de novo whether an instruction states the law correctly.'" *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 868 (9th Cir. 2020) (citation omitted); *Gantt v. City of Los Angeles*, 717 F.3d 702, 706 (9th Cir. 2013) (reversing judgment after jury verdict). Instructions are also reviewed *de novo* "to determine whether they mislead the jury to the prejudice of

46

the objecting party." *City of Long Beach v. Standard Oil Co. of Cal.*, 46 F.3d 929, 933 (9th Cir.1995); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 54 (2d Cir. 2019) (reviewing market definition instructions *de novo* and reversing after jury verdict). And this Court "review[s] de novo whether verdict forms were legally erroneous." *Drozd v. McDaniel*, 2022 WL 819786, at \*1 (9th Cir. Mar. 17, 2022).

Errors regarding jury instructions and the exclusion of evidence are presumed prejudicial and require reversal unless the party benefitting from the error – Sutter, in this case – demonstrates that it is more probable than not that the error did not affect the verdict. *See, e.g.*, *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020); *Obrey v. Johnson*, 400 F.3d 691, 700 (9th Cir. 2005); *Blumenthal Distrib.*, 963 F.3d at 869.

This Court considers a district court's errors collectively when determining whether a judgment should be reversed. *Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir. 2005) ("cumulative error in a civil trial may suffice to warrant a new trial even if each error standing alone may not be prejudicial.").

## ARGUMENT

## I.    The District Court Erred by Broadly Excluding Critical Evidence.

The court's broad exclusion of pre-2006 evidence was legally erroneous and devastating to Plaintiffs' case. Evidence from the period when an antitrust

defendant created and imposed its restraints is often the best evidence of the defendant's own assessment of its market power, its anticompetitive purpose, and the anticompetitive effect that those restraints have caused. Here, the court excluded evidence – including admissions from Sutter executives – that Sutter (1) had market power; (2) used that market power to newly tie its must-have hospitals to its hospitals in markets with alternatives to Sutter; (3) did so to extract supra-competitive prices; and (4) actually succeeded in creating that desired anticompetitive effect. None of this was "irrelevant," "collateral," "compound," or "confusing." To the contrary, the court itself invoked this evidence when it held that disputed issues of material fact required a jury trial and when it certified the Class.

### A. *The Excluded Evidence Was Neither Irrelevant Nor Collateral: It Was Probative of Key Issues.*

The relevance standard under Fed. R. Evid. 401 and 402 is unquestionably "a liberal one." *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019) (quotation omitted); *see also United States v. Curtis*, 568 F.2d 643, 645 (9th Cir. 1978) ("Rule 401 . . . contains a *very expansive definition of relevant evidence.*") (emphasis added). "Evidence is relevant if: (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Crawford*, 944 F.3d at 1077 (quoting Rule 401) (remanding for new trial due to exclusion of relevant

testimony) (emphasis added); *United States v. Evans*, 728 F.3d 953, 960 (9th Cir. 2013) (vacating judgment due to excluded, relevant evidence).

Here, by excluding pre-2006 evidence as "irrelevant" – it repeatedly stated, at trial, that its exclusion rationale was "absolute" and based on relevance, rather than Rule 403, grounds, *see supra* part III.7.a-b – the court failed to follow the liberal principles favoring admission of evidence embodied in Rules 401, 402 (and 403 too). Worse, it overrode black letter Cartwright Act law.[12]

That law renders illegal any restraints that have an anticompetitive *purpose or* effect. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1483 (9th Cir. 1986) ("to show a violation of the Cartwright Act in a rule of reason case, a Plaintiff must show that either the purpose [or] the effect of the conspiracy is an illegal restraint of trade"); Cal. Bus. & Profs. Code § 16720; *Corwin v. L.A. Newspaper Serv.*

---

[12] Federal courts are required to follow California Supreme Court precedent interpreting the Cartwright Act, as it "was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states." S*amsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (quoting *Aryeh v. Canon Bus. Sol., Inc.*, 55 Cal. 4th 1185, 1995 (2013)). It is "no longer the law" that "the interpretation of California's antitrust statute [is] coextensive with the Sherman Act." *Id*. Where the California Supreme Court has addressed a Cartwright Act issue, as it has in addressing Rule of Reason standards, its decision is binding on federal courts. *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *8 (N.D. Cal. Oct. 2, 2014). "'Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it.'" *Giles v. Gen. Motors Acceptance Corp*., 494 F.3d 865, 872 (9th Cir. 2007) (citation omitted).

*Bureau*, 22 Cal. 3d 302, 314 (1978) (affirming analysis, in Cartwright Act case, that determined whether "purpose" or "effect" of challenged conduct was to restrain trade). *See In re Cipro Cases I & II*, 61 Cal. 4th 116, 146 (2015) (Rule of Reason claims under Cartwright Act require analysis of "the reasons for [the] adoption" of the restraints) (quotation omitted). *See also Pac. Coast Agric. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1202 (9th Cir. 1975) (approving instruction advising jury to consider purpose of restraint). Moreover, it is axiomatic that, in a Cartwright Act case, comparative evidence from both *"before" and "*after*"* a restraint was imposed should be considered when determining whether the restraint actually *caused* anticompetitive impact. *Corwin*, 4 Cal. 3d at 854; *Olean Wholesale Grocery Coop, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 671 (9th Cir. 2022); *United States v. Apple*, 791 F.3d 290, 328 (2d Cir. 2015).

The same is true under federal antitrust law: evidence regarding the design and initial imposition of the restraints is critical to antitrust analysis. In a remarkably on-point antitrust precedent, the United States Supreme Court vacated a jury verdict for the defense and remanded for a new trial where, among other things, the trial court excluded evidence from the period when the alleged anticompetitive conduct began. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962). In that case, plaintiffs "sought to introduce evidence that the conspiracy and monopolization [at issue] began in the early

50

1930's [over 30 years earlier], that overt acts thereof occurred in the 1930's, and that it was pursuant to this anticompetitive scheme that respondents sought to and did eliminate petitioners from the vanadium industry after 1938." *Id.* at 709-10. The lower court refused to admit this pre-1938 evidence because the plaintiff had not entered the relevant market (and thus could not have suffered harm) prior to that time. *Id.* The Supreme Court held, however, that even though the period of harm was later, the pre-1938 evidence from the period when the anticompetitive scheme was launched was "clearly material" and should have been admitted. *Id.* at 710; *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 789-90 (1946) (affirming jury verdict and holding that it is "essential[]" for courts to admit "material drawn from earlier years" so plaintiffs can engage in "comparative" exercises to "establish[] any restraint of trade or monopoly").

The court below deprived the jury of this essential evidence. In excluding pre-2006 evidence, it prevented the jury from weighing vital facts concerning the "history" of Sutter's anticompetitive practices, including the evidence comparing the periods "before" and immediately "after" Sutter instituted its anticompetitive systemwide agreements and contractual terms. That included essential economic evidence demonstrating that Sutter had the power to force and that such forcing caused anticompetitive effects, *see supra* p. 21, and admissions from Sutter's

51

executives regarding its ability to force health plans to accept its terms and its anticompetitive purposes in doing so, *see supra* pp. 14-15.

The court's evidentiary exclusion also prevented the jury from seeing critical evidence of Plaintiffs' tying claim. To make out a per se tying claim, Plaintiffs must show: "(1) a tying agreement, arrangement or condition [existed] whereby the sale of the tying product was linked to the sale of the tied product or service; [and] (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product . . ." *UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 369 (2008) (quoting *Classen v. Weller*, 145 Cal. App. 3d 27, 37-38 (1983) (reversing summary judgment to hospital system alleged to have tied its inpatient and outpatient services together)). *See also Corwin*, 4 Cal. 3d at 855-56. Here, the exclusion of pre-2006 evidence prevented Plaintiffs from using substantial documents and testimony to juxtapose Sutter's pre-2000s hospital-by-hospital contracting practices with its post-2000 systemwide contracting practices. That evidence would have shown that the anticompetitive clauses in Sutter's systemwide agreements were not part of its prior individual contracts, further demonstrating how Sutter could only impose them using the leverage of systemwide contracting. *See, e.g.*, 5-ER-995–1040; 5-ER-1042–1066. And it would have shown that health plans wanted to continue to have individual contracts, rather than systemwide contracts, when first confronted with Sutter's

"all or none" contract. *See supra* pp. 12-15; 2-ER-178. This confirms that Sutter

"linked" distinct hospital products through systemwide contracts.

The court's earlier Orders demonstrate the centrality of the excluded

evidence and negate its later suggestion that it was "just a sideshow." *See* 5-ER-

881:5-8. In denying Sutter's motion for summary judgment, the court relied on an

extensive body of material, pre-2006 evidence that was probative of Sutter's

tying—particularly the fact that, by 2002, it tied together the sale of hospital

services that were previously sold separately and this tie was only accomplished by

forcing health plans to submit to it. 3-ER-470 (noting that Anthem "folded" in

2001 in the wake of Sutter's systemwide contract demands).

Similarly, in its Order granting Rule 23(b)(2) class certification, the court

relied on pre-2006 evidence concerning the evolution of Sutter's contracting

practices, including its switch to systemwide contracting in the "early 2000s" and

how Sutter imposed "'anti-steering' provisions" and "'penalty rates'" during that

same timeframe. 7-ER-1347–51 nn.18-24. *See supra* pp. 26-27. The court held

that Sutter's 1999 admissions from the Alta Bates-Summit merger case "provide

support for plaintiffs' position" that, in a world absent Sutter's conduct, "Sutter

would lower its prices, not raise them." 7-ER-1376–77 n.117.

That class Order also referenced pre-2006 economic evidence that showed

that Kaiser hospitals were not part of the relevant markets and that they thus did

not prevent Sutter from forcing health plans to submit to anticompetitive contracts. *Id.* Specifically, it showed that Kaiser Oakland was not part of the Berkeley/Oakland IHS market, notwithstanding Sutter's claim to the contrary (citing that Kaiser Oakland was "literally a two-minute drive from [Sutter's] Alta Bates Summit" hospital). 5-ER-939:21–940:4. That Order pointed to evidence showing that, despite Kaiser Oakland's close proximity to Sutter's Alta Bates Summit hospitals, "following the [Alta Bates/Summit] merger [consummated in 2001], Sutter (according to plaintiffs) increased its prices at Summit by 29.0 to 72.0 percent [between 2002 and 2004], significantly more than other hospitals." 7-ER-1376–77 n.117 (citing *FTC v. Advocate Health Care Network,* 841 F.3d 460, 472 (7th Cir. 2016), and Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction*, 18 Int'l J. Econ. of Bus., 65, 75–76 (2011)). If Kaiser Oakland was in the same market as Sutter's Summit Hospital, Sutter would not have been able to so significantly increase Summit's prices (in such a short time), as health plans would have substituted for Kaiser Oakland in that event. The fact that they did (and could) not, and, instead, absorbed the Sutter price increase is compelling evidence – which the jury never heard or saw – showing that Kaiser hospitals were not part of the relevant market.

The court's prior Orders also undercut the court's statement, made when denying Plaintiffs' Offer of Proof, that pre-2006 evidence is irrelevant (or has minimal relevance) because Sutter's contracts were "renegotiated regularly." 1-ER-110. The court's Orders and the excluded evidence demonstrate that Sutter's conduct constituted a continuing course of anticompetitive conduct. Once Sutter began to impose systemwide contracts, health plans could not negotiate individually with Sutter for any future contracts. *See supra* pp. 21-22. Once Sutter began to impose anti-steering clauses on Class Health Plans through its systemwide contracts, those clauses continued to be part of them. *Id.* No Class Health Plan ever got out from under Sutter's systemwide thumb.

Evidence of multiple overt acts or agreements that constitute a continuing course of conduct, as here, must be analyzed collectively. "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. '* * * (T)he character and effect of a [continued anticompetitive scheme] are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . the duty of the jury was to look at the whole picture.'" *Continental Ore*, 370 U.S. at 699 (citations omitted)*; see also Hanover Shoe, Inc. v. United Shoe Mach. Corp*., 392 U.S. 481, 502 n.15 (1968) (defendant's imposition of a series of anticompetitive leases from 1912 through 1955 "constituted a continuing violation

55

of the Sherman Act [] which inflicted continuing and accumulating harm"); *see also Samsung*, 747 F.3d at 1202-03 (successive agreements with similar anticompetitive provisions constituted continuing antitrust violation).  The court's exclusion of this evidence as irrelevant requires reversal.

> **B.**    ***The Excluded Evidence Should Not Have Been Excluded Under Rule 403.***

The foregoing demonstrates that the excluded evidence was highly probative of key issues in the case.  Accordingly, to justify a blanket exclusion of pre-2006 evidence under Rule 403, the court would have had to analyze how each piece of this highly probative evidence was "substantially outweighed" by the potential for jury confusion or waste of time.  It did not do that.  But even if one assumes that the court did adequately weigh each piece of excluded evidence under Rule 403, its ruling that each piece was "compound" or "confusing" enough to justify exclusion, notwithstanding its probative value, was plain error.

Exclusion of evidence under Rule 403 is an "extraordinary remedy" that should be used "sparingly" and only when the potential for confusion "substantially" outweighs probative value.  *United States v. Haischer*, 780 F.3d 1277, 1281-82 (9th Cir. 2015) (citation omitted); *Gametech Int'l Inc. v. Trend Gaming Sys., L.L.C.*, 232 F. App'x 676, 678 (9th Cir. 2007) (exclusion of evidence under Rule 403 required new trial); *see also United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (Rule 403 "favors admissibility").  For the reasons

discussed above, this evidence was *highly* probative. It would require a particularly extraordinary justification to exclude any of it, let alone all of it.

The court's suggestion that this evidence was "compound" or "confusing" does not suffice. It all concerns contemporaneous documents relating to the pre-2006 period or unique information that establishes why and how Sutter first imposed its systemwide practices—uniquely credible information that no other evidence supplies. No other evidence demonstrates that Sutter moved from individual hospital contracting to systemwide contracting to reap "better pricing," as Sutter only made this move during the early 2000s. *See supra* pp. 12-15. And no other evidence memorializes *admissions* by Sutter executives that they would "increase[] leverage" via systemwide contracting and "force" health plans to accept unfavorable terms "because they could." *Id.*

Sutter argued below that, if pre-2006 evidence was admitted, the jury might be confused about when the damages period began. *See* 7-ER-1332–36. That is wide of the mark, as Dr. Chipty explicitly testified that she calculated damages for only the 2011-Q1 2020 period. *See* 7-ER-1583:15-17. Any potential confusion about the damages period could have been cured by a limiting instruction. *See, e.g.*, *United States v. Cherer*, 513 F.3d 1150, 1159 (9th Cir. 2008) ("the risk of unfair prejudice, which the court reduced by delivering a limiting instruction, did not substantially outweigh the probative value of the evidence").

57

### C. *Excluding This Critical Evidence Was Prejudicial to Plaintiffs.*

The exclusion of this critical evidence was substantially prejudicial. Sutter cannot demonstrate that the error "more probably than not" was harmless, particularly as the excluded evidence was both unique, and "directly probative of the central issues in dispute." *Obrey*, 400 F.3d at 701-02. Deprived of this evidence – *of these Sutter admissions* – the jury could not reasonably ascertain or understand Sutter's anticompetitive purposes, the complete history of its anticompetitive conduct, or how Sutter's conduct caused its intended anticompetitive effects. And the jury could not know that Sutter executives admitted that Sutter had the power to "force" health plans to accede to its demands. A new trial is warranted. *See GN Netcom, Inc. v. Platronics, Inc.*, 930 F.3d 76, 86, 89 (3d Cir. 2019) (exclusion of plaintiffs' evidence warranted new antitrust trial).

## II. The District Court Erred by Failing to Instruct the Jury to Determine Whether Sutter Had an Anticompetitive Purpose in Imposing the Challenged Restraints.

Compounding its error in excluding pre-2006 evidence, the court further erred by wrongfully altering the model Rule of Reason instruction to eliminate the requirement that the jury determine whether Sutter's "purpose" was to unreasonably restrain trade. *See supra* pp. 40-41. The court altered these jury instructions without providing any reason for doing so.

58

Under California antitrust law, actions that are motivated by an anticompetitive purpose are illegal. Therefore, in evaluating a Cartwright Act claim, jurors must determine whether the restraints had an anticompetitive purpose. *See Corwin*, 22 Cal. 3d at 310, 314; *see supra* pp. 30-38 and 40-41. By erroneously eliminating the language concerning "purpose" from the final instructions patterned on CACI 3405, the court unambiguously misstated California law.

The court's failure to instruct the jury that it must assess whether Sutter had an anticompetitive purpose was not harmless error because it directly relates to whether such conduct was "to restrain competition." *See* 2-ER-143 ("Unreasonable-Course-of-Conduct Claim"); *see also Harrington v. Scribner*, 785 F.3d 1299, 1309 (9th Cir. 2015) (reversing verdict for defendant where improper jury instructions were prejudicial because the errors "skewed how the jury would have understood the jury verdict form."); *see also Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 225 (7th Cir. 1983) (ordering new jury trial because instructions were not "an adequate approximation of a rule of reason test").

The jury was specifically asked whether Sutter "force[d] the class health plans to agree to contracts that had terms that prevented the plans from steering patients to lower-cost non-Sutter hospitals." 2-ER-143. An evaluation of Sutter's

purpose – whether it believed it could force and sought to force the Class Health Plans to accept such terms – goes directly to the heart of that question.

## III. The District Court Erred by Failing to Identify Health Plans as the Relevant Direct Purchasers.

The court erred by failing to instruct the jury that health plans – not patients – are the purchasers most relevant to the critical market definition, market power, and tying inquiries in this indirect purchaser case. 1-ER-95–96.

It is undisputed that Sutter's pricing for its services was imposed through contracts with direct purchaser health plans, not with patients. But Sutter did not like that reality, as it limited its ability to suggest that Kaiser hospitals were participants in the relevant markets that sufficiently curb Sutter's market share and forcing power. The court allowed Sutter to base its defense on arguments that fly in the face of settled legal and economic principles.

Antitrust cases are complicated enough. So Plaintiffs asked the court to instruct jurors, consistent with Plaintiffs' allegations and settled law, that they were to analyze the relevant market, Sutter's power within that market, and tying from the standpoint of health plans as the relevant direct purchasers. After all, that is what the court did in its own earlier analysis in the case. 7-ER-1442–43 & n.196. But the court refused to give that legally correct instruction—or to exclude the opinion of Sutter's expert that Kaiser was part of the relevant market on the ground that it was an alternative for patients. As a result, the jury was set adrift to wrestle

with the issue of who the relevant purchaser was, and it was not asked the market

definition, market power, and tying questions raised by Plaintiffs' claims.  This

also requires reversal.

### A. *In Indirect Purchaser Cases, Juries Should Be Instructed to Evaluate Market Definition, Market Power, and Tying From the Perspective of Direct Purchasers.*

In difficult antitrust cases, where "abstract legal principles are not self-

explanatory to a lay jury, and the facts to which they must be applied are

complex," a district court must provide tailored and specific instructions

conforming to a plaintiff's legal theory to prevent confusion.  *L.A. Mem'l Coliseum*

*Comm. v. Nat'l Football League*, 726 F.2d 1381, 1398 (9th Cir. 1984) (affirming

rejection of defendant's jury instructions) (citation omitted).  Indeed, plaintiffs are

"entitled to an instruction about [their] theory of the case if it is supported by law

and has foundation in the evidence."  *Gantt*, 717 F.3d at 706-07 (reversing)

(quotation omitted).

Here, there can be no doubt that Plaintiffs sued as "indirect purchasers"

under California law.  *See In re California Gasoline Spot Market Antitrust Litig.*,

2022 WL 3215002, at *4 (N.D. Cal. Aug. 9, 2022) (standing afforded to those

injured by anticompetitive conduct "regardless of whether such injured person

dealt directly or indirectly with the defendant") (quoting Cal. Bus. & Prof. Code

§ 16750(a)).  In fact, the court recognized on multiple occasions that the theory of

61

injury here was "indirect: the class members' harm comes only to the extent the health plans passed on Sutter's alleged overcharges through to class members . . . ." 7-ER-1379; *see also* 3-ER-501.  *See supra* part I.2.

In an indirect purchaser case, one must engage in a two-step analysis to determine liability and damages: 1) determine whether the defendant imposed anticompetitive overcharges on the direct purchasers at issue, and 2) estimate the portion of those overcharges that were passed on to the indirect purchaser plaintiffs.  *See Olean Wholesale*, 31 F.4th at 684 ("theory of antitrust impact" for indirect purchasers "depends on two separate overcharges: first, an overcharge by the [defendants] to the direct purchasers . . . , and then an overcharge passed on to the" indirect purchasers).

To complete the first step, the jury had to determine whether Sutter was able to force overcharges on the direct purchasers under Plaintiffs' theory— and those were the *health plans*.  And to make this determination, the jury had to determine whether Sutter had market power over health plans, i.e., it had to define the scope of the relevant market in which the direct purchaser health plans participated and then determine Sutter's share of that market.  *See Ohio v. American Express*, 138 S. Ct. 2274, 2285 n.7 (2018) ("Vertical restraints," as here, "often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."); Phillip Areeda &

62

Herbert Hovenkamp, *Fundamentals of Antitrust Law* ¶ 515 (4th ed. 2022) ("In resolving market [] power issues, the courts have typically relied heavily on market definition and on the defendant firm's share of the market thus defined.").

Antitrust markets include only those products that are economic substitutes for the direct purchasers alleged to have been forced—in this case, the health plans. The well-established SSNIP test, discussed at part III.3, seeks to identify only those products for which those direct purchasers would substitute in response to a price increase.

Consequently, it is critical in an indirect purchaser case like this one, which involves two levels of purchasers – health plans, on the one hand, and insurance purchasers, on the other hand – that courts instruct the jury to focus on direct purchaser alternatives when analyzing market definition and market power. That is because the economic substitutes available for direct purchasers that "use" a product can be very different than the economic substitutes available to another type of purchaser that "uses" that same product in a different way. *See United States v. Microsoft*, 253 F.3d 34, 51-52 (D.C. Cir. 2001) (per curiam) ("the relevant market must include all products reasonably interchangeable *by consumers for the same purposes*.") (emphasis added) (citation omitted).

*Telcor Communications, Inc. v. Southwestern Bell Telephone Co.*, 305 F.3d 1124 (10th Cir. 2002), is instructive. There, direct purchaser "location owners"

sued a provider of payphone telephone services for antitrust violations. *Id.* at 1129. The defendant sought to include cellphones within the "relevant market," arguing that downstream patrons could substitute cellphones for the payphones installed by the location owners. *Id.* The defendant argued this because, if cellphones were in the relevant market, that would have reduced the defendants "market" share and, thus, its apparent market power. The Tenth Circuit rejected that: it correctly "exclude[d] cellular phones from the relevant market definition" because "[l]ocation owners [that installed pay phones on their premises were] the relevant customers . . . and cellular phone services and pay phone services [were] not interchangeable" from their perspective. *Id.* at 1136. In other words, because the relevant purchasers were location owners, and location owners could not substitute cellphones for payphones, the relevant product market was payphone services only.

The same is true here: health plans and patients "use" and interact with hospitals in very different ways. The substitutes available to health plans for hospitals that offer to participate in their networks are not the same as the economic substitutes available to patients undergoing individual procedures. Moreover, health plans negotiate and pay for hospital services, while individual patients almost never do. *St. Luke's*, 778 F.3d at 784 ("the vast majority of health care consumers are not direct purchasers of health care . . . the insurance

companies negotiate directly with providers") (quotations omitted); *see supra* part I.1.  Accordingly, health plans, and not patients, are the direct purchasers of Sutter's IHS relevant to the market definition, power, and tying analyses in this indirect purchaser case.  The jury should have been told this.

**B.**     ***As a Matter of Antitrust Law and Settled Economics, Health Plans Are the Relevant Purchasers for the Jury to Consider.***

There is another, complementary reason why the court should have instructed the jury that health plans were the relevant purchasers for market definition, power, and tying analysis: settled antitrust law and economics governing the analysis of hospital market power cases require it.  A stream of appellate precedent confirms that, in hospital market power cases like this one, the essential market definition query seeks to identify hospitals that compete as economic substitutes for health plan direct purchasers, not patients.  Those cases recognize that "antitrust analysis focuses" on the stage of hospital competition where health plans buy and hospitals sell services.  *St. Luke's*, 778 F.3d at 784 n.10.

In *St. Luke's*, this Court held that, in performing its antitrust analysis, it was "correct[] [to] focus[] on the likely response *of insurers* to a hypothetical demand" by a monopolist provider.  *Id.* at 784 (emphasis added) (quotation omitted).  *See* 3-ER-594–95 (relying on *St. Luke's* when reversing dismissal of this case).

Other appellate courts have reached the same conclusion. In *Vasquez v. Indiana University Health*, 40 F.4th 582 (7th Cir. 2022), the Seventh Circuit reversed a dismissal of an antitrust complaint concerning conduct in healthcare markets. It repeated its "endorse[ment]" of the hypothetical monopolist test to determine the scope of relevant healthcare markets and held that such a test should consider "insurers" as the consumers because they are "the most directly affected buyers" of hospital services. *Id.* at 585; *see also FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016) ("the district court failed to properly account for the likely response of insurers in the face of a [price increase]"); *Advocate*, 841 F.3d at 471 (the "market question is [] most directly about the likely response of insurers, not patients, to a price increase" (quotation omitted)); *FTC v. Sanford Health*, 926 F.3d 959, 964 (8th Cir. 2019) ("the hypothetical monopolist test evaluates whether an insurer could avoid a price increase by contracting with [providers] who offer services that are outside of the proposed service markets"); *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 170 (3d Cir. 2022) (affirming application of a SSNIP test to "insurers").

Identifying the relevant direct purchaser is also critical under established tying principles. In a hospital market power case, such as this one, that purchaser is the health plan as a matter of law, contrary to the court's rulings otherwise. *See UAS Mgmt., Inc.*, 169 Cal. App. 4th at 368-69 (analysis of contract between health

66

plan and dominant hospital system under tying principles); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 892, 914 (9th Cir. 2008) (same). Health plans should have been identified as the "buyers" in the court's tying instructions. *See supra* part III.9.

### C. *The District Court Erred in Holding That Determining the Relevant Purchaser Was a Factual Issue.*

The court reversed its earlier holding, in light of the "binding opinion in *St. Luke's*" (7-ER-1442-43 n.196), that health plans were the relevant purchasers for market definition with its eleventh-hour assertion that the identity of the relevant purchaser was actually a question of fact. *See* 1-ER-95–96. This assertion is contrary to numerous cases considering evaluations of hospital market power. *See supra* part III.B.

Recent Supreme Court precedent holds that the identity of the relevant purchaser in market definition analysis is, indeed, a legal issue. In *Ohio v. American Express*, the Supreme Court reversed judgment after trial because of the district court's legally defective analysis of the purchasers relevant to market-definition and market-power queries. 138 S. Ct. at 2285-87 (holding that a two-sided "credit card market must be defined to include both merchant[] and cardholder[]" purchasers); *see US Airways v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) (reversing jury verdict and holding that the buyers which were "include[d]" within "the relevant market" is "a matter of law").

And a recent decision from this Court underscores that the identity of the relevant purchaser is a matter of law. In *PLS.com v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022), this Court reversed where a district court failed to focus its antitrust injury analysis on the alleged direct purchasers of the product – real estate agents – and instead focused on downstream consumers who used those agents' services. This Court held that "a business that uses a product as an input to create another product or service," like health plans do by including hospitals in insurance network products for class members, are "consumer[s] of that input for antitrust purposes." *Id.* at 832. This Court determined – as a matter of law – that the real estate agents were the relevant purchasers, not their downstream customers.

The two cases that the court relied upon in concluding that the determination of the relevant purchaser was a question of fact – *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987 (9th Cir. 1993), and *Thurmond Industries v. Pay 'n' Pak Stores*, 875 F.2d 1369 (9th Cir. 1989) – do not support that position. In those cases, the relevant purchaser was not in dispute. Rather, each case holds that, once the direct purchaser is identified, defining the scope of the market (i.e., determining the substitutes for those purchasers) becomes a factual inquiry. *High Tech. Careers*, 996 F.2d at 990; *Thurmond Indus.*, 875 F.2d at 1374. That is a far

68

different question than who the relevant purchasers are for the purpose of assessing

economic substitutes, particularly in a hospital market power case, like this one.[13]

**D.** ***The District Court Erred by Allowing Sutter's Expert to Testify in a Manner That Contravened the Settled Way to Define Hospital Markets.***

The refusal to identify the relevant purchaser as a legal matter likewise led

the court to erroneously admit expert testimony. Plaintiffs moved to exclude the

opinion of Dr. Gowrisankaran that Kaiser hospitals competed in the relevant

markets under Fed. R. Evid. 702, as he admitted that he did not define the relevant

product market in a manner that was consistent with law – i.e., from the

perspective of health plans – and instead, defined the market from the perspective

of patients. *See supra* p. 43; 5-ER-958:4–962:11. Dr. Gowrisankaran's opinion

contradicted settled law and statements he made to this Court in an *amici curiae*

brief. *See Amici Curiae* Br. of Economics Professors, *St. Luke's* at 10 (explaining

that "courts should focus on the likely responses of insurers, not patients, to . . .

price increases when defining [] markets in healthcare."). The district court denied

---

[13] The law on the identity of the "relevant purchaser" in a case such as this – involving indirect purchasers harmed by exercises of hospital market power – is well established. Nonetheless, if this Court has any questions regarding the applicability of that law to the Cartwright Act, Plaintiffs-Appellants request that this Court certify those questions to the California Supreme Court pursuant to Cal. R. Ct. 8.548(a).

this *Daubert* motion, allowing Sutter to use the sheen of expert testimony to misdirect the jury into considering Kaiser hospitals in the market definition analysis. *See* 1-ER-117–18.[14]

If *St. Luke's* and the many cases like it are correct, then admitting expert testimony that fails to focus on the first stage of hospital competition – when the relevant buyers are the health plans – must be wrong. The court's decision to admit Dr. Gowrisankaran's testimony must be reversed.

## IV. Plaintiffs Request a New Trial.

The court's multiple errors compromised the jury's ability to adequately assess Plaintiffs' claims. This Court should therefore reverse and remand with instructions that a new trial be held. As part of any reversal Order, this Court should (1) hold that the excluded evidence was relevant and that its probative value was not substantially outweighed by any of the enumerated factors set forth in Rule 403; (2) direct the court to instruct the jury, regarding Plaintiffs' Rule of Reason claim, to consider whether Sutter's conduct was motivated by an anticompetitive purpose; and (3) direct the court to identify health plans as the relevant

---

[14] This is not to say that Kaiser was wholly irrelevant to this case. Dr. Chipty, for example, considered competition from Kaiser, in the market for the sale of insurance, to determine the pass through rate. 7-ER-1359–60; 7-ER-1579:16–1580:6.

"purchaser," "consumer," "customer," or "buyer" in its jury instructions and verdict form.

Should the court reverse on issue 1 above, it should also reverse the court's Orders (1) denying an adverse inference instruction for Sutter's vast destruction pre-2006 evidence after this suit was filed and/or (2) preventing Plaintiffs from demonstrating, at trial, that Sutter's destruction of these documents warranted such an inference. *See supra* pp. 38-40. That Order states that "the record does not suggest any destruction of evidence relevant to this case" (1-ER-137), a conclusion that is wholly inconsistent with black letter law – not to mention the court's reliance on more than fifty pieces of pre-2006 evidence in its Orders certifying class and its summary judgment orders. The court backtracked on its reliance on pre-2006 evidence only after it was confronted with Sutter's intentional document destruction of pre-2006 materials and the two state court Orders concerning Sutter's conduct.

The court, indeed, relied on an incorrect standard in denying Plaintiffs' request for sanctions, holding that Sutter did not engage in "bad faith or conduct tantamount to bad faith" when engaging in document destruction. 1-ER-136. But in the Ninth Circuit, "a finding of 'bad faith' is not a prerequisite to this corrective procedure . . . . simple notice of potential relevance to the litigation" will "suffice." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (quotation omitted). It also

71

wrongly failed to apply a presumption that the documents Sutter destroyed were relevant. 1-ER-137–138; *see Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.*, 2009 WL 1949124, at *10 (N.D. Cal. July 2, 2009) (citing *Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir.1982)). The court's Orders regarding Sutter's document destruction constitute error. 1-ER-132-38; 1-ER-112.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants, on behalf of the certified Class, respectfully request that the final judgment entered below be reversed and this matter be remanded to the district court for further proceedings.

October 3, 2022

Respectfully submitted,

*/s/ Matthew L. Cantor*
Matthew L. Cantor
Jean Kim
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

James J. Kovacs
J. Wyatt Fore
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, NW
Suite 1300N
Washington, D.C. 20004
202-204-3500

Azra Z. Mehdi
THE MEHDI FIRM, PC
201 Mission Street, Suite 1200
San Francisco, California 94105
415-293-8039

David C. Brownstein
FARMER BROWNSTEIN JAEGER
    GOLDSTEIN KLEIN & SIEGEL, LLP
235 Montgomery Street, Suite 835
San Francisco, California 94104
415- 795-2050

Allen Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
    ALVAREZ & SMITH LLP
235 Pine Street, 15th Floor
San Francisco, California 94104
415-421-3400

Jill Manning
PEARSON, SIMON & WARSHAW LLP
555 Montgomery Street, Suite 1205
San Francisco, California 94111
415-333-9000

*Attorneys for Plaintiffs-Appellants*

## STATEMENT REQUESTING ORAL ARGUMENT

Given the serious legal errors below and the fact that this case concerns important issues relevant to antitrust law and evidentiary rules, Plaintiffs-Appellants hereby request oral argument.

## CERTIFICATE OF COMPLIANCE

This brief contains 15,985 words, excluding the items exempted by Fed. R. App. P 32(f).  This brief's type size and typeface comply with Fed. R. App. 32(a)(5) and (6).

I certify that this brief is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

October 3, 2022                                   */s/ Matthew L. Cantor*
                                                  Matthew L. Cantor

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using CM/ECF system on October 3, 2022.  All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Matthew L. Cantor*
Matthew L. Cantor

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-15634

I am the attorney or self-represented party.

**This brief contains** 15,985 **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jean Kim      **Date** 10/3/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/2018*

# STATUTORY
# ADDENDUM

# STATUTORY ADDENDUM

CAL.BUS. & PROF. CODE § 16720 ..................................................................3

§ 16720. Trust

CAL.BUS. & PROF. CODE § 16722 ..................................................................4

§ 16722. Contracts violating chapter

CAL.BUS. & PROF. CODE § 16726 ..................................................................5

§ 16726. Trusts against public policy

CAL.BUS. & PROF. CODE § 16750 ..................................................................6

§ 16750. Civil action; venue; damages; injunctive relief; attorney fee; costs

FEDERAL RULES OF EVIDENCE RULE 401, 28 U.S.C.A.............................................10

Rule 401. Test for Relevant Evidence

FEDERAL RULES OF EVIDENCE RULE 402, 28 U.S.C.A.............................................11

Rule 402. General Admissibility of Relevant Evidence

FEDERAL RULES OF EVIDENCE RULE 403, 28 U.S.C.A.............................................12

Rule 403. Excluding Relevant Evidence for Prejudice, Confusion,
Waste of Time, or Other Reasons

CAL. BUS. & PROF. CODE § 16720
## § 16720. Trust

A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:

(a) To create or carry out restrictions in trade or commerce.

(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.

(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

(e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following:

(1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value.

(2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure.

(3) Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity.

(4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.

Cal. Bus. & Prof. Code § 16722
## § 16722. Contracts violating chapter

Any contract or agreement in violation of this chapter is absolutely void and is not enforceable at law or in equity.

4

CAL. BUS. & PROF. CODE § 16726
**§ 16726. Trusts against public policy**

Except as provided in this chapter, every trust is unlawful, against public policy and void.

CAL. BUS. & PROF. CODE § 16750
### § 16750. Civil action; venue; damages; injunctive relief; attorney fee; costs

(a) Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction in the county where the defendant resides or is found, or any agent resides or is found, or where service may be obtained, without respect to the amount in controversy, and to recover three times the damages sustained by him or her, interest on his or her actual damages pursuant to Section 16761, and preliminary or permanent injunctive relief when and under the same conditions and principles as injunctive relief is granted by courts generally under the laws of this state and the rules governing these proceedings, and shall be awarded a reasonable attorneys' fee together with the costs of the suit. This action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant. The amendments to this section adopted at the 1959 Regular Session of the Legislature do not apply to any action commenced prior to September 18, 1959.

(b) The state and any of its political subdivisions and public agencies shall be deemed a person within the meaning of this section.

(c) The Attorney General may bring an action on behalf of the state or of any of its political subdivisions or public agencies to recover the damages provided for by this section, or by any comparable provision of federal law, provided that the Attorney General shall notify in writing any political subdivision or public agency of his or her intention to bring any such action on its behalf, and at any time within 30 days thereafter, such political subdivision or public agency may, by formal resolution of its governing body or as otherwise specifically provided by applicable law, withdraw the authority of the Attorney General to bring the intended action. In any action brought pursuant to this section on behalf of any political subdivision or public agency of the state, the state shall retain for deposit in the Attorney General antitrust account within the General Fund, out of the proceeds, if any, resulting from such action, an amount equal to the expense incurred by the Attorney General in the investigation and prosecution of such action or an amount equal to 10 percent of the total recovery obtained by the Attorney General, whichever is greater.

(d) In any antitrust action brought on behalf of the state in which the Attorney General is the class representative of political subdivisions, public agencies, or citizens of the state who have been affected by the matters set forth in the complaint, the state shall retain for deposit in the Attorney General antitrust account within the General Fund, the proceeds, if any, of any attorneys' fees awarded by the court in which such case is located, to the Attorney General, resulting from such class representation.

(e) In any action brought by the Attorney General pursuant to either state or federal antitrust laws for the recovery of damages by the state or any of its political subdivisions or public agencies, in addition to his or her other powers and authority, the Attorney General may enter into contracts relating to the investigation and the prosecution of such action with any other party plaintiff who has brought a similar action for the recovery of damages and with whom the Attorney General finds it advantageous to act jointly, or to share common expenses or to cooperate in any manner relative to such action. In any such action, notwithstanding the provisions of Section 12520 of the Government Code, the Attorney General may undertake, among other things, either to render legal services as special counsel to, or to obtain the legal services of special counsel from any department or agency of the United States, of this state or any other state or any department or agency thereof, any county, city, public corporation or public district of this state or of any other state, that has brought or intends to bring a similar action for the recovery of damages, or their duly authorized legal representatives in such action. The Attorney General may also enter into any agreement authorized by Chapter 5 (commencing with Section 6500) of Division 7 of Title 1 of the Government Code with any governmental entity enumerated in this subdivision, notwithstanding any provision to the contrary contained in Section 6500 of the Government Code. Every contract or agreement entered into pursuant to this subdivision (e) shall be approved by the Department of General Services.

(f) The amounts paid into the Attorney General antitrust account within the General Fund pursuant to subdivisions (c), (d) and (e) arising from the same action or companion actions shall not cumulatively exceed the greater of ten percent (10%) of the total recovery in all actions resulting from the Attorney General's representation or an amount equal to the expenses incurred by the Attorney General in the investigation and prosecution of such actions. Any excess shall be paid into the General Fund.

7

(g) The district attorney of any county may prosecute any action on behalf of such county or any city or public agency or political subdivision located wholly within such county which the Attorney General is authorized to bring pursuant to subdivision (c) of this section, whenever it appears that the activities giving rise to such prosecution, or the effects of such activities occur primarily within such county. The district attorney shall file with the Attorney General at least 30 days prior to the filing of any such action a copy of the proposed complaint together with a confidential memorandum and report explaining the facts giving rise to the proposed prosecution and supporting the filing of the new complaint. Prior to entering into any stipulated or consent judgment or other settlement of any such action, the district attorney shall file with the Attorney General at least 30 days prior to the execution thereof a copy of the proposed settlement together with a memorandum of explanation of the settlement. The Attorney General may waive any time requirements provided in this subdivision. In any investigation or action undertaken or brought by a district attorney pursuant to this section, if the Attorney General deems it necessary and in the public interest, the Attorney General may take full charge of any such investigation or prosecution, and the Attorney General shall have all the powers granted by Section 12550 of the Government Code in respect thereto.

(h) In any action prosecuted pursuant to the provisions of subdivision (g) a district attorney may exercise all of the powers conferred on the Attorney General by subdivision (e) provided that every contract or agreement entered into pursuant to this subdivision by a district attorney shall first be approved by the governing authority of the agency in his or her county.

(i) In any action brought pursuant to subdivision (g) a district attorney may represent any political subdivision located within his or her county directly, in which case he or she shall notify in writing such political subdivision of his or her intention to bring any such action on its behalf, and at any time within 30 days thereafter, that political subdivision may, by formal resolution of its governing body or as otherwise specifically provided by applicable law, withdraw the authority of the district attorney to bring the intended action. In any action in which a district attorney directly represents any political subdivision located within his county, the district attorney shall retain out of the proceeds, if any, resulting from such action, an amount equal to the expense incurred by the district attorney in the investigation and prosecution of such action or an amount equal to 10 percent of the total recovery obtained by the district attorney, whichever is greater. In any

8

action brought pursuant to subdivision (g) in which the county, through the district attorney, is the class representative of political subdivisions located within such county, the district attorney shall retain the proceeds, if any, of any attorneys' fees awarded by the court in which such action is pending to the district attorney, resulting from such class representation. All proceeds retained by a district attorney pursuant to this subdivision shall be deposited in the appropriate account as provided by law.

(j) Nothing in this section shall be construed to authorize any district attorney to exercise the powers conferred upon the Attorney General by an act of Congress of September 30, 1976, (P.L. 94-905; 90 Stat. 1983) also known as the Hart-Scott-Rodino Antitrust Improvements Act of 1976, except at the direction of the Attorney General.

FEDERAL RULES OF EVIDENCE RULE 401**, 28 U.S.C.A.**
**Rule 401. Test for Relevant Evidence**

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.

FEDERAL RULES OF EVIDENCE RULE **402, 28 U.S.C.A.**
**Rule 402. General Admissibility of Relevant Evidence**

Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible.

11

FEDERAL RULES OF EVIDENCE RULE **403, 28 U.S.C.A.**
**Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons**

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.