**22-15634**

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆

DJENEBA SIDIBE; JERRY JANKOWSKI; SUSAN HANSEN; DAVID HERMAN;
OPTIMUM GRAPHICS, INC.; JOHNSON POOL & SPA, on Behalf of
Themselves and All Others Similarly Situated,

*Plaintiffs-Appellants,*

—v.—

SUTTER HEALTH,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

## BRIEF OF *AMICI CURIAE* SCHOLARS OF HEALTHCARE ECONOMICS IN SUPPORT OF PLAINTIFFS-APPELLANTS

ANDREW R. DUNLAP
LAUREN J. ZIMMERMAN
ANNE L. ARCOLEO
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

ARGUMENT ....................................................................................... 5

I.    Correct Identification of the Relevant Purchaser Is Critical to Sound Antitrust Enforcement ..................................................... 5

II.   In Healthcare Markets, Health Plans—Not Patients—Are the Relevant Purchasers When It Comes to the Negotiation of Prices and Other Terms of Provider Network Inclusion ............ 7

III.  Failure to Identify Relevant Purchasers Could Undermine Antitrust Enforcement .................................................................. 10

CONCLUSION .................................................................................. 15

APPENDIX NO. 1: DESCRIPTION OF INDIVIDUAL AMICI

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008)...............................................................9

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016).........................................................8, 9

*FTC v. Hackensack Meridian Health, Inc.*,
    30 F.4th 160 (3d Cir. 2022)..................................................................8

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327, 341-43 (3d Cir. 2016) .........................................7, 8, 12

*Saint Alphonsus Med. Ctr. - Nampa, Inc. v. Saint Luke's
    Health Sys. Ltd.*,
    778 F.3d 775 (9th Cir. 2015).........................................................8, 11

## Other Authorities

*Antitrust Applied: Hospital Consolidation Concerns and
    Solutions: Hearing Before the Subcomm. on Competition
    Policy, Antitrust & Consumer Rights of the S. Comm. on
    the Judicia*ry, (2021)............................................................................9

Areeda & Hovenkamp*, Antitrust Law: An Analysis of
    Antitrust Principles and Their Application* ¶¶560-65 (5th
    ed. 2021). ...............................................................................................6

Benjamin R. Handel & Kate Ho, *Industrial Organization of
    Health-Care Markets,* § 2 Nat'l Bureau Econ. Res.
    Working Paper No. 29137 (2021) *available at*
    http://www.nber.org/papers/w29137 ...................................................8

Cooper, Craig, Gaynor, & Reenen, *The Price Ain't Right?
    Hospital Prices and Health Spending on the Privately
    Insured*, Q. J. Econ. 51, 52 (2019)...............................................14, 15

Cory Capps, David Dranove & Mark Satterthwaite,
*Competition and Market Power in Option Demand
Markets*, 34(4) RAND J. Econ. 737 (2003).............................................7

Cory Capps et al., *The Continuing Saga of Hospital Merger
Enforcement*, 82 Antitrust L. J. 441, 445 (2019)................................. 10

Cory S. Capps, *From Rockford to Joplin and Back Again:
The Impact of Economics on Hospital Merger
Enforcement*, 59 Antitrust Bull. 443, 455 (2014) ........................ 10, 13

Daniel Arnold and Christopher Whaley, *Who Pays for Health
Care Costs? The Effects of Health Care Prices on Wages*,
Working paper, RAND Corporation (2020) *available at*
https://www.rand.org/pubs/working_papers/WRA621-
2.html;................................................................................................. 14

Gautam Gowrisankaran, Aviv Nevo, & Robert Town,
*Mergers When Prices Are Negotiated: Evidence from the
Hospital Industry*, 105(1) Am. Econ. Rev. 172 (Jan. 2015)................. 8

Gregory Vistnes, *Hospitals, Mergers, and Two-Stage
Competition*, 67 Antitrust L.J. 671 (2000) ................................... 7, 8, 9

Katherine Baicker and Amitabh Chandra, *The Labor Market
Effects of Rising Health Insurance Premiums*, 24 J. Labor
Econ. 3 (2006) at 609-634 ................................................................ 14

Martin Gaynor and Kevin Pflum, *Getting Market Definition
Right: Hospital Merger Cases and Beyond*, CPI Antitrust
Chronicle (July 2017), *available at*
https://www.competitionpolicyinternational.com/wp-
content/uploads/2017/07/CPI-Gaynor-Pflum.pdf/. ............................ 12

Martin Gaynor, Kate Ho & Robert J. Town, *The Industrial
Organization of Health-Care Markets*, 53(2) J. of Econ.
Lit. 235 (June 2015)...................................................................... 8, 15

iii

Medicare and Medicaid Services, *NHE Fact Sheet*, *available at* https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html ................... 15

Rob Waters, *California's Sutter Health Settlement: What States Can Learn About Protecting Residents from the Effects of Health Care Provider Consolidation*, Milbank Memorial Fund (September 2020), at 2, *available at* https://www.milbank.org/wp-content/uploads/2020/09/Sutter-History-Report_v3.pdf ................... 15

Robert Town & Gregory Vistnes, *Hospital Competition in HMO Networks*, 20(5) J. Health Econ., 733 (2001) ............................. 8

Steven Tenn, The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction, 18(1) Int'l J. Econ. Bus. 65-82 (Feb. 2011) ............................................................. 15

U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (2010), at § 4.2 ..................................... 6

William Vogt & Robert Town, *How Has Hospital Consolidation Affected the Price and Quality of Hospital Care*? 11 (Robert Wood Johnson Found. Synthesis Project, Research Report No. 9, 2006) (updated June 1, 2012), *available at* https://www.rwjf.org/en/library/research/2012/06/the-impact-of-hospital-consolidation.html) ............................................. 15

iv

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29, the undersigned counsel of record certifies that none of the *amici curiae* is a nongovernmental entity with a parent corporation or a publicly held corporation that owns 10% or more of its stock.

Dated: New York, NY
       October 11, 2022

By: _____
      Andrew R. Dunlap
      SELENDY GAY ELSBERG, PLLC
      1290 Avenue of the Americas
      New York, NY 10104
      Tel: 212-390-9005
      adunlap@selendygay.com

      *Attorneys for Amici Curiae*

v

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are 13 scholars who conduct research in healthcare economics and healthcare policy, with particular focus on hospital competition and hospital markets. Appendix No. 1 lists their titles and affiliations. This brief applies current research and economic principles, as well as *amici*'s knowledge of current antitrust approaches, to evaluate hospital markets. Based on their expertise and other publicly available information discussed herein, *amici* believe that the implementation of prevailing economic approaches to hospital antitrust cases will generate outcomes consistent with the objective of antitrust law—to protect competition. They also believe that the District Court issued jury instructions at odds with the best available economic science. *Amici* submit this brief to aid the Court's consideration of these important issues.[2]

---

[1] *Amici* have not been retained by any party to this action. This brief was not authored in whole or in part by counsel for any party. No person other than *amici* and their counsel made a monetary contribution that was intended for the preparation or submission of this brief. All parties have consented to the filing of this brief.

[2] *Amici* make the arguments and observations herein solely in their capacity as individual experts and not on behalf of any institutions with which they are affiliated.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs brought "tying" and "unreasonable-course-of-conduct" claims in the above-mentioned matter, alleging that defendant Sutter Health ("Sutter") leveraged its market power to force health plans to accept anticompetitive contracts and pricing. *Amici* understand that both claims required determining who the relevant purchasers of Sutter's services were: Both claims required a showing that Sutter had market power, and the tying claim required a showing of which parties were subject to Sutter's alleged tie. *Amici* also understand that the District Court did not instruct the jury that the relevant purchasers of Sutter's inpatient hospital services, when it comes to the negotiation of prices and other terms over which hospitals exercise pricing power, are health insurers that construct provider networks.

Over two decades of economic research confirms that the relevant purchasers are the health plans. *Amici*—professors, economists, and scholars of healthcare and/or antitrust economics—respectfully submit this brief to explain the economic consensus regarding this issue and its importance in understanding competition in hospital markets.

In most cases, determining whether an entity has engaged in anti-competitive behavior requires defining the relevant market. These market boundaries, in turn, are used to identify the market's participants. Market participants include the consumers to whom the relevant products or services are sold—*i.e.*, the relevant purchasers—and the suppliers of those services. Section I *infra*.

In American healthcare markets, when it comes to determining (or negotiating) transaction prices, the relevant purchasers of a hospital's inpatient services are the health plans that negotiate the payment amounts for those services, not individual patients. The framework now widely used in economic research and analysis of hospital competition is called the "two-stage model" of hospital competition. In stage one, health plans negotiate with hospitals over terms of network inclusion, including the prices the health plan and its enrollees will pay for the hospital's services if the hospital is included in the insurer's provider network. In stage two, in-network hospitals engage in primarily non-price competition for patients.

Because health plans negotiate with hospitals to establish the prices for hospital services, they are the relevant purchasers when it

comes to analyzing hospital market power and any anticompetitive conduct that affects prices. When hospitals possess market power, they can impose higher prices on health plans or, in some cases, demand that health plans purchase services that the plans do not wish to purchase. For example, hospitals may impose "all-or-nothing" contracts that tie hospitals that a health plan does not want to hospitals that the plan needs to offer an attractive insurance product. Section II *infra*.

Misidentifying the relevant purchaser in an antitrust analysis can lead to adverse and illogical economic consequences. This failure could (1) distort the identities of market participants, thereby making it appear that antitrust defendants face more or less competition than they do, and (2) lead to mistaken conclusions of whether an antitrust defendant engaged in tying. Section III *infra*.

Misidentifying the relevant purchaser could have particularly adverse impacts on healthcare markets. Over the past twenty years, hospitals in many geographies have consolidated into large systems that face few competitors. In many geographic areas this has given hospital systems the market power to raise prices and/or impose unwanted contractual terms on commercial health plans, which cover nearly 90 percent of

4

full-time workers. Effective antitrust enforcement is a central policy tool for preventing and restraining increases in market power and its adverse effects, and thereby promotes economic welfare and protects consumers. Misidentifying relevant purchasers can lead to incorrect determinations of antitrust liability, weakening the competitiveness of markets and harming the end-consumers of healthcare services.

## ARGUMENT

## I. Correct Identification of the Relevant Purchaser Is Critical to Sound Antitrust Enforcement

To determine if a defendant has market power, many antitrust cases start by defining the "relevant market." The relevant market is the sphere of competition within which the defendant is alleged to have caused harm.

Defining an antitrust relevant market requires identifying the relevant product market and relevant geographic market. The product market is the group of products or services that are close substitutes for the product or service at issue, such that relevant purchasers may switch

among them to fill a similar need in response to a price increase.[3] The geographic market identifies the relevant area of competition; competition may be geographically bounded if geography limits some purchasers' willingness or ability to substitute to some products or services, or some suppliers' willingness or ability to serve some customers.[4]

A key purpose of defining a market is to identify the market participants—who is purchasing the relevant product in the relevant market and who is supplying the relevant product in the relevant market. The relevant purchaser is the economic actor making the decisions regarding the terms of purchase from suppliers in the relevant market.[5] When the relevant purchaser is misidentified, any analysis that depends on that determination is unreliable.

---

[3] Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶¶560-65 (5th ed. 2021).

[4] U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (2010), at § 4.2.

[5] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 341-43 (3d Cir. 2016) ("*Hershey*") (analyzing relevant purchaser in the context of geographic market definition).

**II.    In Healthcare Markets, Health Plans—Not Patients—Are the Relevant Purchasers When It Comes to the Negotiation of Prices and Other Terms of Provider Network Inclusion**

The two-stage model of hospital competition is the generally accepted model of competition in healthcare markets.[6] Courts have consistently used it to evaluate anticompetitive conduct by hospitals.[7]

Prices and other terms of network inclusion are established during the first stage. At this stage, hospitals compete with one another for

---

[6] *See generally* Gregory Vistnes, *Hospitals, Mergers, and Two-Stage Competition*, 67 Antitrust L.J. 671 (2000); Cory Capps, David Dranove & Mark Satterthwaite, *Competition and Market Power in Option Demand Markets*, 34(4) RAND J. Econ. 737 (2003); Gautam Gowrisankaran, Aviv Nevo, & Robert Town, *Mergers When Prices Are Negotiated: Evidence from the Hospital Industry*, 105(1) Am. Econ. Rev. 172 (Jan. 2015); Robert Town & Gregory Vistnes, *Hospital Competition in HMO Networks*, 20(5) J. Health Econ., 733 (2001); Martin Gaynor, Kate Ho & Robert J. Town, *The Industrial Organization of Health-Care Markets*, 53(2) J. of Econ. Lit. 235 (June 2015); Benjamin R. Handel & Kate Ho, *Industrial Organization of Health-Care Markets,* § 2 Nat'l Bureau Econ. Res. Working Paper No. 29137 (2021) *available at* http://www.nber.org/papers/w29137.

[7] *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. Saint Luke's Health Sys. Ltd.*, 778 F.3d 775, 784 n.10 (9th Cir. 2015) ("This 'two-stage model' of healthcare competition is 'the accepted model.'"); *accord FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 168 (3d Cir. 2022); *FTC v.*

inclusion in health plan networks.[8] Hospitals "sell" inpatient hospital services to health plans in the sense that they negotiate the prices that the health plans and their members will pay for care that is provided to plan members. If the health plans and hospitals reach mutually agreeable terms, the plans will include the hospitals in their provider networks.

Patients seek care at in-network hospitals because, in most circumstances, it is substantially less costly for patients to visit a hospital that is in their health plan's network. Hospitals are thus incentivized to seek inclusion in health plan networks, so that patients enrolled in those plans will be more likely to seek their services. Health plans are incentivized to include hospitals in their networks because (all else equal) plans with more in-network providers are more attractive to members.[9] In their negotiations, hospitals bargain for higher rates and health plans bargain

_____

*Advocate Health Care Network*, 841 F.3d 460, 465 (7th Cir. 2016); *Hershey*, 838 F.3d at 342.

[8] Gregory Vistnes, *Hospitals, Mergers, and Two-Stage Competition*, 67 Antitrust L.J. 671, 674 (2000).

[9] *Id.* at 678; *see also Antitrust Applied: Hospital Consolidation Concerns and Solutions: Hearing Before the Subcomm. on Competition Policy, Antitrust & Consumer Rights of the S. Comm. on the Judicia*ry, (2021) (statement of Martin Gaynor at 10).

for lower rates, and the resulting rates are heavily determined by each side's market power.[10]

In the second stage of competition, in-network hospitals compete for patients. This competition occurs primarily on dimensions other than price. When choosing among hospitals in their health plan's network, patients are usually not sensitive to differences in the prices negotiated by the plan for inpatient services because patients pay little, if any, of the differences in underlying negotiated prices and may not even be aware of such differences.[11] Patients instead consider non-price aspects of a hospital that are relevant to them, such as quality and convenience.[12]

---

[10] *Advocate Health*, 841 F.3d at 465 (citing Vistnes, 67 Antitrust L.J. at 674-75); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 892 (9th Cir. 2008).

[11] Cory S. Capps, *From Rockford to Joplin and Back Again: The Impact of Economics on Hospital Merger Enforcement*, 59 Antitrust Bull. 443, 455 (2014) ("[T]he patient's and the physician's incentive to consider price is either very small or nil[.]").

[12] Vistnes, 67 Antitrust L.J. at 682 ("[H]ospitals may compete for individual patients by providing private rooms, offering labor-delivery-recovery rooms for maternity care, advertising the friendliness of their nursing staff, or improving the physical appearance of the hospital.").

When analyzing a hospital system's alleged or potential use of market power to demand higher prices, economic principles thus dictate that the relevant purchasers are the *health plans* at the first stage of competition—not patients at the second.[13]

## III. Failure to Identify Relevant Purchasers Could Undermine Antitrust Enforcement

Failure to identify relevant purchasers could result in an incorrectly defined relevant markets and, in turn, to incorrect determinations of market power and harm to end consumers in antitrust cases.

*First*, failure to identify relevant purchasers could result in incorrectly defined markets. The "SSNIP" or "hypothetical monopolist" test is the primary analytical tool used by economists to verify that a candidate market is not overly narrow. The test asks whether a hypothetical monopolist in the proposed market could profitably implement a small but significant, non-transitory increase in price (a "SSNIP"). If sufficient numbers of buyers are likely to switch to alternative products or services so that the price increase is unprofitable, then the hypothetical

_____

[13] *See* Cory Capps et al., *The Continuing Saga of Hospital Merger Enforcement*, 82 Antitrust L. J. 441, 445 (2019).

monopolist lacks the power to raise prices and the market has been drawn too narrowly and should be expanded.[14]

If one performs the SSNIP test using the incorrect relevant purchaser, the resulting bounds of the product and geographic market are unreliable.[15] In hospital antitrust cases, the SSNIP test is properly applied to health plans as the buyers that negotiate prices with the hospital(s) at issue.[16] The test asks whether a hypothetical monopolist could profitably impose a price increase (*i.e.*, a SSNIP) on a health plan. If a health plan must accept the SSNIP because, for example, it has insufficient alternatives that it could turn to, then an antitrust relevant market has been properly identified.

---

[14] *See St. Luke's,* 778 F.3d at 784.

[15] *See Hershey*, 838 F.3d at 336-37 (reversible error to run SSNIP through the lens of patients only).

[16] *See* Martin Gaynor and Kevin Pflum, *Getting Market Definition Right: Hospital Merger Cases and Beyond*, CPI Antitrust Chronicle (July 2017) *available at* https://www.competitionpolicyinternational.com/wp-content/uploads/2017/07/CPI-Gaynor-Pflum.pdf/.

Performing the SSNIP test from the perspective of healthcare patients can generate inaccurate and thus unreliable results.[17] For example, because patients with commercial health insurance are not price sensitive when selecting a hospital, they likely would not switch hospitals even if their hospital increased prices by five or even ten percent (so long as it stays in their health plans' network).[18] If patients do not switch hospitals in response to a SSNIP, an analyst might incorrectly conclude that a given hospital controls a market unto itself—contrary to economic reality in many circumstances.

*Second*, misidentifying relevant purchasers could lead to incorrect outcomes in tying claims. As in the case at hand, tying claims may require that a defendant conditions the sale of one product on the sale of another; a paradigmatic example is an "all-or-nothing" contract in which a hospital system requires a health plan to include all of its hospitals (and often other providers) in the plan's network if the plan wants to

_____

[17] *See Hershey*, 838 F.3d at 336-37.

[18] Cory S. Capps, *From Rockford to Joplin and Back Again: The Impact of Economics on Hospital Merger Enforcement*, 59 Antitrust Bull. 443, 455 (2014).

include any one hospital in its network. Such tying arrangements are imposed on *health plans*, not patients; *i.e.*, health plans are forced to purchase hospital services from all of a system's hospitals if they want members to have in-network access to any of those hospitals, but patients seeking care at one hospital need not go to another. Misidentifying the relevant purchaser could therefore lead to the false conclusion that the system has not imposed a tie, when, in fact, it has.

*Finally*, applying an antitrust analysis not founded on an appropriate economic model of how prices are determined in healthcare markets could have significant real-world negative effects. Healthcare costs have soared in the past twenty years.[19] Although health plans bear these increased prices in the first instance, they pass them onto patients and plan sponsors as increased premiums and/or through lower benefits.[20]

---

[19] Cooper, Craig, Gaynor, & Reenen, *The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured*, Q. J. Econ. 51, 52 (2019).

[20] Daniel Arnold and Christopher Whaley, *Who Pays for Health Care Costs? The Effects of Health Care Prices on Wages*, Working paper, RAND Corporation (2020) *available at*

By 2028, $1 of every $5 in American spending will go towards healthcare.[21] In the private sector, one contributing factor to these rising healthcare costs is concentration in hospital markets,[22] which in turn can be a consequence of insufficient or ineffective antitrust enforcement.[23]

_____

https://www.rand.org/pubs/working_papers/WRA621-2.html; Katherine Baicker and Amitabh Chandra, *The Labor Market Effects of Rising Health Insurance Premiums*, 24 Journal of Labor Economics 3 (2006) at 609–634.

[21] Centers for Medicare and Medicaid Services, *NHE Fact Sheet*, *available at* https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html.

[22] Hospital consolidation has steadily increased over the past decade. There is a strong correlation between this increasing market concentration and higher prices for healthcare. *See e.g.*, Cooper, Craig, Gaynor, & Reenen, *The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured*, Q. J. Econ. 51, 52 (2019); Rob Waters, *California's Sutter Health Settlement: What States Can Learn About Protecting Residents from the Effects of Health Care Provider Consolidation*, Milbank Memorial Fund (September 2020) at 2, *available at* https://www.milbank.org/wp-content/uploads/2020/09/Sutter-History-Report_v3.pdf.

[23] William Vogt & Robert Town, *How Has Hospital Consolidation Affected the Price and Quality of Hospital Care*? 11 (Robert Wood Johnson Found. Synthesis Project, Research Report No. 9, 2006) (updated June 1, 2012), *available at* https://www.rwjf.org/en/library/research/2012/06/the-impact-of-hospital-consolidation.html); Martin Gaynor, Kate Ho and Robert

14

Effective antitrust enforcement requires correctly defining a relevant market and its participants—including the relevant purchasers. Economic consensus establishes that, in negotiations over price and other terms under which a hospital or hospital system participates in a health plan's provider network, the relevant purchaser is the *health plan*.

## CONCLUSION

Economic research has shown that hospital prices for commercially-insured patients are determined through a two-stage model of hospital competition, in which health plans—not patients—negotiate over prices in the first of these stages, and patients then select hospitals primarily based on non-price dimensions in the second stage. Therefore, when price setting is at issue, the relevant purchasers of inpatient hospital services are the health plans that negotiate over the prices and other terms of hospital inclusion in their provider networks. When evaluating antitrust

---

J. Town, *The Industrial Organization of Health-Care Markets*, 53(2) J. of Econ. Lit. 235 (June 2015). One study suggests that "prices at Sutter hospital increased between 28 and 44 percent after its merger with Alta-Bates hospital, relative to the control group." *Id.* (citing Steven Tenn, The Price Effects of Hospital Mergers: A Case Study of the Sutter–Summit Transaction, 18(1) Int'l J. Econ. Bus. 65-82 (Feb. 2011)).

allegations, substituting patients in the place of health plans as the relevant purchaser is likely to lead to economically unsound conclusions that undermine effective antitrust enforcement and fail to combat rising hospital market power.

Dated: New York, NY
      October 11, 2022

Respectfully submitted,

By: _____

Andrew R. Dunlap
Lauren J. Zimmerman
Anne L. Arcoleo
SELENDY GAY ELSBERG, PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
adunlap@selendygay.com
lzimmerman@selendygay.com
aarcoleo@selendygay.com

*Attorneys for Amici Curiae*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a), the undersigned counsel certifies that this Brief: (i) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word and is set in Century Schoolbook font in a size equivalent to 14 points or larger; and (ii) complies with the length requirement of Federal Rule of Appellate Procedure Rules 5(c)(1) and 29(a)(5) because it is 2,903 words (excluding cover page, corporate disclosure statement, table of contents, table of authorities, appendix, exhibit, certificates of counsel, signature block, and proof of service), equivalent to less than one-half the maximum length authorized for the Plaintiffs-Appellants' brief.

Dated: New York, NY
      October 11, 2022

By: _____
      Andrew R. Dunlap

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 11, 2022, I electronically filed this Brief with the Clerk of Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: New York, NY
       October 11, 2022

By: _____
     Andrew R. Dunlap

*Counsel for Amici Curiae*

# Appendix No. 1

## DESCRIPTION OF INDIVIDUAL *AMICI*

*David Cutler* is the Otto Eckstein Professor of Applied Economics in the Department of Economics at Harvard University. Professor Cutler has extensive experience in the healthcare sector. He has served on the Council of Economic Advisers and the National Economic Council during the Clinton Administration. Cutler has advised the Presidential campaigns of Bill Bradley, John Kerry, and Barack Obama as well as being Senior Health Care Advisor for the Obama Presidential Campaign. Professor Cutler is a Commissioner of the Health Policy Commission in Massachusetts. Among other affiliations, Professor Cutler has held positions with the National Institutes of Health and the National Academy of Sciences. Currently, Professor Cutler is a Research Associate at the National Bureau of Economic Research and a member of the National Academy of Medicine.

*Leemore Dafny* is the Bruce V. Rauner Professor of Business Administration at the Harvard Business School. Professor Dafny also serves on the faculties of the John F. Kennedy School of Government and the interdisciplinary Program in Health Policy. Professor Dafny's research examines competitive interactions among payers and providers of

healthcare services, and the intersection of industry and public policy. She is a partner at Bates White and has worked on a range of matters in the healthcare industry involving competition and anticompetitive conduct.

*Randall Ellis* is Professor of Economics at Boston University. He has a background in industrial organization and econometrics that he applies primarily to health economics, spanning both U.S. and international economics topics. His recent work focuses on healthcare payment systems, insurance, innovation, and predictive modeling using big data.

*Roger Feldman* is Professor Emeritus in the Division of Health Policy and Management at the University of Minnesota School of Public Health. He specializes in applying economic theory to health services research. His research examines the organization, financing, and delivery of healthcare with a focus on health insurance and Medicare reform. He is a regular contributor to journals of economics and health services research, and serves as consultant to national agencies such as the U.S. Department of Health and Human Services and the Congressional Budget Office.

*Paul Ginsburg* is Professor of Health Policy at the Sol Price School of Public Policy, University of Southern California and a Senior Fellow at the USC Schaeffer Center for Health Policy and Economics. Ginsburg is a noted speaker and consultant on the changes in the financing and delivery of healthcare, particularly on the evolution of healthcare markets. From 1995 through the end of 2013, he founded and served as President of the Center for Studying Health System Change. He has been named to Modern Healthcare's "100 Most Influential Persons in Health Care" eight times.

*Matthew Grennan* is the Robinson Chancellor's Chair and an Associate Professor in the Economic Analysis & Policy and Innovation & Entrepreneurship groups at Haas School of Business at the University of California, Berkeley. Grennan's research studies healthcare markets, products, and organizations using empirical and theoretical models from industrial organization economics. His recent work examines how complex incentives and imperfect information affect how health technologies are adopted, priced, and ultimately deliver value for society.

*Atul Gupta* is an Assistant Professor in the department of Health Care Management at the Wharton School, University of Pennsylvania.

He is also a Senior Fellow at the Leonard Davis Institute for Health Economics. His current research examines various determinants of productivity in U.S. healthcare including performance pay for providers, local regulation, the expansion of public insurance programs and the growing role of managed care therein.

*Barton Hamilton* is the Robert Brookings Smith Distinguished Professor of Entrepreneurship at the Olin Business School, Washington University in St. Louis. He is also the Research Director of the Koch Center for Family Business at Olin. He conducts research in the fields of entrepreneurship, healthcare, personnel economics, and strategy.

*Vivian Ho* is the James A. Baker III Institute Chair in Health Economics, a professor in the Department of Economics at Rice University, and a professor in the Department of Medicine at Baylor College of Medicine. Ho's research examines the effects of economic incentives and regulations on the quality and costs of healthcare. Her research is widely published in economics, medical, and health services research journals. Ho's research has been funded by the National Institutes of Health, the Agency for Healthcare Research and Quality, the American Cancer

Society, and Arnold Ventures. She was elected to the National Academy of Medicine in 2020.

*Thomas G. McGuire* is Professor Emeritus of Health Economics in the Department of Health Care Policy at Harvard Medical School and a Research Associate at the National Bureau of Economic Research. His research focuses on the design and impact of healthcare payment systems, the economics of healthcare disparities, the economics of mental health policy, and drug regulation and payment. McGuire has contributed to the theory of physician, hospital, and health plan payment. His research on healthcare disparities includes developing approaches to defining and measuring disparities.

*Mark Pauly* is Professor Emeritus of Health Care Management at the Wharton School, University of Pennsylvania. Pauly is a former commissioner on the Physician Payment Review Commission, and has been a consultant to the Congressional Budget Office, the Office of the Secretary of the U.S. Department of Health and Human Services, and the American Enterprise Institute. He has served on the Medicare Technical Advisory Panel.

*Kevin Pflum* is a Principal in the Healthcare Practice at Bates White. He has significant experience analyzing the competitive effects of consolidation, market monopolization, and monopsonization in the healthcare sector. Dr. Pflum has worked with and advised a variety of government enforcement agencies, providers, and payers, and has published multiple papers on the industrial organization of healthcare markets.

*Barak D. Richman* is the Katharine T. Bartlett Professor of Law and Professor of Business Administration at Duke University. Professor Richman's primary research interests include the economics of contracting, new institutional economics, antitrust, and healthcare policy. He has consulted on merger reviews and antitrust actions in the hospital sector and has advised government regulators on healthcare competition matters.