No. 22-15634

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DJENEBA SIDIBE, et al.,

*Plaintiffs-Appellants*,

v.

SUTTER HEALTH,

*Defendant-Appellee.*

Appeal from United States District Court for the
Northern District of California, No. 3:12-CV-04854-LB
(Hon. Laurel Beeler)

## BRIEF OF APPELLEE

Robert H. Bunzel
Oliver Q. Dunlap
BARTKO, ZANKEL, BUNZEL &
MILLER
One Embarcadero Center,
Suite 800
San Francisco, CA 94111
(415) 956-1900

David C. Kiernan
Craig E. Stewart
Matthew J. Silveira
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
(415) 626-3939

Jeffrey A. LeVee
JONES DAY
555 South Flower St., 50th Floor
Los Angeles, CA 90071
(213) 489-3939

*Counsel for Appellee Sutter Health*

## CORPORATE DISCLOSURE STATEMENT

Appellee Sutter Health has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated:  January 3, 2022 /s/ Craig E. Stewart

*Counsel for Appellee Sutter Health*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................... i

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ........................................................4

STATEMENT OF THE CASE ................................................................4

    A.    Sutter's Volume-Discount Contracting With Insurers. ...............4

    B.    Contract Provisions That Preserved the Parties' Bargain. ..........8

    C.    Plaintiffs' Claims..................................................................11

    D.    Ruling on Pre-2006 Evidence.........................................................14

    E.    Trial.......................................................................................15

        1.    Tying Claim...............................................................16

        2.    Unreasonable Course of Conduct Claim..........................24

    F.    Jury Verdict. ..........................................................................26

SUMMARY OF ARGUMENT ..........................................................................26

ARGUMENT ........................................................................................29

I.    STANDARD OF REVIEW ........................................................29

II.    EXCLUSION OF THE PRE-2006 EVIDENCE AT ISSUE WAS
    PROPER AND NOT PREJUDICIAL.........................................................30

    A.    The Court's Ruling Was Not an Abuse of Discretion.................30

        1.    1997 and 1998 memoranda regarding systemwide
            contracting.........................................................................30

        2.    Revenue projection from 1998.............................................34

3.      1999 Alta Bates-Summit merger litigation. ......................37

4.      Alleged forcing of insurers. .................................................40

B.      Plaintiffs' Other Attacks on the Ruling are Groundless. ...........44

C.      The District Court's Ruling Was Not Prejudicial. ......................46

III.   THE DISTRICT COURT PROPERLY DECLINED TO
       INSTRUCT THAT PURPOSE ALONE COULD VIOLATE THE
       CARTWRIGHT ACT. .................................................................................48

A.      An Alleged Anticompetitive Purpose Does Not Violate
        the Cartwright Act. .............................................................................50

B.      The Jury Did Not Reach the Questions to Which the
        Disputed Instructions Pertained. ...................................................53

IV.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY
       ON PLAINTIFFS' THEORY THAT INSURERS ARE THE
       RELEVANT PURCHASERS. .....................................................................53

A.      The District Court Properly Exercised Its Discretion in
        Formulating the Challenged Instructions. ...................................53

B.      Accepting Plaintiffs' Proposed Formulation Would Have
        Been Error. ............................................................................................57

C.      Any Purported Error Was Not Prejudicial. ................................67

D.      Plaintiffs' Challenge to Dr. Gowrisankaran's Kaiser
        Testimony, If Not Waived, is Meritless. ........................................70

V.     THIS COURT SHOULD NOT DISTURB THE DISTRICT
       COURT'S SPOLIATION RULING. ..........................................................71

A.      Plaintiffs Have Not Properly Challenged the Spoliation
        Ruling. ....................................................................................................71

B.      The Ruling was Correct. ...................................................................72

C.      If the District Court Erred, Only Vacatur is Appropriate. ........75

CONCLUSION ...................................................................................................76

STATEMENT OF RELATED CASES ................................................................77

CERTIFICATE OF COMPLIANCE ...................................................................78

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*32nd St. Surgery Ctr., LLC v. Right Choice Managed Care,*
   820 F.3d 950 (8th Cir. 2016) ...............................................................5

*Akiona v. United States,*
   938 F.2d 158 (9th Cir. 1991) ..............................................................74

*Am. Unites for Kids v. Rousseau,*
   985 F.3d 1075 (9th Cir. 2021) ............................................................74

*Badgley v. United States,*
   957 F.3d 969 (9th Cir. 2020) ..............................................................70

*Barranco v. 3D Systems Corp.,*
   952 F.3d 1122 (9th Cir. 2020) ............................................................46

*Bell v. Blue Cross of California,*
   131 Cal. App. 4th 211 (2005)..............................................................21

*Bird v. Lewis & Clark Coll.,*
   303 F.3d 1015 (9th Cir. 2002) ............................................................29

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.,*
   963 F.3d 859 (9th Cir. 2020) ..............................................................56

*Brewer v. City of Napa,*
   210 F.3d 1093 (9th Cir. 2000) ............................................................55

*Cascade Health Sols. v. PeaceHealth,*
   515 F.3d 883 (9th Cir. 2008) ..............................................................12

*Chicago Board of Trade v. United States,*
   246 U.S. 231 (1918) ............................................................................52

*Children's Hosp. Cent. California v. Blue Cross of California,*
   226 Cal. App. 4th 1260 (2014)............................................................21

*Cholakyan v. Mercedes-Benz, USA, LLC,*
    281 F.R.D. 534 (C.D. Cal. 2012) ......................................................40

*City of Long Beach v. Standard Oil Co. of California,*
    46 F.3d 929 (9th Cir. 1995) .................................................... 42, 56

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962) ........................................................................45

*Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.,*
    22 Cal. 3d 302 (1978) .....................................................................51

*Dimidowich v. Bell & Howell,*
    803 F.2d 1473 (9th Cir. 1986) ........................................................51

*Exxon Corp. v. Superior Court,*
    51 Cal. App. 4th 1672 (1997)................................................... 50, 54

*Feldman v. Sacramento Bd. of Realtors, Inc.,*
    119 Cal. App. 3d 739 (1981) ..........................................................50

*Fink v. Gomez,*
    239 F.3d 989 (9th Cir. 2001) .........................................................74

*Fisherman's Wharf Bay Cruise Corp. v. Superior Court,*
    114 Cal. App. 4th 309 (2003)..........................................................50

*Freeman v. San Diego Ass'n of Realtors,*
    77 Cal. App. 4th 171 (1999) ..........................................................54

*FTC v. Advoc. Health Care Network,*
    841 F.3d 460 (7th Cir. 2016) .........................................................64

*FTC v. Hackensack Meridian Health, Inc.,*
    30 F.4th 160 (3d Cir. 2022)............................................................64

*FTC v. Penn State Hershey Med. Ctr.,*
    838 F.3d 327 (3d Cir. 2016)............................................................64

*FTC v. Sanford Health,*
    926 F.3d 959 (8th Cir. 2019) .........................................................64

*Gantt v. City of Los Angeles,*
  717 F.3d 702 (9th Cir. 2013) ...............................................................56

*Glover v. BIC Corp.,*
  6 F.3d 1318 (9th Cir. 1993) ................................................................74

*High Tech. Careers v. San Jose Mercury News,*
  996 F.2d 987 (9th Cir. 1993) ....................................................... 58, 61

*Hung Lam v. City of San Jose,*
  869 F.3d 1077 (9th Cir. 2017) ............................................................55

*In re Cipro Cases I & II,*
  61 Cal. 4th 116 (2015)........................................................................51

*In re O'Brien,*
  312 F.3d 1135 (9th Cir. 2002) ............................................................72

*Kentucky Ass'n of Health Plans, Inc. v. Miller,*
  538 U.S. 329 (2003) .............................................................................5

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
  726 F.2d 1381 (9th Cir. 1984) ......................................... 51, 52, 56, 58

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.,*
  658 F.3d 936 (9th Cir. 2011) ..............................................................55

*Marsh v. Anesthesia Servs. Med. Grp., Inc.,*
  200 Cal. App. 4th 480 (2011)..............................................................50

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.,*
  817 F.3d 934 (6th Cir. 2016) ................................................................5

*Med. Lab. Mgmt. Consultants v. Am. Broad. Co.,*
  306 F.3d 806 (9th Cir. 2002) ....................................................... 72, 75

*Ohio v. American Express Co.,*
  138 S. Ct. 2274 (2018) ........................................................................65

*Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.,*
  526 F.2d 1196 (9th Cir. 1975) ............................................................52

*People v. Moore,*
  51 Cal. 4th 386 (2011) ........................................................................52

*People v. Nero,*
  181 Cal. App. 4th 504 (2010) ............................................................52

*People v. Samaniego,*
  172 Cal. App. 4th 1148 (2009) ..........................................................52

*PLS.com, LLC v. Nat'l Ass'n of Realtors,*
  32 F.4th 824 (9th Cir. 2022) ..............................................................65

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.,*
  778 F.3d 775 (9th Cir. 2015) ...................................................... 58, 63

*Sali v. Corona Reg'l Med. Ctr.,*
  909 F.3d 996 (9th Cir. 2018) ..............................................................44

*Shirk v. U.S. ex rel. Dep't of Interior,*
  773 F.3d 999 (9th Cir. 2014) ..............................................................75

*Simeonov v. Ashcroft,*
  371 F.3d 532 (9th Cir. 2004) ..............................................................71

*Sprint/United Mgmt. Co. v. Mendelsohn,*
  552 U.S. 379 (2008) ...........................................................................29

*Sullivan v. U.S. Dep't of Navy,*
  365 F.3d 827 (9th Cir. 2004) ..............................................................71

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.,*
  305 F.3d 1124 (10th Cir. 2002) .........................................................65

*Trevino v. Gates,*
  99 F.3d 911 (9th Cir. 1999) ................................................................29

*UAS Mgmt., Inc. v. Mater Misericordiae Hosp.,*
  169 Cal. App. 4th 357 (2008) ............................................................12

*United States v. Cont'l Can Co.,*
  378 U.S. 441 (1964) ...........................................................................58

*United States v. Haischer,*
    780 F.3d 1277 (9th Cir. 2015) ...........................................29

*United States v. Hall,*
    552 F.2d 273 (9th Cir. 1977) ............................................56

*US Airways, Inc. v. Sabre Holdings Corp.,*
    938 F.3d 43 (2d Cir. 2019)....................................... 56, 65

*Vasquez v. Indiana Univ. Health, Inc.,*
    40 F.4th 582 (7th Cir. 2022) .............................................64

*Wilk v. Am. Med. Ass'n,*
    719 F.2d 207 (7th Cir. 1983) ............................................50

## Statutes

Cal. Health & Safety Code § 1375.7(b) ....................................26

Cal. Health & Safety Code § 1395.6 ........................................6

## Other Authorities

DOJ/FTC Horizontal Merger Guidelines,
    https://www.justice.gov/atr/horizontal-merger-guidelines-
    08192010 ....................................................................62

K. Ho & R. Lee, *Insurer Competition in Health Care Markets*, 85
    ECONOMETRICA 379 (March 2017) ....................................63

## Rules

Cal. Rules of Court, Rule 2.1050(b)–(c) ..................................52

Fed. R. App. Proc., Rule 28(a)(5), (7), (8) ...............................70

Fed. R. Evid., Rule 103 .......................................................40

Fed. R. Evid., Rule 403 ................................................passim

# Regulations

28 Cal. Code Regs. § 1300.71(a)(3) ........................................................................6

## INTRODUCTION

After a four-week trial, the jury found that plaintiffs failed to prove the threshold element of their two claims. Plaintiffs do not address the extensive evidence supporting that verdict, let alone challenge its sufficiency. Instead, they argue that an evidentiary ruling and two purported instructional errors require reversal. This Court should affirm because the challenged rulings were correct and, in any event, were immaterial to the jury's verdict.

Plaintiffs asserted two claims at trial under the California Cartwright Act—tying and "unreasonable course of conduct." Both were centered on the assertion that Sutter prevented insurance companies from creating "narrow" and "tiered" networks designed to steer patients away from Sutter. The jury found against plaintiffs on the first element of each claim. On the tying claim, it found Sutter did not tie its hospital services together. On the course-of-conduct claim, it found Sutter did not force insurers to enter contracts with terms that prevented steering. The jury never reached (and did not need to reach) any questions regarding market definition, market power, anticompetitive effect, procompetitive benefits, or damages.

1

Plaintiffs first argue that the district court should have admitted evidence from as much as a decade or more before the damages period because it supposedly showed Sutter's purpose or intent. But the trial court did not abuse its discretion in excluding that evidence under Rule 403. The evidence did not address the contract terms and conduct the jury was asked to address, and its admission would have confused the issues and prejudiced Sutter by improperly inviting the jury to hold Sutter liable for other alleged conduct that far pre-dated the limitations period. Nor did the ruling prejudice plaintiffs because admitting the evidence would not have rebutted the extensive evidence showing, as the jury found, that Sutter did not engage in tying or prevent steering.

Plaintiffs next challenge the court's instructions regarding purpose. Consistent with uniform California case law, the court properly instructed that anticompetitive effect is required, with the reasons for the alleged restraint to be considered when weighing anticompetitive effects against procompetitive benefits. Purpose alone is not sufficient to support an antitrust claim. And, again, the court's instructions did not prejudice plaintiffs. Plaintiffs' preferred instructions would have directed the jury to consider purpose for the second and third elements of plaintiffs' course-of-

conduct claim. But the jury never reached those elements because it found against plaintiffs on the first element.

Finally, the court properly declined to instruct that insurers are the only relevant "buyers" of hospital services. The court's instructions correctly stated the law and left plaintiffs free to argue their theory as a factual matter. By contrast, giving plaintiffs' instruction would have been error. Plaintiffs acknowledge they sought the instruction so that they could tell the jury that the instruction precluded any finding that Kaiser competes against Sutter. But the record is filled with evidence from insurers, Sutter, and Kaiser itself that Kaiser and Sutter compete. None of plaintiffs' cases defeats that evidence because none addressed a vertically integrated provider like Kaiser. And, again, the court's instructions did not prejudice plaintiffs because the grounds on which the jury found against plaintiffs did not turn on the identity of the buyer.

After ten years of litigation and a lengthy trial in which the evidence directly refuted their claims, the jury correctly found plaintiffs' claims failed at the first step. This Court should affirm and bring this lengthy lawsuit to a close.

## STATEMENT OF JURISDICTION

Sutter agrees with plaintiffs' statement of jurisdiction.

## STATEMENT OF THE CASE

Plaintiffs one-sidedly recite only their version of the facts, while omitting almost entirely the extensive evidence refuting that story and supporting the jury's verdict.

### A.    Sutter's Volume-Discount Contracting With Insurers.

Sutter operates an integrated healthcare system that serves over 100 communities in Northern California with 24 hospitals and dozens of other medical providers, including physician groups and ambulatory surgery centers.  7-SER-1892:4–7, 12-SER-3303:11–16.

Sutter and insurance companies enter contracts that, among other things, set the rates for services Sutter provides to commercially insured patients.  In negotiating those contracts, the insurers seek discounted rates in exchange for the insurers' including Sutter providers in their provider networks.  Being in-network is valuable to a hospital because it results in more patients using the hospital — insurers encourage patients to use in-network providers by covering more of the cost when they do.  12-SER-

3302:13–16, 12-SER-3321:17–3329:13, 9-SER-2440:13–15, 10-SER-2917:7–18,

13-SER-3709:21–3710:3, 16-SER-4618:12–22.

Plaintiffs do not challenge the lawfulness of this discount-for-volume

bargaining. It is a well-recognized and longstanding feature of valid

provider-insurer contracting. *Kentucky Ass'n of Health Plans, Inc. v. Miller*,

538 U.S. 329, 332 (2003) ("Providers in such networks agree to render

health-care services . . . at discounted rates . . . . In return, they receive the

benefit of [higher] patient volume . . . ."); *accord Med. Ctr. at Elizabeth Place,*

*LLC v. Atrium Health Sys.*, 817 F.3d 934, 941 (6th Cir. 2016); *32nd St. Surgery*

*Ctr., LLC v. Right Choice Managed Care*, 820 F.3d 950, 952 (8th Cir. 2016).[1]

While the discount for in-network hospitals varies, the blended

average of all rates for large insurers is usually between 55 and 60 percent

of "chargemaster" (or list) charges. 12-SER-3323:24–3324:12; *see also* 12-

SER-3318:21–3320:11, 12-SER-3340:19–3342:15. Smaller insurers that bring

less volume to Sutter receive discounts that are typically 80 to 85 percent of

charges. 12-SER-3323:1–22, 12-SER-3328:20–3329:14.

---

[1]     Unless otherwise indicated, all emphasis in this brief is added and
internal quotation marks and citations are omitted.

The corollary to discounted rates for in-network hospitals is higher rates for out-of-network hospitals. Sutter's contracts specify such a non-participating (or "non-par") rate, which is usually between 90 and 95 percent of charges. 12-SER-3326:6–11. Plaintiffs' expert agreed that it is appropriate for a provider to contractually set a higher rate for hospitals that will get less volume because they are excluded from a network. 10-SER-2916:12–2917:22. California law likewise recognizes that providers may contractually set higher out-of-network rates. Cal. Health & Safety Code § 1395.6(a); 28 Cal. Code Regs. § 1300.71(a)(3). And the evidence was uncontradicted that a provider like Sutter has a strong, legitimate, and procompetitive interest in having an agreed out-of-network rate. Without that rate, Sutter would be faced with either accepting an insurer's unilaterally determined "reasonable and customary" rate or needing to engage in burdensome and expensive litigation to obtain reasonable payment. 12-SER-3368:2–3370:4, 12-SER-3372:18–3374:25, 13-SER-3642:25–3643:15, 8-SER-2232:5–2233:17, 8-SER-2233:24–2234:12, 9-SER-2384:22–25.

Each contract also contains a "product grid" that sets out the negotiated network participation of each Sutter provider—*i.e.*, whether the

provider is in-network or out-of-network.  12-SER-3334:9–18.  Below is the

first page of the product grid in the 2015 agreement with Blue Shield:

**Exhibit 23**
**Benefit Program and Network Participation**
**(Every Provider might not participate in every Benefit Program or Network)**
**Effective:  February 1, 2015**

| Benefit Program (Product) | | Description | Provider Participation Status | | |
|---|---|---|---|---|---|
| **A.** | **Commercial HMO Products (Plan ):** | | **PMG** | **Hospital** | **Ancillary** |
| A1 | Blue Shield Access + HMO Plan | Members must choose a primary care physician who is responsible for coordinating the health care services for the Member, includes HMO Supplement to Original Medicare Plan. | P, except SMF/SEC and SMF/SNMG | P | P |
| A2 | Blue Shield Access+ HMO/EPO CalPERS Limited Network | CalPERS Members must choose a primary care physician who is responsible for coordinating the health care services for the Member, includes HMO Supplement to Original Medicare Plan. | NP except: PAMF/PAFMG (All Sites) and PAMF - MPD /MPMG, SEBMF/EBPMG (including All Other Sites and Diablo Division), SMF/SMG - Solano Division and SMF/SNMG (for EPO only) Effective January 1, 2016 SMF/SMG - Solano Division shall be non-participating | NP except: ABSMC, SLH, SAH, SCH, SSMC, NCH, MPHS, SMSC, MPSH, SDMC and SSHNV | P |
| A3 | Blue Shield Net Value HMO CalPERS Limited Network | CalPERS Members must choose a primary care physician who is responsible for coordinating the health care services for the Member and managing care within the Net Value Network. Available in the following counties: Contra Costa, El Dorado, Madera, Nevada, Placer, Sacramento, San Francisco, San Joaquin, San Mateo, San Luis Obispo, Santa Clara, Santa | NP except: SEBMF/EBPMG (including Diablo Division and All Other Sites), | NP except: SLH, SAH, SCH, NCH, SSMC, SMSC, MPSH, ABSMC, SDMC and SSHNV | P |

10-ER-2142. The first three columns describe the insurer's product, and the next three columns describe the network participation of each Sutter provider, with "P" indicating participating (in-network) and "NP" indicating non-participating (out-of-network). *See* 12-SER-3330:15– 3332:20.[2] The providers are identified by their acronym. *See* 10-ER-2139–41 (table of acronyms). Where the parties agreed that a Sutter provider would participate in a network but at a lower "tier" (meaning patients would have a higher co-pay, co-insurance, or deductible for using that hospital than for using other in-network hospitals), that tier status is also specified. *See, e.g.,* 10-ER-2147.

**B.      Contract Provisions That Preserved the Parties' Bargain.**

The contract makes explicit that the agreed rates are predicated on the agreed network participation. *See, e.g.,* 10-ER-2128, § 2.06. And the contract contains provisions to protect this negotiated *quid pro quo*:

- The "*No Change to Provider Status*" provision specifies that the insurer may not amend the contract to change a Sutter provider's network participation during the term without Sutter's consent. 10-ER-2128, § 2.06.1; *see* 12-SER-3347:5–24, 8-SER-2216:2–11.

---

[2]      "PMG" in the fourth column refers to "Participating Medical Group." 12-SER-3332:1–3.

- The "*New Plan*" provision requires that the parties negotiate Sutter's participation in any new benefit plan or network the insurer might offer. 10-ER-2128, § 2.06.2; *see* 12-SER-3347:25–3348:24.

- The "*Equal Treatment*" provision requires that, once the parties have agreed that a Sutter hospital will participate in a network, the insurer will not deviate from that agreement by treating the hospital less favorably than other hospitals in the network. *See* 10-ER-2128, § 2.06.3; 12-SER-3348:25–3349:17.

- The "*Tiered Products, Restricted or Limited Networks*" provision states that the agreed network participation is specified in the contract and any changes require Sutter's consent. 10-ER-2128, § 2.06.4; 12-SER-3350:5–3352:1.

By requiring that changes to the contract be negotiated and mutually agreed to, these provisions give effect to the parties' bargain and ensure that each side receives the anticipated benefits of the contract. The insurers benefit from discounted rates they can count on for the duration of the contract, which enable them to create attractive products for their insureds. And Sutter benefits from predictable revenue that it can use to, among other things, (1) invest in providing quality care, (2) pay its high fixed costs, and (3) cover its losses in providing care to uninsured and government-insured patients. 6-SER-1510:15–1511:25, 12-SER-3318:11–17, 13-SER-3744:15–3746:4, 13-SER-3756:5–15, 14-SER-4044:4–4045:6, 13-SER-3799:8–15, 16-SER-4522:12–22, 16-SER-4647:21–4648:12.

These provisions also ensure that insurers do not make unilateral changes that could impair Sutter's ability to provide quality care or that impose unwanted or unexpected costs on its patients. Of principal importance, to ensure the coordination of care that is vital to quality care, Sutter wanted to avoid insurers' including some providers in a network but excluding other providers that were integrated with the included providers (*e.g.*, including physicians but excluding the hospitals where they practice). 12-SER-3381:21–3386:1, 12-SER-3353:10–23, 12-SER-3390:18–3392:6, 12-SER-3395:12–3397:22. Sutter was also concerned about inaccuracies in the insurers' provider directories, which could mislead (and in Sutter's experience, had misled) patients about whether their doctor or hospital was in-network. 12-SER-3401:13–3428:22. Government reports, on which Sutter relied, identified both lack of adequate providers in a network and unexpected costs to patients as problems with narrow and tiered networks. *Id.;* 18-SER-5130–40.

Sutter and the insurers negotiate a single "systemwide" contract rather than negotiating separate contracts for each of Sutter's 24 hospitals and scores of other providers. Other hospital systems also negotiate as a system. 5-SER-1256:10-23, 5-SER-1279:23-25, 5-SER-1295:17–1296:2

10

(Dignity); 13-SER-3675:1-6, 13-SER-3685:21–3686:2 (Stanford); 14-SER-4051:3–19 (Tenet); *see also* 7-SER-1987:11–18.  As plaintiffs' witnesses admitted, merely entering a systemwide contract is not a sale of any services and does not determine which hospitals will be in-network.  4-SER-938:1–9, 8-SER-2211:10–15.  Whether contracting is systemwide or hospital-by-hospital, network participation must be negotiated and determined as to each hospital, with the result specified in the contract's product grid.  *Supra*, pp. 6–7.

## C.     Plaintiffs' Claims.

For their tying claim, plaintiffs asserted that Sutter tied the sale of inpatient hospital services at seven hospitals to the purchase of services at four other hospitals.  1-ER-19, 18-SER-5093:16–5094:7.[3]  As alleged in plaintiffs' complaint, this claim was not that Sutter refused to sell a given hospital service (like an appendectomy) unless the buyer also obtained

---

[3]     The alleged "tying" hospitals were Sutter Coast Hospital, Sutter Lakeside Hospital, Sutter Auburn Faith Hospital, Sutter Delta Medical Center, Sutter Amador Hospital, Sutter Tracy Community Hospital, and Alta Bates Summit Medical Center.  The alleged "tied" hospitals were California Pacific Medical Center, Sutter Medical Center Sacramento, Santa Rosa Regional Hospital, and Memorial Medical Center.  1-ER-19, 9-SER-2605:13–2606:24.

some other service from Sutter. Plaintiffs offered no evidence that Sutter ever did so. Instead, plaintiffs alleged that Sutter refused to agree that the "tying" hospitals could participate in an insurer's network unless the insurer also included the "tied" hospitals in network. 3-ER-585 (¶¶ 125–27). According to plaintiffs, this alleged tie was anticompetitive because it purportedly prevented insurers from creating "narrow" networks that selectively excluded the tied hospitals (or "tiered" networks that made it more expensive for patients to use those hospitals) and could thereby steer patients away from those Sutter hospitals. *E.g.*, 3-ER-577–78 (¶¶ 94–97). Plaintiffs repeated this theory in their opening statement. 3-SER-646:15–647:15. It is also the theory plaintiffs refer to on appeal when, in discussing the two-stage model of competition, they assert that competition occurs when providers "compete by bargaining with health plans to be included in their provider networks." AOB 7. And network participation was what was at issue in the two hospital tying cases plaintiffs cite. *See* AOB 66–67 (*citing UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 369 (2008); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 892–93 (9th Cir. 2008)).

In closing argument, however, plaintiffs took a different tack.  They asserted that their complaint was merely a "notice document," that their tying claim had "developed," and that their "trial theory" was not in fact about "network participation" but about the "purchase of hospital services" (or perhaps the "purchase [of] hospitals").  17-SER-4871:15–21, 17-SER-5031:6–5032:23.  At the same time, however, perhaps recognizing that Sutter did not tie together the sales of its individual services and that neither patients nor insurers purchase a "hospital," plaintiffs continued to refer to "network participation" as central to their claim.  They argued that Sutter's "systemwide contracts tied in-network participation to out-of-network participation," 17-SER-4874:1–3, and that "in-network participation and out-of-network participation was linked through those contracts," 17-SER-5033:1–4.  Whatever theory plaintiffs intended, the verdict form asked the jury to determine whether Sutter tied together the sale of its "hospital services"—and plaintiffs do not challenge that aspect of the verdict form.

For their course-of-conduct claim, plaintiffs asserted that Sutter forced insurers to agree to contractual provisions that prevented insurers from steering patients away from Sutter's hospitals.  18-SER-5096:11–21, 1-

ER-9.  The allegedly offending contractual provisions were the terms

described above (*supra*, pp. 8–9) that required negotiation and mutual

agreement over changes to the contract and set a higher out-of-network

price, and also the contract's confidentiality provisions.  17-SER-4844:17–

4845:10.

The alleged damages period was 2011 to 2020.  Plaintiffs originally

claimed damages beginning in 2008, but, in a ruling plaintiffs do not

challenge on appeal, the district court granted summary judgment against

plaintiffs for any damages before 2011.  3-ER-474.

### D.    Ruling on Pre-2006 Evidence.

Before trial, Sutter moved *in limine* under Federal Rule of Evidence

403 to exclude evidence from before 2006 as too remote in time and too

disconnected from the conduct at issue.  After a lengthy hearing (4-ER-735–

68), the district court granted the motion.  The court recognized that some

evidence from before the damages period may be appropriate to provide

context.  1-ER-110.  But it concluded that the evidence plaintiffs offered

from as much as a decade or more earlier is "too attenuated from the

relevant period, confuses the issues, wastes time and adds delay in the

form of the parties' litigating collateral issues."  1-ER-111.  The court made

clear, however, that, "at trial, in the context of a particular identified exhibit, the plaintiffs can make an offer of proof." *Id.*

Rather than waiting until trial, plaintiffs made an offer of proof several months before trial, consisting of 23 items of evidence, primarily focused on Sutter's decision in the late 1990s to transition to systemwide contracting and Sutter's implementation of that decision in the early 2000s. 2-ER-144. Following another lengthy hearing (4-ER-771–830), the district court ruled that the 23 items should be excluded. The court concluded that the proffered evidence had only marginal relevance because of its age and because it "does not address (except in an attenuated manner) the main issue in the case: whether the systemwide contracts during the relevant period were anticompetitive." 1-ER-93. The court concluded that introducing the proffered items pertaining to decisions and actions long pre-dating the relevant period would be confusing and that any relevance was substantially outweighed by its prejudicial effect. *Id.*

### E.    Trial.

Plaintiffs do not challenge the sufficiency of the evidence supporting the jury's verdict.

### 1.    Tying Claim.

On tying, the jury was asked "Did Sutter sell inpatient hospital services in one or more of the tying hospitals only if the buyer also purchased inpatient hospital services at one or more of the tied hospitals?" 1-ER-7.  The jury had ample basis for answering no.

a.    As to sales of services, plaintiffs presented no evidence that Sutter ever refused to sell a hospital service unless the purchaser (whether an insurer or a patient) also purchased a separate service from Sutter.  The only evidence on this point was that Sutter did not do so.  8-SER-2261:7–17.

b.    The answer is the same if "inpatient hospital services" is deemed to mean "network participation."  The record is filled with evidence that Sutter did not condition the network participation of the seven "tying" hospitals on the participation of the four "tied" hospitals.  As shown in the following trial exhibit listing 94 networks from product grids in executed contracts, Sutter repeatedly agreed to networks that excluded Sutter hospitals (or that placed them in a lower tier), including networks that included "tying" hospitals but excluded (or tiered) one or more "tied" hospitals:

| aetna | | Anthem BlueCross | | | | BlueShield | | | Health Net | UnitedHealthcare |
|---|---|---|---|---|---|---|---|---|---|---|
| Aetna Premier Care/Plus | ACO Flex | Community Med Centers | Healthy Check Program | USC | Prime Healthcare | USC Verdugo Hills Hospital | SA PPO ASO – Adventist | Tandem PPO | Blue & Gold HMO | CORE |
| Aetna Value Network | Advantage PPO | Community Memorial Health | Henry Mayo Newhall | Pathway HMO Plans | Salinas Valley Memorial Hospital | UC Care | SA PPO ASO – Alameda Hosp | Trio ACO HMO Covered CA – Small Business | ExcelCare ELECT Open Access | Nexus ACO |
| Aexcel/Aexcel PLUS | Alameda Health System | Cottage Health System | HMO Saver Small Group Plan | Pathway(s) Narrow PPO Network | Salinas Valley Memorial Hosp Union | Access+ HMO/EPO CalPERS | SA PPO – Bakersfield Heart Hosp | Trio ACO HMO – SF Health Svc System | ExcelCare HMO | |
| BEN/Choose and Save | American Hospital/Mad River | County of San Joaquin | Huntington Memorial Hospital | Pathway(s) EPO (Tiered Hospital) | Scripps Health | ASO – Washington Hospital | SA PPO – Cass Colina Hosp | Trio ACO HMO (sold outside CHBE) | PremierCare HMO | |
| Concentric | Barton Health Systems | Dameron Hospital Association | KPC Healthcare EPO | Pathway(s) PPO (Tiered Hospital) | Select HMO | Blue Groove | SA PPO – Enloe Med Ctr (Classic / Value) | Trio ACO HMO (sold through CHBE) | PureCare Health Care Service Plan | |
| Jackson Labs | California Pathway EPO | Dignity Health Plans | KPC Healthcare PPO | Pebble Beach Company | Select HMO (CalPERS Only) | CalPERS Trio HMO | SA PPO – Marin General Hosp | | PureCare One EPO | |
| Savings Plus | Cedars Sinai Health Systems | Eisenhower Med Center | Madera Community Hospital | PERS Select PPO | Select PPO | Daughters of Charity Health System | SA PPO – Marshall Med Ctr | | SmartCare HMO | |
| SHCA Cisco Life—Connections | Central Coast Community | EPO Tiered Hospital Program | Memorial Care Health System | Power Advantage HMO | Torrance Health Association | Local Access+ | SA PPO – Plumas District Hosp | | | |
| Stanford HealthCare | CHA Hollywood Presbyterian PPO | Fairfield Medical Center | Oak Valley Hospital District | Power Select HMO | UC Faculty Health Insurance Plan | Net Value HMO CalPERS | SA PPO – UC Berkeley Student Plan | | | |
| Stanford Healthcare Alliance | Community Hospital – Monterey Peninsula | Fremont Rideout Health Group | Orchard Hospital | Presbyterian Intercommunity Hosp | UC Student Health Insurance Plan | SA ASO – John Muir | Save Net HMO | | | |

18-SER-5141, 5-SER-1287:19–1288:13, 11-SER-3168:22–25, 13-SER-3592:1–21; *see also* 18-SER-5150, 15-SER-4241:5–4243:16, 18-SER-5142–45.

The Blue Shield Access+ and Net Value networks are illustrative. As shown on the product grid excerpted above (*supra*, p. 7), those networks (which Blue Shield has offered for more than 15 years) include five of the alleged tying hospitals but only one of the alleged tied hospitals. 12-SER-3335:12–3337:23. The product grid also includes Blue Shield's Local Access+ and SaveNet networks (which Blue Shield has offered for nearly a decade), which include three tying hospitals but none of the tied hospitals. 10-ER-2143, 8-SER-2214:1–20, 10-ER-2081, 10-ER-2097, 10-ER-2235.

Anthem's Power Select HMO (which Anthem has offered since 2007 including a name change) similarly included four tying hospitals but none of the tied hospitals (except for transplants at two hospitals). 9-SER-2404:3–21, 9-ER-1769, 9-ER-1879, 9-ER-1895, 9-ER-1968.

These networks refute any claim that Sutter would agree to including tying hospitals only if the insurer agreed to include the tied hospitals. And they are only a few of many such examples, all of which refute plaintiffs' tying theory.[4] Sutter also agreed to amendments during the term of existing contracts that excluded or tiered its providers. *E.g.*, 12-SER-3354:15–3356:8.

---

[4] *See* 5-SER-1290:18–1291:22, 4-SER-914:4-916:20 (discussing 11-ER-2440 (SmartCare); 5-SER-1155:18–1156:6 (discussing 10-ER-2059, Shared Advantage PPO ASO); 8-SER-2248:14–2249:7 (Tandem); 8-SER-2249:8–2251:5 (Trio); 9-SER-2366:5–15, 9-SER-2397:22–2399:11 (Select PPO); 9-SER-2375:2–7 (ACO Flex); 9-SER-2399:12–2400:6 (discussing 9-ER-1897, PERS Select PPO); 9-SER-2400:9–2401:2 (PERS Select); 9-SER-2401:3–2402:20 (CCSF plan); 9-SER-2403:5–2404:2 (Power Advantage HMO); 9-SER-2531:22–2533:12 (CORE); 4-SER-911:9–912:9 (Blue & Gold).

As Ms. Brendt explained, even if self-funded plans and Southern California plans are removed from this list, the list includes about 50 plans. 13-SER-3606:20–3608:5. And she explained why the self-funded and Southern California plans should not be removed. 13-SER-3608:14–3617:18.

Numerous instances also exist in which an insurer excluded Sutter hospitals entirely from certain products, and yet Sutter agreed to participate in other products of that same insurer—which again contradicts any claim of all-or-none participation. *E.g.*, 13-SER-3602:21–3604:4 (Blue Shield alone had roughly 50 ACO narrow networks that excluded Sutter entirely).

All of this evidence refutes plaintiffs' assertion that Sutter's non-par rate "made it impossible for health plans to construct lower-premium networks that excluded (or tiered) Sutter hospitals," AOB 18, or that Sutter "would almost always refuse to allow tiering for its hospitals," AOB 18 n.18. The record is replete with evidence of precisely such narrow and tiered networks that insurers offered for years notwithstanding the non-par rate or any of the other contractual provisions to which plaintiffs point. *Supra*, pp. 17–19 & n.4; *see also* 8-SER-2219:12–19 (Q. And you agree, Mr. Barnes, that overall with respect to [Blue Shield] tiered products, that Sutter agreed to participate more often than not? . . . [A]: With tiered networks around other providers or providers as payers, that's correct."); 9-SER-2402:11–14 ("Q. There were many networks that Anthem had that

Sutter agreed to participate where some of the hospitals were in network and some of the hospitals were not in the network?  A.  Yes.").

Plaintiffs cite insurer testimony claiming that the contract provisions stopped them from creating effective narrow or tiered networks.  AOB 18. But the jury was entitled to reject that testimony given the scores of such networks the insurers created and offered for years.  Indeed, even though Sutter's purported refusal to agree to the seven "tying" hospitals being in-network unless the four "tied" hospitals were also included was the basis for their tying claim, plaintiffs' witnesses did not identify *even a single instance* in which any insurer requested to include a tying hospital but Sutter refused unless the insurer included a tied hospital.[5]

Plaintiffs' reliance on the non-par rate as supposedly imposing a tie was further undermined by evidence that—contrary to plaintiffs' core assertion—Sutter's non-par rate was not higher than the amount Sutter would otherwise have been entitled to collect.  Plaintiffs asserted that,

---

[5]    Some insurer witnesses referred to instances in which Sutter declined requests that certain of its hospitals participate in a network.  *E.g.*, 4-SER-886:2–890:6.  That testimony did not establish a tie because the witnesses did not claim that Sutter refused to include a tying hospital unless the insurer included a tied hospital—*i.e.*, the alleged refusal was not *conditional*.

absent the contracted non-par rate, insurers would have offered to pay

Sutter only a "usual and customary" amount for out-of-network services,

which plaintiffs asserted was much lower than 95% of charges. But the

evidence was uncontradicted that an insurer's unilaterally set "usual and

customary" rate is not determinative, because Sutter (like any other

provider) is not obligated to accept that rate but is entitled to take the issue

to litigation or arbitration. *See supra*, p. 6; *see also Bell v. Blue Cross of Cal.*,

131 Cal. App. 4th 211, 217–18 (2005); *Children's Hosp. Cent. Cal. v. Blue Cross*

*of Cal.*, 226 Cal. App. 4th 1260, 1271-76 (2014). Plaintiffs offered no

evidence that the amounts awarded in such proceedings were materially

less than Sutter's non-par rate. To the contrary, Sutter was awarded 90–

95% of charges in two arbitrations against Kaiser, 12-SER-3372:21–3374:6,

13-SER-3661:2–6, and North Bay Medical Center was awarded an amount

that was much greater than Sutter's 95% rate, 8-SER-2303:5–2308:22, 14-

SER-3976:7–3978:23. Sutter also showed at trial that, because Sutter's

chargemaster prices are often lower and its non-par rate is a percentage of

those chargemaster prices, its non-par rate often results in lower prices

than what other hospitals charge for out-of-network services. 18-SER-

5146–48, 14-SER-3971:14–3978:23, 12-SER-3435:14–3439:9.

The non-par rate also did not create a tie because it does not require or coerce the purchase of two services (or hospitals) *together*. It simply sets the price for an excluded hospital on a hospital-by-hospital basis. *See, e.g.,* 10-ER-2127 (§ 2.01.2 – non-par rate applies to the hospitals "that do not participate"); *see* 12-SER-3307:19–3308:9, 9-SER-2360:17–21, 5-SER-1260:14–17, 7-SER-1943:22–1944:1. If, for example, an insurer wishes to avoid the non-par rate at CPMC and pay instead the lower in-network rate, it need only include CPMC in network, not any other hospital. Because the lower rate for CPMC is not conditioned on the rate or network participation of *any* other hospital (let alone one of the tying hospitals), no tie exists. Tying law addresses tying separate products together, not to pricing that induces a buyer to purchase a greater volume of a single product.

 c.   The trial evidence also refuted plaintiffs' claim that systemwide contracting created a tie. Plaintiffs argued that systemwide contracting meant an insurer could not contract with a Sutter hospital without the contract covering all Sutter providers. As noted, however, merely entering a contract (whether systemwide or hospital-by-hospital) is not a sale of any service, nor does it determine network participation. *Supra*, p. 11. So merely having a contract that covered all hospitals did not tie together

22

either the sale of services or network participation—and thus could not have foreclosed any competition by preventing insurers from excluding Sutter hospitals from their networks or placing them in lower tiers.

Plaintiffs argue that Sutter used systemwide contracting to impose "anticompetitive terms" on the insurers, including the non-par rate. AOB 15. But, by focusing on the contractual terms, that argument admits that plaintiffs' challenge was to those terms, not simply to the fact that Sutter had one contract that covered all hospitals. And plaintiffs' challenge to the contract terms failed for the reasons already discussed—neither the non-par rate nor any other of the challenged contract provisions tied services or hospitals together. *Supra*, pp. 17–22.

Plaintiffs' claim was also refuted by the uncontradicted evidence that, even absent systemwide contracting, each insurer would still have had a contract with each Sutter hospital. Each insurer offered at least one broad network (*i.e.*, a network that included all major hospitals in the area) in which it wanted all Sutter hospitals to be in-network at the lower in-

network rates.[6]  This required that each hospital have a contract with Sutter specifying the terms.  12-SER-3305:16–24.  Accordingly, no witness testified that any insurer would have opted to not contract at all with certain Sutter hospitals.  Systemwide contracting thus did not impose a contract over any hospital or impose contract terms or rates where none would otherwise have existed.

### 2. Unreasonable Course of Conduct Claim.

On plaintiffs' course-of-conduct claim, the jury was asked "Did Sutter force the class health plans to agree to contracts that had terms that prevented the plans from steering patients to lower-cost Sutter hospitals within the plan network?"  1-ER-5.  Again, the jury had ample basis for answering no.

As shown above (*supra*, pp. 17–22), the contract terms at issue do not prevent steering and did not in fact prevent insurers from creating narrow and tiered networks.  Those contract terms simply preserve the parties'

---

[6]     *Anthem:* 9-SER-2394:11–2395:2, 9-SER-2395:14–16, 9-SER-2395:23–2396:8, 9-SER-2414:13–15; ***Blue Shield:*** 4-SER-1148:9–21; ***United:*** 9-SER-2527:2–16, 7-SER-1859:13–19; ***Aetna***: 7-SER-1924:1–7; ***Health Net:***  4-SER-905:12-22, 4-SER-903:14–904:1; ***Dr. Chipty:*** 10-SER-2915:25–2916:10. *See also* 12-SER-3304:21–3307:13, 12-SER-3334:22–3335:11, 8-SER-2078:21–2079:11.

lawful volume-discount bargain by (1) ensuring that changes to the contract during the contract term (including changes to network participation) be the subject of negotiation and agreement—*i.e.*, neither party could unilaterally change the terms; and (2) charging more for hospitals that receive less volume because the insurer placed them out-of-network. Contrary to plaintiffs' assertion, AOB 18, Ms. Brendt did not testify that the equal-treatment provision stopped steering. She testified only that, if an insurer agreed to put a Sutter hospital in-network (and thereby obtain discounted rates), the insurer agreed that it would not unilaterally defeat that network participation during the contract term by penalizing patients for using Sutter. 5-ER-919:25–920:17.

Far from proving that such clauses are unlawful, plaintiffs' own witnesses repeatedly admitted that it is reasonable (and, indeed, common) for a contract to provide that changes to participation status require notice to the provider and an opportunity to negotiate. 7-SER-2034:5–10, 9-SER-2405:23–2406:5, 9-SER-2441:3–8, 10-SER-2913:22–2915:15. They likewise agreed that it is reasonable to prohibit amendments unless both sides agree in writing. 4-SER-1146:14–1147:11, 8-SER-2219:21–2221:6, 9-SER-2440:21–2441:8; *see* 18-SER-5126, § 6.19. All of this is consistent with the California

25

statutory Health Care Provider's Bill of Rights, which precludes changes to a material contract term unless the provider agrees. *See* 8-SER-2221:14–2224:11; Cal. Health & Safety Code § 1375.7(b)(1)(A).

### F.  Jury Verdict.

The two questions the jury answered addressed the first element of plaintiffs' two claims. Because the jury found against plaintiffs on this first element, the jury did not reach—and did not need to reach—any of the issues that were potentially relevant to the remaining elements, including anticompetitive effect, market power, balancing of harms/benefits, procompetitive justifications, or damages.[7]

### SUMMARY OF ARGUMENT

Plaintiffs offer no basis for overturning the jury's verdict.

---

[7]  Plaintiffs assert their claims were "similar" to claims supposedly "successfully litigated" in the state-court *UEBT* case. AOB 3, 24. In fact, that case was settled without any determination of liability or resolution of any factual issue. And it was different in important respects: its damages period went back to 2003 (not 2011), and it asserted different theories of liability, including a "price tampering" claim under California law and a different tying arrangement. The trial in this case was the first time a jury considered the critical factual questions whether any tying arrangement existed or whether Sutter prevented steering.

1.     The trial court did not abuse its discretion in excluding the proffered pre-2006 evidence.  The issue for trial was whether Sutter raised prices in the damages period (2011 forward) by engaging in tying or preventing steering.  The proffered pre-2006 evidence did not pertain to tying together hospital services or network participation, or to the contract terms that allegedly prevented steering.  And admitting the evidence would have risked the jury's holding Sutter liable for conduct from long before the limitations period.

Nor was the exclusion prejudicial.  The evidence overwhelmingly showed that Sutter did not refuse to agree to narrow and tiered networks and that its contract provisions did not prevent them.  Plaintiffs' evidence did not show otherwise.

2.     The court's ruling that anticompetitive purpose alone cannot support an antitrust claim was also correct.  California courts have repeatedly held that anticompetitive effect is required.  Indeed, in a decision on which plaintiffs rely, the California Supreme Court made clear that purpose is relevant only to evaluating anticompetitive *effect* and to balancing those effects against the defendant's procompetitive justifications.  That is precisely the instruction the district court gave here.

27

And the instruction was not prejudicial because the jury found plaintiffs failed to prove the first element of their course-of-conduct claim and thus never reached the second and third elements of that claim, which were the only elements for which purpose would have been relevant even under plaintiffs' preferred instructions.

3.     The district court correctly instructed that tying requires proof that the buyer was required to purchase services together and that market definition depends on the options available to the buyer.  This instruction precisely followed California law, and plaintiffs were not entitled to have the district court go further to adopt their argument that the only relevant buyers here were the insurers.  Doing so would have improperly resolved in plaintiffs' favor the hotly disputed question whether Kaiser competed in the relevant market.  And, like the other rulings plaintiffs challenge, this ruling ultimately proved inconsequential because the jury never needed to reach the question of market definition.

4.     The Court should not disturb the district court's spoliation ruling.  Plaintiffs do not offer that ruling as a ground for reversal and have not adequately raised or briefed it in this Court.  And the ruling was in any

event correct on multiple grounds, including grounds plaintiffs do not challenge.

## ARGUMENT

## I. STANDARD OF REVIEW

Rule 403 rulings are reviewed for abuse of discretion, with the court's balancing given considerable deference. *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1999). This deferential standard of review reflects that, "[w]ith respect to evidentiary questions in general and Rule 403 in particular, a district court virtually always is in the better position to assess the admissibility of the evidence in the context of the particular case before it." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).[8]

This Court reviews "a district court's formulation of civil jury instructions for an abuse of discretion." *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1022 (9th Cir. 2002). "[I]f jury instructions are challenged as a misstatement of the law, they are reviewed de novo." *Id.*

---

[8] Plaintiffs argue that Rule 403 should be used "sparingly." AOB 56. But the cases they cite refer to "the exclusion of evidence offered by the defendant in a criminal prosecution." *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015). That is not this case.

## II.    EXCLUSION OF THE PRE-2006 EVIDENCE AT ISSUE WAS PROPER AND NOT PREJUDICIAL.

The district court did not abuse its discretion in excluding under Rule 403 the evidence plaintiffs proffered from as much as a decade or more before the damages period.

### A.    The Court's Ruling Was Not an Abuse of Discretion.

A review of the excluded evidence, AOB 31, shows why the district court's ruling was proper.[9]

### 1.    1997 and 1998 memoranda regarding systemwide contracting.

Plaintiff rely most heavily on two memoranda—one from 1997 and one from 1998—that they claim show Sutter moved to systemwide contracting to "leverage" its system and obtain "better pricing."  AOB 14–15.  The 1997 memorandum discussed Sutter's desire to negotiate higher

---

[9]    Plaintiffs incorrectly assert that the court excluded the evidence on relevance grounds and not under Rule 403.  AOB 43.  The court repeatedly made clear that it was acting under Rule 403.  *See, e.g.*, 1-ER-111, 1-ER-93, 5-SER-1332:5–9.  Plaintiffs argue that the court sustained objections at trial to "particular" pre-2006 evidence without assessing anew whether its probative value was outweighed by prejudicial effect.  AOB 35.  But plaintiffs do not describe the "particular" evidence purportedly excluded at trial in this manner or its purported relevance.  They have thus waived any argument regarding its exclusion.

rates with Blue Cross because the existing rates were so low that several
Sutter hospitals were losing money on inpatient services provided to Blue
Cross members. 2-ER-177. The 1998 memorandum described the benefits
the author believed accrued from being part of the Sutter system, including
strategic planning, sharing of risk, greater access to capital, financial and
operational oversight, shared technology, clinical integration, and
centralized contracting. 2-ER-181–86. He noted that freestanding hospitals
are often not viable, with many closing (or on the verge of closing). 2-ER-
181. And he opined that the estimated annual "benefit" of contracting as a
system, including enabling Sutter affiliates to "recoup their costs" by
obtaining competitive market rates, would be $198 million. 2-ER-183.

Neither of these memoranda say anything about tying together
hospital services or forcing network participation. Nor do they say
anything about preventing steering or about a non-par rate, or any other of
the challenged contract terms. As plaintiffs admit, AOB 21, Sutter did not
negotiate for those provisions until later. Rather, the memoranda simply
discussed the potential value of Sutter negotiating as a system rather than
each Sutter provider negotiating separately.

The court properly excluded these memoranda. The issues for the jury as specified in the unchallenged verdict form were whether Sutter tied its hospital services together from 2009 forward and whether it forced insurers in that same period to agree to contract terms that prevented steering. The jury was not asked whether the fact of systemwide contracting that had begun a decade earlier was unlawful or whether having one contract rather than dozens of separate contracts enabled Sutter to negotiate higher prices. Indeed, the verdict form does not refer to systemwide contracting at all. 1-ER-7–9. And, because the memoranda addressed only systemwide contracting (and not the later-adopted contract provisions, much less tying or steering), they shed no light on whether Sutter was tying its services together or preventing steering.

Plaintiffs try to weave all of this together by arguing that Sutter was able to "impose" the alleged anti-steering contract provisions on all hospitals only because it adopted systemwide contracting. AOB 52. But the memoranda do not address that issue. Nothing in them suggests that Sutter adopted systemwide contracting so that, years later, it could negotiate for the provisions plaintiffs now challenge as a way to tie its services together or prevent steering. Indeed, plaintiffs did not offer any

evidence that any insurer was even seeking in 1997 or 1998 to create narrow or tiered networks to steer patients away from Sutter. The first request to Sutter for a narrow network was not until late 2003, 2-SER-411–15 (¶¶ 37, 40), and the first request for a tiered network was not until 2008, 13-SER-3609:16–23. And plaintiffs admit that the non-par rate was not adopted until 2005. AOB 21.

The district court was correct, and certainly did not abuse its discretion, in concluding that admitting these memoranda would have been greatly prejudicial given their marginal (at best) relevance. Admitting the memoranda would have invited the jury to find Sutter liable not because it engaged in tying or prevented steering in 2009 and later, but because Sutter decided more than a decade earlier to transition away from a disjointed, uncoordinated negotiation strategy that had resulted in contracts with rates that did not cover its hospitals' costs. Plaintiffs do not argue and have presented no authority that it is an antitrust violation for a company to negotiate one contract rather than dozens for its affiliated entities, even if the asserted purpose were to achieve better prices. And even if plaintiffs had so argued, that was not the question the unchallenged verdict form asked the jury to decide—and it would have been prejudicial

to cloud the jury's deliberations with that extraneous issue. At best, the jury would have been confused about whether it was supposed to be deciding the legality of contracting as a system, and trial time would have been wasted trying to re-create and argue over events and market conditions long before the damages period. Worse, the jury may have found Sutter liable for having achieved "better pricing" merely by having a more coordinated contracting approach rather than because it engaged in tying or prevented steering.

Plaintiffs are also incorrect in asserting that Ms. Brendt testified to Sutter's purpose in moving to systemwide contracting. AOB 37. She testified only that, without regard to whether Sutter had a single systemwide contract or separate contracts with individual providers, Sutter wanted to have "consistent terms across the agreements" for administrative reasons. 5-ER-915:17–916:5, 5-ER-918:2–20. Sutter's expert stated that it makes economic sense to have a systemwide contract, but he likewise did not purport to opine on Sutter's purpose. 5-ER-971:3–972:7.

### 2. Revenue projection from 1998.

Plaintiffs' argument that the 1998 memorandum was admissible to prove that Sutter gained a "benefit" of $198 million per year from

systemwide contracting, AOB 2, 14–15, 31, only confirms that the court's order was proper. Again, the memorandum did not mention tying or preventing steering, and it was thus not attempting to quantify the benefit of any such activity. For that reason alone, the document lacked probative value.

Even if projected revenue from systemwide contracting by itself were relevant, plaintiffs offered no evidence that Sutter in fact realized any revenue gains from moving to systemwide contracting, let alone that it did so during the damages period and, if so, in what amount. Plaintiffs' expert, Dr. Chipty, testified that she did not estimate any pricing impact of systemwide contracting by itself, but that she instead was measuring the purported effect of the "*combination* of practices that is part of the systemwide practice"—*i.e.*, the purported "anti-tiering/anti-steering clauses, the non-par clauses and the price secrecy clauses." 10-SER-2823:9– 2824:2, 10-SER-2825:2–22. She stated that she was using the term "systemwide contracting" to "reference[] the contract that Sutter enters into that contain this *combination* of provisions," and that she did not know how to separately evaluate any effect of the systemwide contract by itself. 10- SER-2827:9–18. Further, plaintiffs offered no proof that whatever unknown

revenue gains may have resulted from systemwide contracting alone were supracompetitive gains from any unlawful exercise of market power, as opposed to lawfully negotiated prices that reflected the market value of the valuable services the system of Sutter providers offered. In short, the estimated "benefit" figure lacked any probative value because it was untethered to any issue the jury was asked to decide.[10]

Plaintiffs try to muddy this point by asserting that Dr. Chipty did a "before and after analysis" that showed Sutter's prices increased relative to other hospitals "once systemwide contracting was imposed." AOB 21, 34–35 (citing 2-ER-412). That argument is meritless. As demonstrated by the regression model Dr. Chipty presented for the actual damages period (2011 forward), any attempt to prove a price effect by comparing Sutter's prices to other hospitals required controlling for factors that explain differences in prices among providers. *See* 10-SER-2744:10–24, 10-SER-2746:5–8. Dr. Chipty's purported "before-and-after analysis" for the pre-limitations

---

[10]     The same is true of insurer testimony that systemwide contracting led to higher prices. *See* AOB 34. Plaintiffs did not show that any such increased prices—from well before the limitations period and before the challenged contract terms were in place—resulted from any anticompetitive behavior.

period, however, does none of that. It is not a regression model, and it does nothing to account for the various factors that may have influenced revenues during that period. 4-ER-806:17–808:17, 2-SER-540–41. As Sutter explained without rebuttal, when the relevant factors are controlled for using Dr. Chipty's own variables, the increase purportedly shown by her before-and-after analysis disappears. *Id.*

Introducing the 1998 memorandum or Dr. Chipty's "analysis" would only have confused the issues and created the risk of the jury improperly seizing upon the fact of systemwide contracting (rather than the actual, later-adopted contract provisions at issue) as a basis for a damages award. Indeed, plaintiffs' brief makes clear that is exactly how plaintiffs intended to use the document. *See* AOB 31. The district court properly excluded the document to thwart that gambit, prevent such prejudice, and avoid a sideshow at trial regarding events from more than two decades ago and more than a decade before the damages period.

### 3. 1999 Alta Bates-Summit merger litigation.

Plaintiffs' argument that the court abused its discretion in excluding Sutter's proposed findings from the 1999 Alta Bates-Summit merger litigation is likewise unfounded. Plaintiffs argue that those proposed

findings showed that Sutter agreed that steering and tiering can lower prices. AOB 17. But Sutter did not dispute at trial that directing patients away from a provider can reduce volume and constrain pricing—Sutter's expert repeatedly acknowledged as much. 16-SER-4667:14–19, 16-SER-4668:12–4669:2, 16-SER-4704:8–4706:23, 17-SER-4754:23–4757:22. Sutter demonstrated instead that it did not prevent steering or tiering—and the jury found in Sutter's favor on that point, which meant it never reached what effect preventing steering or tiering might have had.

Sutter also argued that the actual impact of steering depends in part on whether the insurer is engaging in "opportunism"—*i.e.*, obtaining discounted rates predicated on a hospital's being in-network and then unilaterally changing that status after-the-fact during the contract's term and depriving the hospital of the expected patient volume. *E.g.*, 16-SER-4619:23–4620:23, 16-SER-4667:14–4668:2. But Sutter's 1999 proposed findings are not relevant to that question because they do not address it. Nowhere do the proposed findings state that insurers could (or should be able to) engage in opportunistic, after-the-fact steering as a way of disciplining prices.

38

Nor is it relevant that Sutter argued that some patients do not like narrow or tiered networks. AOB 37 (citing 4-ER-841:10-19). The jury never reached that question and, in any event, Sutter's argument is not inconsistent with Sutter's 1999 proposed findings because a patient may be unhappy that his or her preferred hospital or doctor is out-of-network, even if the overall effect of a narrow or tiered network were to generally lower costs for patients as a whole. For many patients, their paramount concern is access to their preferred doctor. *See, e.g.*, 3-SER-795:5–11, 3-SER-796:23–25.

Even if the proposed findings from 1999 had some relevance, exclusion would still be proper because of the prejudice that would have resulted. The 81-page, 192-paragraph proposed findings relied heavily on the extensive fact and expert evidence in that merger litigation and the market dynamics in 1999, *see* 2-ER-188–99, which Sutter would have been obliged to explain to the jury in this case to place the findings in proper context and to ensure the jury was not misled into erroneously concluding the proposed findings were inconsistent with Sutter's arguments in this case. The result would have been to prejudicially derail this case into relitigating much of the 1999 merger case.

Also groundless is plaintiffs' suggestion that the court should have admitted a study regarding prices at Summit following the merger. AOB 21, 54. Plaintiffs waived that issue by not including that evidence in *any* offer of proof and never obtaining a definitive ruling on it. Sutter moved *in limine* to exclude the study (which did not ascribe the price increase to any conduct challenged in this case). 2-SER-403–06. But the court made no definitive ruling on the study in its order on that motion (1-ER-110), and plaintiffs never raised the question again, thus waiving it. Fed. R. Evid., Rule 103. Even apart from waiver, plaintiffs do not show that it would have been admissible. Plaintiffs did not propose to have the study's author testify. And it would have been improper for Dr. Chipty to testify about it, because she conducted no independent analysis of that issue. *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544–45 (C.D. Cal. 2012).

### 4. Alleged forcing of insurers.

Plaintiffs lastly point to pre-2006 evidence they say shows that Sutter "forced" insurers to accept the "first systemwide contracts and their anticompetitive terms in the early 2000s." AOB 31. Plaintiffs assert this evidence would have shown that the insurers objected to systemwide

contracting and to the contract terms in the early 2000s, but the insurers agreed anyway because they felt they had no choice, in part because Sutter "us[ed] the leverage of systemwide contracting." AOB 34, 51–52.

The district court properly excluded this evidence. The insurer witnesses testified at length that they consistently objected during the relevant time period to systemwide contracting and to the contract terms plaintiffs challenge, but ultimately agreed because they felt Sutter left them no choice.[11] And Sutter's former CFO testified that the insurers all complained about Sutter's contracts. 6-SER-1733:16–1734:3. Having the insurer witnesses state they also objected in an earlier time period not at issue would not have added anything material to plaintiffs' case. It would have only wasted trial time and created the risk that the jury would impose

---

[11] *HealthNet:* 3-SER-843:20–847:18, 18-SER-5127–29, 3-SER-840:3–8, 4-SER-854:6–23, 4-SER-856:5–16, 4-SER-858:20–24, 4-SER-873:17–874:18, 4-SER-903:3-13; *Aetna*: 7-SER-1929:5–1930:9, 7-SER-1936:25–1939:22, 7-SER-1944:4–24, 7-SER-1947:2–1950:12; *Anthem*: 8-SER-2337:19–2338:17, 9-SER-2360:8–2361:11, 9-SER-2367:2–21, 9-SER-2371:7–19; *Blue Shield*: 4-SER-1075:20–1076:1, 4-SER-1077:11–16, 4-SER-1080:8–14, 4-SER-1090:1–7, 4-SER-1112:17–1113:7, 8-SER-2142:12–19, 8-SER-2143:14–2144:17, 8-SER-2161:4–20, 8-SER-2168:1–14, 8-SER-2172:23–2173:14, 8-SER-2195:4–10, 8-SER-2327:20–2328:7; *United*: 9-SER-2492:11–20, 9-SER-2493:13–18, 9-SER-2497:8–15, 9-SER-2498:13–21, 9-SER-2499:10–16, 9-SER-2501:16–2503:2, 9-SER-2514:1–20, 9-SER-2519:24–2520:17, 9-SER-2520:22–2521:19.

liability based on alleged conduct (or on alleged market power) from long before the limitations period. *See City of Long Beach v. Standard Oil Co. of California*, 46 F.3d 929, 937 (9th Cir. 1995) (trial court properly excluded evidence that "would be, at best, cumulative since the record reveals that the plaintiffs presented numerous other pieces of evidence designed to show" the same element).

Plaintiffs assert they needed this pre-2006 evidence to dispute Ms. Brendt's purported assertion that the insurers did not complain about the terms until 2012. AOB 36. But Ms. Brendt did not make that assertion. 12-SER-3539:20–3541:7. She believed the complaints became more repeated and uniform after the lawsuit was filed. 13-SER-3644:20–3645:12. But that is not denying that insurers complained earlier.[12] And even if she had denied that, the record was still filled with testimony from all of the insurer witnesses that they had objected throughout the relevant period.

Plaintiffs' argument regarding a 2006 consultant's memorandum that attributed to Sutter's Sarah Krevans a statement that Sutter could "force"

---

[12]    Plaintiffs point to a portion of the transcript in which plaintiffs' counsel sought to ascribe to Ms. Brendt testimony that Anthem did not complain about the non-par rate until 2012. AOB 36. In fact, Ms. Brendt offered no such testimony. *See* 12-SER-3548:2–19, 13-SER-3646:15–3647:16.

insurers to pay high prices, AOB 38, is also erroneous. There is substantial reason to doubt Ms. Krevans made that statement.[13] But if she did, the court correctly ruled that (1) nothing in the purported statement refers to the relevant contracting issues (tying or preventing steering), and (2) the early 2006 interview looked back to a period more than five years before the damages period and raised the same concerns addressed in the court's *in limine* ruling on other pre-2006 evidence. 1-ER-112. Plaintiffs have waived any challenge to this ruling by not addressing the court's first reason. But even aside from waiver, the trial court's ruling was correct for both of the reasons the court stated. Further, nothing prevented plaintiffs from questioning Ms. Krevans at trial whether she believed Sutter could "force" contract terms on the insurers (and from then making an offer of

---

[13] The consultant's interview with Ms. Krevans was not recorded and no transcript exists. 2-SER-516:2–13. Instead, the memorandum was prepared from "scribbled" notes (which have never been produced) taken by the consultant or perhaps by an intern (the consultant could not remember). 2-SER-507:10–19, 2-SER-510:2–9. Further, the memorandum inaccurately identifies Ms. Krevans as "CEO, Memorial Medical Center and Memorial Hospital Los Banos," a position Ms. Krevans never held. 2-SER-518:1–12, 2-SER-523 n.2. Plaintiffs deposed Ms. Krevans before the district court's *in limine* ruling, but they offer no evidence that they asked her any question about the consultant's interview or the statements the consultant attributed to her (and they did not).

proof if they believed her answer was contradicted by the consultant's memorandum). But plaintiffs did not do so.

**B. Plaintiffs' Other Attacks on the Ruling are Groundless.**

Plaintiffs contend the district court did an "about face" in excluding pre-2006 evidence after having "relied" on it in granting class certification and denying summary judgment. AOB 30. But at the class certification stage neither the admissibility of plaintiffs' evidence nor the merits of their claims was at issue—and the court addressed neither. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018); 7-ER-1376–77 & n.117 (making clear the court was not resolving merits issues); 4-ER-753:20–24 (same).

As for summary judgment, the court denied Sutter's motion because of factual issues regarding the challenged contract terms, not factual issues about pre-2006 systemwide contracting. In its background discussion, the court described plaintiffs' contentions regarding Sutter's move to systemwide contracts and "forcing insurers to participate." 3-ER-470. But the factual issues that the court concluded existed for trial were over the effect of the non-par rate and the other contract provisions plaintiffs challenge, and over whether "Sutter denied requests to put Sutter hospitals in non-preferred tiers." 3-ER-476. As the court summarized, "disputed

facts about the combined effect of the contract provisions precludes summary judgment." *Id*. This order was not inconsistent with the court's later conclusion that the evidence plaintiffs offered from years before those contract provisions were adopted was inadmissible under Rule 403.

Plaintiffs misstate the holding in *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962). The Supreme Court did not rule that the pre-1938 evidence "should have been admitted." AOB 51. It ruled only the district court erred in excluding the evidence solely on the ground that it was from before the plaintiff entered the market. The Court said that the district court should have evaluated whether the evidence's probative value justified its admission—and the Court remanded for the district court to conduct that analysis. 370 U.S. at 710. The Court specifically recognized that a trial court may "place reasonable limits upon such evidence or set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it." *Id.* Here, the district court conducted the required analysis under Rule 403 and properly excluded the evidence.

Also meritless is plaintiffs' assertion that selecting 2006 as the relevant date was "arbitrary." AOB 4, 30, 32. The date corresponded to

when the multi-year contracts in force during the relevant period were negotiated and to the time period for which Sutter produced documents in response to plaintiffs' discovery requests specific to this case. 2-SER-524–25, 2-SER-543–46, 4-ER-826:6–19, 4-ER-733:9–22. And the evidence at issue was properly excluded not because it merely happened to fall before 2006 but because, as shown above, any relevance to the issues the jury was asked to decide was substantially outweighed by unfair prejudice.

## C. The District Court's Ruling Was Not Prejudicial.

Even if the district court had erred in excluding the evidence, no prejudice resulted because "it is more probable than not that the error did not materially affect the verdict." *Barranco v. 3D Systems Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020).

On tying, as discussed above (at 17–22), extensive evidence supports the jury's finding that Sutter did not condition any sales. It was undisputed that Sutter sold its services separately, and Sutter's contracts showed that it agreed to scores of networks that included tying hospitals but excluded or tiered tied hospitals. The pre-2006 evidence plaintiffs proffered would not have rebutted any of that evidence (much less change the outcome) because it did not address selling services separately or

46

network participation.  And, even if the proffered evidence had addressed those issues, the fact would still remain that Sutter did sell its services separately (as plaintiffs do not dispute) and did repeatedly agree to narrow and tiered networks (as the product grids in the contracts show).

The excluded pre-2006 evidence would similarly not have changed the jury's verdict on the course-of-conduct claim.  Just as it defeated the tying claim, the evidence of narrow and tiered networks defeated plaintiffs' contention that Sutter's contract terms prevented steering—and none of the excluded evidence showed otherwise.  Plaintiffs assert that, because it showed the insurers objected, the evidence at least showed the insurers were "forced."  *E.g.*, AOB 45, 58.  As discussed above, however, plaintiffs were permitted to—and did—present extensive evidence that the insurers uniformly objected during the relevant period to systemwide contracting and the challenged terms.  *Supra,* p. 41.  Evidence that they also objected or were "forced" in the early 2000s added nothing of substance.

The jury's findings likewise defeat plaintiffs' contention that evidence of Sutter's alleged purpose or intent (or history of the restraint) was needed for the jury to assess "anticompetitive effects."  AOB 58.  Because the jury found the challenged conduct did not occur, no restraint of trade existed

47

for which the jury needed to evaluate history, purpose, or effect. *See infra*, pp. 50–52. And, on the tying claim, plaintiffs persuaded the district court that California's *per se* tying rule precludes considering justifications for a tie, which further rendered irrelevant the reasons for the tie or balancing those reasons against anticompetitive effects. *See* 1-ER-96–98.

Finally, to the extent plaintiffs needed testimony from Sutter that systemwide contracting resulted in "better results" for Sutter (which is what any company would hope from a change in practice), they elicited that testimony from Sutter's former CFO. 6-SER-1733:1–14.

## III. THE DISTRICT COURT PROPERLY DECLINED TO INSTRUCT THAT PURPOSE ALONE COULD VIOLATE THE CARTWRIGHT ACT.

The district court's instructions regarding "purpose" were both correct and ultimately inconsequential.

Plaintiffs' argument relates to the second and third elements of their course-of-conduct claim, neither of which the jury reached. For the second element, the court instructed that plaintiffs needed to prove "[t]hat the effect of Sutter's conduct was to restrain competition." 1-ER-20. Plaintiffs argue that the court should have instructed that plaintiffs needed to prove

"[t]hat the *purpose or* effect of Sutter's conduct was to restrain competition."

AOB 40–41 (emphasis added).

For the third element, the court instructed that plaintiffs needed to

prove that "the anticompetitive effect of the restraint outweighed any

beneficial effect of the restraint on competition."  1-ER-20.  Plaintiffs do not

challenge that instruction.  They complain instead about a related

instruction on balancing anticompetitive and beneficial effects.  That

instruction read as follows, with the language plaintiffs contend on appeal

should have been included (or deleted) indicated by bracketed italics (or

strike-through):

> In deciding whether Sutter's challenged restraint has an
> anticompetitive or beneficial *[purpose or]* effect on competition,
> you should consider the results that the restraint was intended
> to achieve or actually did achieve.  In balancing these *[purposes
> or]* effects, you may also consider, among other factors, the
> following:
>> (a) The nature of the restraint;
>> (b) The probable effect of the restraint on the business involved;
>> (c) The history of the restraint;
>> (d) The reasonableness of the *[stated purpose for the]* restraint;
>> (e) The availability of less restrictive means to accomplish the
>>    stated *[purpose]* ~~reason~~ for the restraint;
>> (f) The portion of the market affected by the restraint; and
>> (g) The extent of Sutter's market power."

1-ER-20, 2-SER-471.

## A. An Alleged Anticompetitive Purpose Does Not Violate the Cartwright Act.

The court's instructions were correct. California courts have repeatedly held that, while purpose may be relevant to weighing effects and benefits, an antitrust plaintiff "must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail." *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1680–81 (1997).[14] These decisions are consistent with a long line of federal decisions—including one of plaintiffs' own cases, AOB 59—holding that, while purpose may be relevant to interpreting effects, it is insufficient alone to prove a Sherman Act violation. *Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 225 (7th Cir. 1983) ("it is effect or consequence which controls, not intent or motive"); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir.

---

[14] *See also Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 495 (2011) ("it is plaintiff's burden to make the required showing of a substantially adverse effect on competition in the relevant market"); *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal. App. 4th 309, 335 (2003) ("Red and White had to evince a substantially adverse effect on competition in the relevant market to support a viable legal theory . . . and consequently to survive a summary judgment motion"); *Feldman v. Sacramento Bd. of Realtors, Inc.*, 119 Cal. App. 3d 739, 747 (1981) ("Where the rule of reason applies, the plaintiff has the burden of proving that defendant's restrictive trade practices have substantial or serious anticompetitive effects within the relevant market.").

1984) ("[A]nticompetitive purpose alone is not enough to condemn [a restraint].").[15]

None of plaintiffs' cases holds otherwise. In *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1483 (9th Cir. 1986), the court found that the plaintiff had shown anticompetitive effect, and in *Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 22 Cal. 3d 302, 314 (1978), the plaintiff had shown neither purpose nor effect, so the question whether purpose by itself would suffice was not presented in either case. And *In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015), affirmatively rebuts plaintiffs' argument. Plaintiffs rely on the Court's observation that the fact-finder should consider the "reasons for [the] adoption" of the restraint. AOB 50 (citing *Cipro,* 61 Cal. 4th at 146). But the Court did not hold or suggest a bad "reason" could suffice. To the contrary, the Court made clear that the plaintiff's burden is to prove "anticompetitive effects," *Cipro*, Cal. 4th at 157, with the "reasons" for the

---

[15]    *Accord K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 130 (2d Cir. 1995); *Schachar v. Am. Acad. of Ophthalmology Inc.*, 870 F.2d 397, 400 (7th Cir. 1989); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir. 1996); *SCFC ILC, Inc. v. Visa U.S.A., Inc.*, 36 F.3d 958, 69 (10th Cir. 1994); *see also* ABA Model Jury Instructions in Civil Antitrust Cases, Chapter 1 - Sherman Act—General, Instruction 2: Sherman Act Section 1 and Instructions 3A and 3B (June 2016 ed.).

restraint being only a factor in evaluating whether the anticompetitive effects outweigh any benefits, *id.* at 146. That is exactly the instruction the district court gave here. *See* 1-ER-20 (telling the jury it should "consider the results the restraint was intended to achieve"). Further, the California Supreme Court relied heavily on federal Sherman Act cases, including *Chicago Board of Trade v. United States,* 246 U.S. 231 (1918), which makes clear that bad intent alone is not sufficient. *Id.* at 238 ("[A] good intention will [not] save an otherwise objectionable regulation or the reverse . . . .").[16]

The CACI model instructions do not require a different result. Courts are not bound by model instructions that do not accurately state the law. *See* Cal. Rules of Court, Rule 2.1050(b)–(c). Accordingly, California courts have departed from model instructions when they were erroneous, confusing, or misleading. *See, e.g., People v. Samaniego*, 172 Cal. App. 4th 1148, 1164–65 (2009); *People v. Nero,* 181 Cal. App. 4th 504, 518–19 (2010); *People v. Moore*, 51 Cal. 4th 386, 411 (2011).

---

[16]   Plaintiffs also cite *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1202 (9th Cir. 1975), but the instruction there required both "purpose and effect." This Court has been clear that purpose alone is not sufficient. *Los Angeles Mem'l Coliesum*, 726 F.2d at 1395.

### B. The Jury Did Not Reach the Questions to Which the Disputed Instructions Pertained.

Even if the court had erred, no prejudice resulted because the jury never reached either the second or third element of the course-of-conduct claim. 1-ER-20, 1-ER-9. Having found for Sutter on the first element, the jury did not need to proceed further. The alleged instructional error was thus irrelevant to the outcome and provides no basis to disturb the verdict.

### IV. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON PLAINTIFFS' THEORY THAT INSURERS ARE THE RELEVANT PURCHASERS.

The district court also did not abuse its discretion, let alone err, in declining to adopt as a matter of law plaintiffs' theory that insurers are the only relevant "buyer." Nor were plaintiffs prejudiced.

### A. The District Court Properly Exercised Its Discretion in Formulating the Challenged Instructions.

The court instructed that plaintiffs' tying claim required plaintiffs to prove Sutter refused to sell some services unless the "buyer" also purchased other services. 1-ER-19. And the court told the jury that, in evaluating market definition and economic power, the jury should consider the alternatives available to "buyers," "customers," or "consumers." 1-ER-17–19. Each of these instructions followed the

corresponding CACI instruction nearly verbatim. *Compare id. with* 2-SER-438, 2-SER-442, 2-SER-447, 2-SER-452.

Plaintiffs do not argue that these CACI instructions misstate the legal standards for market definition or tying. Nor could they. *See Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 (1999) ("A tying arrangement . . . exists when a party agrees to sell one product (the tying product) on the condition that the *buyer* also purchases a different product (the tied product) . . . ."); *Exxon Corp.*, 51 Cal. App. 4th at 1682 ("the relevant market is determined by considering commodities reasonably interchangeable by *consumers* for the same purposes").

Rather, plaintiffs asked the court to replace certain general terms ("buyers," "consumers," "customers") with plaintiffs' preferred term (variations of "health plans"). *See* 2-SER-432, 2-SER-439, 2-SER-443, 2-SER-448. Put another way, plaintiffs wanted the court to formulate the instructions in terms of their theory that insurers are the *only* relevant buyers of hospital services. *See* 2-SER-416–17 (arguing that "the jury should be instructed that . . . the health plans are *the* relevant purchasers of Sutter's Inpatient Hospital Services").

The district court did not abuse its discretion in rejecting plaintiffs'
proposal. The "court's charge covered the appropriate legal standard and
left counsel more than enough room to argue the facts in light of that
standard." *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017);
*Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000) (no abuse in giving
instruction that "fairly and adequately covered the issues presented" and
provided the litigant "ample opportunity to argue his theory of the case to
the jury"); *see also Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d
936, 942–43 (9th Cir. 2011) ("court did not abuse its discretion by
formulating jury instructions" that "failed to distinguish between" asserted
"means of infringement").

Nor did the court refuse to instruct the jury regarding plaintiffs'
contentions. To the contrary, the court told the jury that plaintiffs
contended that Sutter "us[ed] its economic power in seven markets to force
*the health insurance companies to buy Sutter's medical services* in four other
markets." 3-SER-587–88. The court's instruction on the course-of-conduct
claim likewise centered on Sutter's "contracts with insurance companies."
1-ER-20. Thus, the court's instructions "in their entirety" amply covered
plaintiffs' theory that insurers are the buyers. *Brewer*, 210 F.3d at 1097.

Plaintiffs were free to present evidence and argue — as they did at length — that insurers are direct purchasers of hospital services and that the options available to insurers are all that matter. *See* 3-SER-633:7–8, 3-SER-647:2–25, 17-SER-4859:13–4860:17. They had lengthy expert testimony on that point. *See, e.g.*, 9-SER-2227:3–18, 9-SER-2632:19–2633:7, 9-SER-2652:14–18. But they were not also entitled to have the court put its thumb on the scale on the issue. While plaintiffs may have been entitled to an instruction about their theory of the case, AOB 61, they were not entitled to an instruction that their theory was correct. *See United States v. Hall,* 552 F.2d 273, 275 (9th Cir. 1977) (a court need not give instruction that is "manifestly intended to influence the jury towards accepting the evidence of [one party] as against that of [the other]").[17]

---

[17]    Plaintiffs' cases are not to the contrary. Some found no abuse of discretion in formulating instructions. *See City of Long Beach,* 46 F.3d at 936; *cf. Los Angeles Mem'l Coliseum,* 726 F.2d at 1398–99. And others involved affirmative misstatements of the law. *See Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 869 (9th Cir. 2020); *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2d Cir. 2019).

## B.     Accepting Plaintiffs' Proposed Formulation Would Have Been Error.

The court's rejection of plaintiffs' formulation was not only permissible, but correct, because instructing the jury that the insurers were the only relevant "buyer" would have improperly short-circuited the required analysis.

As plaintiffs admit, they sought their preferred instruction "because of Kaiser."  AOB 42.  Plaintiffs' theory is that Kaiser does not compete with Sutter because insurers cannot switch to Kaiser (a vertically integrated, closed system) in response to a Sutter price increase.  AOB 10–11.  By asking the court to tell the jury that "insurers" were the buyer, and that the relevant market definition turns only on the options available to "health plans," plaintiffs were in effect asking the court to instruct the jury to disregard Kaiser entirely and to find that Kaiser is not in the relevant market as a matter of law.

Instructing the jury that way would have been error.  As plaintiffs' authorities recognize, market definition is a fact-intensive inquiry, particularly in industries with multiple "levels" or "stages" of competition. *E.g.*, *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778

F.3d 775, 783–85 (9th Cir. 2015) ("*St. Luke's*") (recognizing that market definition "is a factual question 'dependent upon the special characteristics of the industry involved'"); *Los Angeles Mem'l Coliseum,* 726 F.2d at 1393–94 (explaining that "the exceptional nature of the industry [made] precise market definition especially difficult"). Ultimately, "[d]efining the relevant market requires identifying those competitors who have the actual or potential ability to deprive each other of significant levels of business." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). And courts "must recognize meaningful competition where it is found to exist." *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964).

The record here is filled with evidence that Kaiser has "actual or potential ability to deprive" Sutter of significant business. Even if insurers cannot switch to Kaiser, the patients they insure can do so by purchasing a Kaiser plan during open enrollment rather than one of the insurers' plans (and employers can switch to offering Kaiser plans) if Sutter's prices cause insurance premiums to go up. 15-SER-4207:23–4208:3, 15-SER-4212:12–4213:9, 5-SER-1371:7–9, 8-SER-2088:17–20, 9-SER-2432:5–20, 13-SER-3706:10–13. And when patients and employers switch to Kaiser, they are switching away from Sutter (and putting competitive pressure on Sutter)

because, as plaintiffs stress, Kaiser-insured patients are generally required to use Kaiser hospitals.

Reflecting this market reality, plaintiffs' own witnesses attested to the competitive pressure Kaiser puts on both insurers and Sutter. United's witness admitted that "United tries to keep its rates low in order to compete with Kaiser" and accordingly "has urged Sutter to lower its rates to enable United's products to compete with Kaiser." 9-SER-2559:4–2560:1. Aetna's witness agreed that Kaiser "is a competitor of Sutter" and that Aetna and Sutter shared "a joint concern that Sutter was losing market share of patients to Kaiser." 7-SER-2039:23–2040:21. Blue Shield's witness testified that both Blue Shield and Sutter lost patients to Kaiser, Blue Shield raised this with Sutter in negotiations, and Sutter was concerned about it. 5-SER-1156:25–1157:13. And Health Net's witness testified that Health Net sought lower prices from providers like Sutter so that it could better compete with Kaiser. 3-SER-847:21–848:19, 4-SER-898:25–899:16, 4-SER-936:12–19; *see also* 8-SER-2065:17–24 (San Francisco health director testifying that Sutter's increasing costs "drives our Blue Shield costs up. And then, people leave Blue Shield to go to Kaiser."), 15-SER-4214:23–4215:14.

Sutter's witnesses and contemporaneous documentary evidence likewise confirmed that Sutter competes with Kaiser. Sutter's former CEO identified Kaiser as Sutter's "single biggest competitor." 11-SER-3052:23–3053:2. Evidencing this competition, in the decade after Kaiser opened a hospital in Modesto, "Sutter lost 42 percent of its . . . commercial discharges at Memorial Medical Center." 11-SER-3130:3–24, 11-SER-3131:9–17, 18-SER-5149. Similarly, Sutter's Antioch hospital lost a significant share of its patients when Kaiser opened its hospital in Antioch. 18-SER-5152, 15-SER-4226:11–4227:16. And from 2006 to 2019, Kaiser's share of discharges in Northern California overall steadily rose while Sutter's share declined. 18-SER-5151; *see also* 11-SER-3126:13–3127:19 (Kaiser is "definitely, in Northern California, the largest competitor, the most formidable competitor we have"); 1-SER-104:10–105:6 (Kaiser is a "formidable competitor in each of our regions"), 1-SER-121:10–13 (Sutter spent more time tracking Kaiser than any other competitor); 5-SER-1276:3–23 ("the health plans would like to compete on price with Kaiser, and so they frequently will want the – health system, whether it's Dignity or with Sutter, to accept lower prices"); 13-SER-3705:14–3706:13 (UC Davis Medical

Center director of contracting testifying that competition is "robust" between Kaiser, Sutter, Dignity, and UC Davis).[18]

And evidence from Kaiser likewise identified Sutter as a competitor. 19-SER-5284–87 (describing Sutter as a competitor); 19-SER-5255–83 (repeatedly identifying Sutter as a competitive threat); 15-SER-4214:12–17.

Plaintiffs disputed that competition from Kaiser constrained Sutter's pricing. They argued, among other things, that Sutter prices were allegedly high even when Kaiser hospitals operated nearby. At best for plaintiffs, however, that contention only created factual issues for the jury regarding whether Kaiser was a competitor (had the jury not resolved the case on other grounds). It did not entitle plaintiffs to an instruction that took the issue out of the jury's hands and resolved it in plaintiffs' favor. *High Tech. Careers*, 996 F.3d at 990 ("defining the relevant market is a factual inquiry for the jury").

---

[18] *See also* 12-SER-3452:18–20 ("We were trying to capture Kaiser members as our --you know, they're our largest competitor, so the goal was to compete with them both on price and quality."); 6-SER-1526:19–1527:6 (Kaiser is "a competitor because they want to convert our commercial members to their commercial members."); 13-SER-3798:6–8 ("The competitive environment has been very challenged for Alta Bates. Probably the principal competitor that -- from a volume perspective has been Kaiser.").

Plaintiffs' argument that the case law has resolved this issue against Sutter as a matter of law, AOB 65–67, is groundless. None of the cases plaintiffs or their amici cite addressed a market in which a vertically integrated provider like Kaiser existed. Thus, none considered (much less resolved in plaintiffs' favor) whether the presence of such a provider may be ignored simply because insurers cannot turn to it even though consumers can and do.

Nor is there any basis for categorically excluding such vertically integrated providers. It would be like saying (as a matter of law without any factual inquiry) that Tesla does not compete against BMW or Audi for electric vehicle sales merely because Tesla sells only directly and therefore BMW and Audi dealers (the direct purchasers from BMW and Audi) cannot switch to Tesla. As the authoritative DOJ/FTC Horizontal Merger Guidelines[19] explain, "[v]ertically integrated firms are also included [as market participants] to the extent that their inclusion accurately reflects their competitive significance." Guidelines, § 5.1; *see also id.* § 4.1.3 (agencies also consider "the influence of downstream competition faced by

---

[19] https://www.justice.gov/atr/horizontal-merger-guidelines-08192010

customers in their output markets"); *St. Luke's*, 778 F.3d at 784 n.9 (noting that, although not binding, the Guidelines are often used as persuasive authority).  As discussed, the record in this case amply demonstrates Kaiser's "competitive significance."  It therefore would have been error for the district court to resolve this issue as a matter of law in plaintiffs' favor. *See* 15-SER-4252:9–4253:22, 15-SER-4304:12–4305:1, 15-SER-4350:6–19 (Dr. Gowrisankaran testifying about the role of the Guidelines in antitrust analysis and competition with Kaiser as a vertically integrated entity); *see also* 15-SER-4217:9–23 (discussing academic literature showing competitive impact of Kaiser, *see* K. Ho & R. Lee, *Insurer Competition in Health Care Markets*, 85 ECONOMETRICA 379 (March 2017)).

The two-stage model of competition, AOB 7–11, does not support excluding Kaiser from the market.  Even if plaintiffs were correct that hospital competition at the first-stage (*i.e.*, the stage at which insurers negotiate reimbursement rates with providers) is limited to the options available to insurers in markets without a vertically integrated provider like Kaiser, that is decidedly not true where Kaiser is present, as the record in this case demonstrates.  *Supra*, pp. 58–61.  Certainly, there was more than

enough evidence to require that the jury decide this issue, rather than the court resolve it as a matter of law.

And, even aside from Kaiser, plaintiffs' cases do not support plaintiffs' proposed instructions because those cases recognize that patient preferences are important in defining healthcare markets generally. "[I]n the healthcare industry patient preferences and insurer preferences cannot be viewed in separate, isolated spheres." *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 171 (3d Cir. 2022). This is because an insurer's demand for including a hospital in a network is driven by the demand of its insured members to use that hospital. *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016) ("Patients are relevant to the analysis, especially to the extent that their behavior affects the relative bargaining positions of insurers and hospitals as they negotiate rates.").[20]

---

[20]    *See also Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 585 (7th Cir. 2022) (patient demand means "insurers (the *most directly affected* buyers here) face pressure to provide vascular surgery in or near Bloomington"); *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019) (relying on insurer testimony that their networks must include certain services to be competitive for area patients); *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 471 (7th Cir. 2016) ("insurers respond to both prices and patient preferences").

Plaintiffs' proposed instructions, however, would have improperly disregarded patient preferences entirely.

Nor are plaintiffs correct that cases from outside the healthcare industry dictate that the jury consider only options available to direct purchasers and ignore vertically integrated providers. None of them addressed that issue. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2287 (2018), and *US Airways*, 938 F.3d at 59, ruled that, in a case involving a "two-sided transaction market," both sides of the market must be considered. No such two-sided market is alleged here. *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022), did not address relevant market definition at all, but held only that a listing service was injured and could sue even though it was not the "ultimate consumer." And *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1133 (10th Cir. 2002), did not involve a vertically integrated competitor to which ultimate consumers could turn for the same service.

Plaintiffs' argument that the trial court departed from its prior rulings, AOB 25–27, 29, 42–43, 60, is also wrong. The court denied summary judgment on the ground that "there are disputes of material fact about whether the plaintiffs can establish that their Candidate Markets are

65

properly defined geographic markets for antitrust purposes." 7-ER-1398.

As the court explained, it "did not grant summary judgment on the basis of

who the purchasers are, and its [summary judgment denial] order framed

the plaintiffs' position but did not embrace it." 1-ER-96 (citing 1-ER-139 &

7-ER-1443–44).

Finally, there is no merit to plaintiffs' amici's suggestion that the

district court "failed to 'describe the applicable law'" by inadequately

explaining "the relationship between indirect and direct purchasers." AG

Br. at 29. Plaintiffs never requested instructions discussing the relationship

between "indirect and direct purchasers." *See* 2-SER-420–96. Nor did

plaintiffs object to the court's instructions on the ground that the

instructions failed to distinguish between "indirect" and "direct"

purchasers. Plaintiffs objected solely on the ground that insurers should be

identified as "the buyers or purchasers." 2-SER-395–97. And the court in

any event explained to the jury plaintiffs' "two-step" theory, AOB 62, that

Sutter overcharged the insurers, which then passed along the higher prices

in the form of insurance premiums.  *See* 3-SER-588:2–9, 1-ER-21.  That was more than enough.[21]

## C.  Any Purported Error Was Not Prejudicial.

The court's decision to follow the CACI instructions would not require reversal even if those instructions had been erroneous.

On tying, no reason exists to believe the jury's verdict would have been different had the court given plaintiffs' preferred instruction.  The court told the jury that plaintiffs contended that insurers purchased hospital services from Sutter, and the court did not preclude plaintiffs from presenting whatever evidence they wished on that point.  And both sides identified the key question as whether Sutter forced insurers to contract with, purchase from, or include in their networks Sutter's tied hospitals.  16-SER-4859:21–4860:5, 17-SER-4871:22–25, 17-SER-4925:19–4926:2, 17-SER-4928:11–13.  Sutter argued that no tie existed because Sutter did not require

---

[21]    Plaintiffs' amici also argue at length that hospital consolidation has led to higher prices.  That argument is also misguided.  Plaintiffs did not assert any claim regarding any Sutter acquisition or offer any admissible evidence that any Sutter acquisition resulted in supracompetitive prices.  Likewise unfounded are amici's more generalized arguments that Sutter's prices were higher than competitive levels.  Had the jury needed to answer that question, Sutter amply demonstrated that its prices were not anticompetitively high.  *See, e.g.*, 16-SER-4527:13–4613:20.

that insurers include the tied hospitals as a condition of including the tying hospitals (17-SER-4925:14–4926:8), not because someone other than the insurers was the buyer. Indeed, Sutter's expert agreed that health plans are at times direct purchasers of hospital services. 16-SER-4662:23–25. In these circumstances, telling the jury that the "insurers" or "health plans" were the "buyer" would have added nothing.[22]

For the course-of-conduct claim, the jury instruction and verdict form were specifically framed in terms of the insurers—whether Sutter forced "insurers" to accept provisions that prevented steering. 1-ER-9, 20. No possible claim of error or prejudice can be made as to that framing.

That leaves only whether any prejudice occurred on the market definition question (*i.e.*, whether Sutter competes against Kaiser). None did. The jury did not need to—and did not—reach that question. The jury found no tying based on the absence of a conditioned sale, and it found no unreasonable course of conduct based on the lack of evidence that Sutter

---

[22]    Although immaterial to resolving the tying claim, adhering to the CACI instruction's use of the general term "buyer" was important to help ensure (as discussed above, *supra*, pp. 57–65) that plaintiffs would not improperly use the instruction to try to bolster their argument regarding Kaiser.

forced insurers to agree to contracts with steering terms. 1-ER-9–10. Neither of these threshold questions turned on market definition. On tying, Sutter's "economic power" was the second element of plaintiffs' claim, which the jury did not reach because it found for Sutter on the first element. 1-ER-8. And on the course-of-conduct claim, the "portion of the market affected" and "extent of Sutter's market power" were factors the jury was to address only if it reached the second and third elements of that claim (1-ER-20), which the jury did not reach because it found for Sutter on the first element of that claim as well.

Plaintiffs suggest that market power was relevant to the course-of-conduct verdict because "forcing" implicates market power. *See* AOB 44. But the jury was not instructed that, to find "forcing," it had to find Sutter had market power—and, as discussed above (at 41), the insurers were unanimous in repeatedly asserting that they objected to the contract terms at issue and agreed to them only because they felt Sutter left them no choice. There is thus no reason to believe the jury's "no" answer to the verdict question was based on lack of forcing rather than a conclusion that the contract terms did not prevent steering, as the evidence amply demonstrated. *See supra*, pp. 17–22. Even if the jury's verdict had rested on

lack of market power, plaintiffs presented their evidence and argued at length that Kaiser did not compete with Sutter because insurers cannot substitute to Kaiser. *See supra*, p. 56. Nothing prevented the jury from so concluding had they been so persuaded. The jury found against plaintiffs because plaintiffs failed to prove their case, not because the court declined to formulate the instructions the way plaintiffs wanted them.

### D. Plaintiffs' Challenge to Dr. Gowrisankaran's Kaiser Testimony, If Not Waived, is Meritless.

The Court should decline to consider plaintiffs' argument that Dr. Gowrisankaran's Kaiser testimony was improperly admitted. AOB 69–70. Plaintiffs waived the argument by not identifying it in their statement of issues or summary of argument, not citing any supporting authorities, and not stating the applicable standard of review. *See* Fed. R. App. Proc., Rule 28(a)(5), (7), (8) (requiring each of these components); *Badgley v. United States*, 957 F.3d 969, 978–79 (9th Cir. 2020) (appellant waived argument "limited to two sentences and two footnotes, without a single citation to legal authority").

In any event, the court did not abuse its discretion in admitting that testimony, as Kaiser's role in the market presented factual issues. *See supra*,

pp. 58–61.   If anything, it would have been an abuse of discretion not to

admit the testimony.  *Sullivan v. U.S. Dep't of Navy*, 365 F.3d 827, 834 (9th

Cir. 2004).

## V.   THIS COURT SHOULD NOT DISTURB THE DISTRICT COURT'S SPOLIATION RULING.

The Court should reject plaintiffs' request that, if the Court finds the

pre-2006 evidence was improperly excluded, it also reverse the district

court's ruling on spoliation.  AOB 70–71.

### A.   Plaintiffs Have Not Properly Challenged the Spoliation Ruling.

Plaintiffs do not offer spoliation as a basis for reversing the judgment.

*See* AOB 70.  They are thus asking the Court to rule on a nondispositive

issue committed to the district court's sound discretion.  The Court need

not indulge that request.  *Simeonov v. Ashcroft*, 371 F.3d 532, 538 (9th Cir.

2004).

Plaintiffs also have failed to adequately raise and brief the issue.

They do not mention the issue in their statement of issues or summary of

argument.  They do not identify the elements necessary for a spoliation

finding or the standard of review.  *See* AOB 46–47, 71–72.  And they offer

only five cursory sentences of analysis for three different steps in the district court's reasoning. *See id.* at 71–72.

Nor have plaintiffs provided an adequate record. *See In re O'Brien*, 312 F.3d 1135, 1136–37 (9th Cir. 2002). The spoilation issue turned on an extensive record of more than 80 exhibits and 1200 pages. But plaintiffs have provided almost none of that evidence on appeal. *See* 1-ER-132–38, 3-ER-423–467.

### B.    The Ruling was Correct.

If this Court does address spoilation, it should affirm. The district court's ruling is reviewed for abuse of discretion. *Med. Lab. Mgmt. Consultants v. Am. Broad. Co.*, 306 F.3d 806, 824 (9th Cir. 2002). Plaintiffs needed to establish that (1) Sutter had an obligation to preserve the evidence in 2015 when documents were destroyed; (2) Sutter had a culpable state of mind; and (3) a reasonable trier of fact could find the destroyed evidence would have supported plaintiffs' claims. 1-ER-137.

Failure on just one of these elements was enough to defeat sanctions—and the district court found in Sutter's favor on *each* of them. *See* 1-ER-132, 1-ER-138.

1.     The court first ruled that Sutter did not have an obligation in 2015 to preserve the documents at issue.  1-ER-132.  The court found that plaintiffs' third amended complaint—the operative complaint at the time—did not make clear their intent to challenge "systemwide contracting going back to the late 1990s or early 2000s."  1-ER-137.  It also relied on plaintiffs' own litigation conduct, which for much of this suit suggested pre-2006 had no bearing on plaintiffs' claims.  *Id.*; *see* 2-SER-526–30.

Plaintiffs do not address this portion of the court's ruling at all, and thus have waived any challenge to it.  That by itself defeats their challenge.  Even if the pre-2006 evidence became relevant and admissible by virtue of plaintiffs' fourth amended complaint and plaintiffs' subsequent litigation positions, none of that was apparent in 2015.

2.  The district court next ruled that Sutter did not intentionally destroy evidence but that the documents were at most negligently destroyed in an "organization-wide attempt to free up storage space."  1-ER-137–38.  Again, plaintiffs do not challenge this ruling as a factual matter.  They argue only that negligent destruction is enough.  As the district court correctly recognized, however, sanctions are available only if the court finds at least "'bad faith or conduct tantamount to bad faith,' such

73

as recklessness 'combined with an additional factor such as frivolousness, harassment, or an improper purpose.'" 1-ER-136 (quoting *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001)); *see also Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090–91 (9th Cir. 2021) (vacating evidentiary exclusion sanction under that standard).[23]

3. Finally, the district court found no prejudice. 1-ER-138. Plaintiffs argue that the court should have presumed prejudice. AOB 71–72. But the presumption does not apply where, as the district court found here, the party in question did not destroy the document "in response to litigation." *Akiona*, 938 F.2d at 161.

Further, the district court ruled that any presumption of prejudice was overcome. 1-ER-138. Plaintiff do not address this ruling other than to argue it was based on the court's view that pre-2006 evidence was not

---

[23] Plaintiffs point to the statement in *Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993), that "simple notice of 'potential relevance to the litigation'" will suffice, *id.* at 1329 (quoting *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991)). But *Glover* drew that principle from *Akiona*, which explains that "[a] party should only be penalized for destroying documents if it was *wrong to do so*." 938 F.2d at 161. In light of *Akiona*, *Fink*, and *Am. Unites*, *Glover* must be read as referring to situations where a party knows or consciously disregards the risk that the destroyed document was relevant. That is, where the "notice" is of such a character as to imply at least recklessness by the destroying party.

relevant. AOB 71. But this ignores that the district court found that Sutter had restored lost discovery by other means and that, at bottom, "[t]his is not a case that suffers from the withholding of discovery." 1-ER-138. It also ignores the extensive record detailing Sutter's restoration efforts and plaintiffs' failure to identify specific contents of destroyed boxes that would have aided them. *See* 2-SER-531–35.

### C. If the District Court Erred, Only Vacatur is Appropriate.

If the Court were to find legal error, vacatur—not reversal—would be appropriate. The Court usually remands where it lacks "the benefit of the district court's analysis of [a] case using the proper . . . approach." *Shirk v. U.S. ex rel. Dep't of Interior*, 773 F.3d 999, 1007 (9th Cir. 2014). And, even if spoliation occurred, the district court would still have discretion not to give an adverse-inference instruction. *Med. Lab.*, 306 F.3d at 823–25. The district court should assess that question in the first instance.

## CONCLUSION

The judgment should be affirmed.

Dated:  January 3, 2023

Respectfully submitted,

JONES DAY

*/s/* Craig E. Stewart

BARTO, ZANKEL, BUNZEL & MILLER,
a Professional Corporation

*/s/* Robert H. Bunzel

*Counsel for Appellee* Sutter Health

## STATEMENT OF RELATED CASES

Appellee is not aware of any related cases pending in this Court.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15634

I am the attorney or self-represented party.

**This brief contains** | 15,370 | **words,** including | 569 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☒ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [              ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Craig E. Stewart | **Date** | January 3, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*