**No. 22-15634**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**DJENEBA SIDIBE; JERRY JANKOWSKI; SUSAN HANSEN; DAVID HERMAN; OPTIMUM GRAPHICS, INC.; JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,**

*Plaintiffs-Appellants*,

v.

**SUTTER HEALTH,**

*Defendant-Appellee*.
_____

On Appeal from the United States District Court for the Northern District of California, Case No. 3:12-cv-04854-LB
_____

**BRIEF OF AMICI CURIAE ECONOMISTS AND ANTITRUST SCHOLARS IN SUPPORT OF DEFENDANT-APPELLEE**
_____

Timothy Michael Snyder
Jordan R. Goldberg
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Alfred C. Pfeiffer, Jr.
Christopher S. Yates
Sarah M. Ray
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29, the undersigned counsel of record certifies that all of the amici curiae are individuals, not corporations, and so none is a nongovernmental entity with a parent corporation or a publicly held corporation that owns 10% or more of its stock.


|  | _s/_ Sarah M. Ray |
|---|---|
| Timothy Michael Snyder | Alfred C. Pfeiffer, Jr. |
| Jordan R. Goldberg | Christopher S. Yates |
| LATHAM & WATKINS LLP | Sarah M. Ray |
| 555 Eleventh Street, NW, Suite 1000 | LATHAM & WATKINS LLP |
| Washington, DC 20004 | 505 Montgomery Street, Suite 2000 |
| (202) 637-2200 | San Francisco, CA 94111 |
|  | (415) 391-0600 |

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................... iii

INTERESTS OF AMICI CURIAE.................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ........................................................................................4

I.   COURTS SHOULD APPLY THE STANDARD MARKET DEFINITION FRAMEWORK TO THE HEALTHCARE SECTOR ...........4

    A.   Market Definition's Nature and Purpose ................................4

    B.   The Hypothetical Monopolist Test Provides a Flexible Framework for Defining Relevant Markets in Diverse Economic Sectors ................................................................7

II.  PLAINTIFFS' EX ANTE RULE IMPROPERLY NARROWS THE STANDARD MARKET DEFINITION ANALYSIS ...................9

    A.   Plaintiffs' Ex Ante Rule Narrows the Market Definition Analysis to Exclude Vertically Integrated Firms ................................10

    B.   A Proper Hypothetical Monopolist Test Should Account for All Dimensions of Substitution that Constrain Pricing Whereas Plaintiffs' Ex Ante Rule Risks Excluding Important Information .......11

    C.   The Standard Approach to Market Definition Comports with the Two-Stage Model for Healthcare Markets...........................................14

III. NO "SETTLED LAW" REQUIRES COURTS TO EXCLUDE VERTICALLY INTEGRATED FIRMS WHEN DEFINING RELEVANT HEALTHCARE MARKETS .................................................14

CONCLUSION ........................................................................................16

APPENDIX A ........................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Atlantic Exposition Services Inc. v. SMG*,
  262 F. App'x 449 (3d Cir. 2008) .........................................................7

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992).........................................................................4

*FTC v. Abbvie, Inc.*,
  No. 2:14-cv-5151 (HB), 2017 WL 3726414 (E.D. Pa. July 10,
  2017) ...............................................................................................7

*FTC v. Qualcomm, Inc.*,
  969 F.3d 974 (9th Cir 2020) ...........................................................4

*High Technology Careers v. San Jose Mercury News*,
  996 F.2d 987 (9th Cir. 1993) ..........................................................4

*Killian Pest Control, Inc. v. HomeTeam Pest Defense, Inc.*,
  No. 14-cv-5239 (VC), 2015 WL 3766754 (N.D. Cal. June 16,
  2015) ...............................................................................................4

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) .........................................................7

*Theme Promotions, Inc. v. News America Marketing FSI*,
  546 F.3d 991 (9th Cir. 2008) ..........................................................7

*United States v. Aluminum Co. of America*,
  148 F.2d 416 (2d Cir. 1945) ............................................................9

*Vasquez v. Indiana University Health, Inc.*,
  40 F.4th 582 (7th Cir. 2022) ...........................................................7

## OTHER AUTHORITIES

Am. Bar Ass'n Section of Antitrust Law, *Market Definition in
  Antitrust: Theory and Case Studies* (2012) ...................................7, 13

iii

**Page(s)**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (Aug. 2022 update)......................5

David Evans & Richard Schmalensee, *The Antitrust Analysis of Multi-Sided Platform Businesses*, *in* 1 *The Oxford Handbook of International Antitrust Economics* (Roger D. Blair & D. Daniel Sokol eds., 2015) .................................................................................5

Kate Ho & Robin S. Lee, *Insurer Competition in Health Care Markets*, 85 Econometrica 379 (2017) ........................................................13, 14

James Langenfeld, Jonathan T. Tomlin, David A. Weiskopf & Georgi Giozov, *Hicks-Marshall Conditions and Defining Antitrust Markets for Intermediate Goods*, 27 Rsch. L. & Econ. 67 (2015)...................13

U.S. Dep't of Just. & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ..............................................................3, 7, 8, 12

Gregory J. Werden, *The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm*, 71 Antitrust L.J. 253 (2003).................................................................................5

## INTERESTS OF AMICI CURIAE[1]

Amici curiae are 17 economists and antitrust scholars who conduct research in antitrust economics. Appendix A lists their titles and affiliations.

This brief applies the economic principles of market definition to explain why Plaintiffs' arguments alleging flaws in the district court's jury instructions are inconsistent with accepted economic principles and could lead to incorrect conclusions concerning market definition in this and other antitrust cases. Amici submit this brief to aid the Court's consideration of these important issues.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Well-accepted economic principles of market definition—embodied in the hypothetical monopolist test—provide a framework that, when correctly applied, accounts for the unique characteristics of innumerable antitrust markets, including in the healthcare sector. Defining relevant markets is, by design, a fact-specific exercise that must be conducted case-by-case.

Plaintiffs and several amici ask this Court to adopt a new, ex ante rule for market definition in healthcare markets. Under their approach, courts would bypass the standard market definition analysis and be required to conclude without any

---

[1]    Amici curiae have not been retained by any party to this action. This brief was not authored in whole or in part by counsel for any party. No person other than amici curiae and their counsel made a monetary contribution that was intended for preparation or submission of this brief. All parties have consented to the filing of this brief.

analysis that "health plans—not patients—are the relevant purchasers." Amici Br. of Scholars of Healthcare Economics ("Scholars Br.") 7, ECF No. 31. As applied here, this new rule would require the jury to ignore Kaiser Permanente as a possible part of the relevant market solely because Kaiser is a vertically integrated "closed system" that does not accept non-Kaiser health plans. In other words, they would forgo the fact-specific, case-by-case analysis that is a hallmark of properly defining markets in favor of a conclusory rule defining the relevant market participants to be *only* non-vertically integrated hospitals. Rather than allowing economic evidence to inform the definition of the relevant market, this new regime would simply "instruct[] the jury that Kaiser could not be an alternative in the relevant market" as a matter of judicial fiat. Amici Br. of Law & Econ. Profs. et al. 18, ECF No. 26.

This Court should decline to adopt Plaintiffs' rule for three reasons:

*First*, established principles of market definition embodied in the hypothetical monopolist test apply equally in the healthcare sector. The hypothetical monopolist test—as set forth in the Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines* and applied by courts around the country—is designed to ensure a market definition that includes all factors constraining the ability of a monopolist to profitably raise prices or to maintain prices at supracompetitive levels, regardless of the industry at stake. That test, not Plaintiffs' ex ante rule, should inform market definition in this and other cases.

2

*Second,* Plaintiffs' rule would lead to erroneous conclusions. By forgoing the standard market definition framework, it removes an essential protection provided by the hypothetical monopolist test: "[T]o ensure that candidate markets are not overly narrow." U.S. Dep't of Just. & Fed. Trade Comm'n, *Horizontal Merger Guidelines* ("2010 HMG") § 4 (2010). The question of whether Kaiser is in—or out—of the relevant market requires a factual inquiry. Plaintiffs' simplistic view that Kaiser must, as a matter of law, be excluded from the relevant market risks defining an "overly narrow" market.

*Third*, Plaintiffs' rule is novel—not "settled"—and in tension with accepted economic principles. Plaintiffs cite no evidence that requires singling out healthcare markets for the uniquely truncated analysis they propose. To the contrary, the relevant economic principles make clear that, in the healthcare context, market definition remains an intensely factual inquiry ill-suited to bright-line rules.

**ARGUMENT**

## I. COURTS SHOULD APPLY THE STANDARD MARKET DEFINITION FRAMEWORK TO THE HEALTHCARE SECTOR

Economics provides a well-accepted and flexible framework for defining relevant antitrust markets. This framework can accommodate a wide variety of circumstances, and thus its application is fact-specific.[2]

### A. Market Definition's Nature and Purpose

Market definition plays an important role in antitrust cases.[3] It provides an approach for identifying the relevant scope of competition. And it allows the computation of market shares and other measures of market concentration that may, under certain conditions, be relevant to an assessment of the degree of market power of the firm subject to an antitrust action. Although market definition itself may not always be dispositive, it is often central to the overall economic analysis of challenged conduct in antitrust cases. Firms without substantial market power rarely

---

[2] "The process of defining the relevant market is a factual inquiry for the jury." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). Thus, "[t]he proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992)); *see Killian Pest Control, Inc. v. HomeTeam Pest Def., Inc.*, No. 14-cv-5239 (VC), 2015 WL 3766754, at *1-2 (N.D. Cal. June 16, 2015) (quoting *High Technology Careers* in a case involving claims brought under the Cartwright Act).

[3] *See FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir 2020) ("A threshold step in any antitrust case is to accurately define the relevant market, which refers to the area of effective competition." (citation omitted)).

have the ability or incentive to engage in conduct that may harm competition. Conversely, firms with substantial market power may, under certain circumstances, be willing and able to do so.

Market definition identifies competitive constraints that must be considered when evaluating the anticompetitive potential of challenged conduct—that is, those market forces that might "reduce the profitability of raising prices above competitive levels or lowering quality." David Evans & Richard Schmalensee, *The Antitrust Analysis of Multi-Sided Platform Businesses*, *in* 1 *The Oxford Handbook of International Antitrust Economics* 404, 423 (Roger D. Blair & D. Daniel Sokol eds., 2015). One commonly used, and generally well-understood, approach to defining relevant markets focuses on a hypothetical firm that controls a set of products in the proposed market. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 533b (Aug. 2022 update); Gregory J. Werden, *The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm*, 71 Antitrust L.J. 253, 259-66 (2003). This approach considers whether such a firm could profitably raise prices or sustain supracompetitive prices (or commensurately low quality) in that market, or whether competition is such that supracompetitive prices would not be profitable. Specifically, this approach evaluates how well customers are willing and able to substitute away from the products in a candidate market in response to a price

increase or quality decrease by such a firm. Because the approach focuses on customer responses (broadly defined), the profitability of a hypothetical price increase is ultimately governed by the extent of demand-side substitution. If customers in the candidate market can effectively substitute away from the firm imposing that price increase, then the proposed market, as defined, is too narrow.

The hypothetical monopolist test ("HMT") provides one conceptual framework for ascertaining whether a candidate group of products or services is broad enough to constitute a relevant market. As described in the *Horizontal Merger Guidelines*:

> [T]he test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms.

2010 HMG § 4.1.1.  With appropriate, case-specific modifications, this same test can be applied more broadly, not just for the purpose of assessing mergers, but also for assessing single-firm conduct.[4, 5]

**B.    The Hypothetical Monopolist Test Provides a Flexible Framework for Defining Relevant Markets in Diverse Economic Sectors**

By design, the HMT provides a flexible framework for defining relevant antitrust markets.  It does not specify the process for doing so within that framework.  The HMT does not, for example, define the mechanism(s) by which demand may shift away from a firm or group of firms seeking to (profitably) impose a price increase (or quality decrease).  Nor does it exclude any specific set or type of

---

[4]    *See, e.g.*, *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (nonmerger case defining market by asking if a "SSNIP would . . . be profitable for [a] hypothetical monopolist"); *see also Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 585 (7th Cir. 2022) (approving use of HMT to define market in nonmerger case); *McWane, Inc. v. FTC*, 783 F.3d 814, 829, 837 (11th Cir. 2015) (same); *Atl. Exposition Servs. Inc. v. SMG*, 262 F. App'x 449, 452 (3d Cir. 2008) (unpublished) (same); FTC Br. 31 & n.61, *FTC v. Abbvie, Inc.*, No. 2:14-cv-5151 (HB), 2017 WL 3726414 (E.D. Pa. July 10, 2017) (explaining that "[t]he HMT is a widely accepted methodology . . . routinely applied by courts and economists in merger and conduct cases alike" and collecting cases (footnote omitted)); Am. Bar Ass'n Section of Antitrust Law, *Market Definition in Antitrust: Theory and Case Studies* ("*Market Definition in Antitrust*") § I.B.1 (2012).

[5]    The "Cellophane Fallacy" sometimes arises in the context of defining relevant markets in single-firm conduct cases.  The Cellophane Fallacy involves consideration of the level of "competitive" prices and assessment of substitution at those prices but, crucially, does not affect the *types* of firms that may constrain the hypothetical monopolist.  *See generally Market Definition in Antitrust* § I.B.3.

competitors from consideration as a demand constraint. It merely asks whether a change in price or quality would be profitable for a hypothetical monopolist over a candidate set of products or services.

The HMT's open-ended flexibility is a feature, not a bug, that enables it to apply across a range of products and market structures, including those with unique or unusual attributes. By assessing constraints on a hypothetical monopolist's ability to profitably raise prices or sustain supracompetitive prices without reference to specific mechanisms or types of firms, the HMT calibrates market definition to account for all factors—and every player—relevant to the hypothetical monopolist's exercise of market power.[6] And in doing so, it specifically accounts for two dynamics that are particularly relevant to this case: vertical integration and "captive" sales.

Vertically integrated firms that own and operate assets at multiple levels of the supply chain may be included in the relevant market if the facts warrant. *See* 2010 HMG § 5.1 ("Vertically integrated firms are also included [in the relevant market] to the extent that their inclusion accurately reflects their competitive

---

[6] One group of amici supporting Plaintiffs acknowledges that "[a] key purpose of defining a market is to identify the market participants." Scholars Br. 6. The HMT framework fulfills this purpose, but an ex ante rule that predetermines market participants puts the proverbial cart before the horse by identifying market participants before defining the relevant market.

significance.").  And so-called "captive sales" within a vertically integrated firm are not *ipso facto* excluded from the relevant market simply because they are not available to the broader marketplace.

The *Alcoa* case offers a classic example.  *United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) (Hand, J.).  There, the court considered Alcoa's entire aluminum ingot production—whether sold to independent fabricators or fabricated internally (and thus a "captive output")—to be part of the relevant market. *Id.* at 423-25.

## II.  PLAINTIFFS' EX ANTE RULE IMPROPERLY NARROWS THE STANDARD MARKET DEFINITION ANALYSIS

Plaintiffs' proposed ex ante rule inappropriately narrows the scope of the market definition exercise.  Specifically, it risks excluding competitors from the relevant market that would otherwise be included, such as vertically integrated players with "captive" sales.  As a result, it distorts the purpose of market definition, which is to provide a framework for assessing the nature of competition that the firm in question faces and the extent to which it possesses market power.

This is not to say that vertically integrated firms should *always* be included in the same relevant market as non-vertically integrated firms.  This is inherently an empirical question.  Ex ante rules—whether mandating exclusion or inclusion of such firms—should be rejected altogether in favor of a case-by-case approach to market definition.  Nor do amici take any position on whether, in this case, Kaiser

9

disciplines the prices that non-Kaiser hospitals can negotiate with health plans. Among other things, the answer to that question turns on whether Sutter's patients would accept a price increase or, instead, if they would shift from Sutter (and the insurers with whom it deals) to Kaiser.

### A. Plaintiffs' Ex Ante Rule Narrows the Market Definition Analysis to Exclude Vertically Integrated Firms

In this case, Plaintiffs assert that health insurers must be viewed as the only "Relevant Purchasers" of Sutter's services. Pls. Br. 65-67. Several amici make a similar assertion. *See, e.g.*, Scholars Br. 3-4 ("Because health plans negotiate with hospitals to establish the prices for hospital services, they are the relevant purchasers when it comes to analyzing hospital market power and any anticompetitive conduct that affects prices."). Thus, according to Plaintiffs, courts must "instruct the jury to focus on direct purchaser alternatives when analyzing market definition and market power." Pls. Br. 63. And here, they contend, that means the district court should have told the jury that the *only* relevant purchasers were insurers with whom non-Kaiser providers deal directly—*not* Kaiser or insurance enrollees (end consumers who could, in theory, shift from Sutter's healthcare services to Kaiser's). *Id.* at 65.

But that proposed ex ante rule significantly narrows the traditional market definition analysis embodied in the HMT. The traditional analysis does not turn on affixing the "purchaser" label to one entity or another, or on trying to identify the one "relevant" purchaser (or category of purchasers) in a given case. Instead, the

required analysis turns on identifying the key competitive constraints for the firms and conduct in question.

Neither Plaintiffs nor their amici define what a "Relevant Purchaser" is, or why, as a matter of economics, it would be appropriate to limit the assessment of relevant antitrust markets to such purchasers. As a factual matter, it is undisputed that unintegrated hospitals, including Sutter, establish reimbursement rates for their services through bilateral negotiations with independent health insurers. Those insurers, in turn, sell health insurance to consumers, who also obtain services from providers like Sutter. And insurers charge those consumers premiums for their services and may also impose copayments when their customers obtain covered medical services from providers. The fact that unintegrated healthcare providers and health insurers often set prices through negotiation does not imply that integrated hospital-insurers such as Kaiser should be excluded ex ante from relevant healthcare markets.

**B.     A Proper Hypothetical Monopolist Test Should Account for All Dimensions of Substitution that Constrain Pricing Whereas Plaintiffs' Ex Ante Rule Risks Excluding Important Information**

The HMT asks whether a hypothetical monopolist could profitably impose a SSNIP. It does not require a specific type of response to such an attempted price increase. Instead, as already explained, it is purposefully silent on the mechanism(s) by which such an attempted increase would or would not be profitable, so that all

11

relevant competitive constraints may be considered. Consistent with that understanding, the *Horizontal Merger Guidelines* describe a wide array of evidence relevant to market definition. Notably, the *Guidelines* indicate that regulators take into account "the influence of downstream competition faced by customers in their output markets" in assessing "customers' likely responses to higher prices." 2010 HMG § 4.1.3.

Plaintiffs' ex ante rule departs from this practice, and unduly restricts analysis of relevant evidence. To see this, consider the case of an industry that makes widgets. Suppose that Firms A and B are widget manufacturers that contract with third-party retailers to sell widgets to consumers and that Firm C is a vertically integrated widget manufacture and retailer. The logic of Plaintiffs' position is that, by definition, Firms A and B do not compete with Firm C even if the widgets that all three firms produce are perfectly interchangeable from the perspective of consumers.

The standard market definition framework, embodied in the HMT, provides a more flexible and, thus, more accurate approach. It accounts for the diverse characteristics of many markets, including healthcare. And it embraces the many ways in which a hypothetical monopolist could be discouraged, by market forces, from profitably imposing a SSNIP.

Of particular relevance here, if a provider like Sutter raised reimbursement rates, and an insurer correspondingly raised premiums, the insurers' customers might

shift away from that insurer *and* the provider, to a vertically integrated firm that provides both health insurance and healthcare services. *See* Kate Ho & Robin S. Lee, *Insurer Competition in Health Care Markets*, 85 Econometrica 379, 380 (2017) ("One of this paper's primary contributions is identifying and quantifying the mechanisms by which insurer competition affects negotiated hospital prices in equilibrium."). If so, then the ability of a provider to profitably raise the price of healthcare services would depend, among other factors, on the price and availability of the services offered by integrated firms like Kaiser. [7] Thus, a proper implementation of the HMT, and the resulting market definition for healthcare services, may require an assessment of the extent to which Kaiser offers a competitive alternative for patients. Adopting Plaintiffs' rule, on the other hand, would forbid courts and juries from engaging in that necessary analysis.

---

[7] Intuitively, the ability of upstream healthcare providers to raise prices for downstream insurers depends on the ability of those insurers to pass on price increases to their customers and thus is a function of downstream competition between insurers. According to the Hicks-Marshall Law of Derived Demand, under general conditions, the elasticity of demand for an upstream product is a function of the elasticity of demand for the downstream product for which it is an input. *See Market Definition in Antitrust* § II.A.1; James Langenfeld, Jonathan T. Tomlin, David A. Weiskopf & Georgi Giozov, *Hicks-Marshall Conditions and Defining Antitrust Markets for Intermediate Goods*, 27 Rsch. L. & Econ. 67, 74 (2015).

### C. The Standard Approach to Market Definition Comports with the Two-Stage Model for Healthcare Markets

Accepting the two-stage model of healthcare competition—in which providers first compete to be included in health networks and then patients choose providers, *see, e.g.*, Pls. Br. 7, 65—does not require adopting Plaintiffs' overly narrow analysis of market definition. Under the two-stage model, higher insurance premiums or reduced benefits could still cause insurers' customers to shift to a vertically integrated competitor like Kaiser. As discussed above, this substitution would likely not occur when patients seek care (the second stage) but rather at the point of enrollment: Enrollees might shift away from non-integrated insurers *and* providers, thus disciplining the incentive of the hypothetical monopolist provider to raise prices. *See, e.g.*, Ho & Lee, *supra*, at 380 & n.5. The point here is not that Kaiser *must* be included in the relevant market. Rather, whether Kaiser should be included in a relevant market should be decided on the case-specific facts and not on an inflexible rule of ex ante exclusion.

### III. NO "SETTLED LAW" REQUIRES COURTS TO EXCLUDE VERTICALLY INTEGRATED FIRMS WHEN DEFINING RELEVANT HEALTHCARE MARKETS

Plaintiffs and their amici argue that the Court should reject this case-by-case approach and instead impose a healthcare-specific, ex ante rule excluding patients (and thus vertically integrated firms like Kaiser) from the analysis. Notwithstanding all the above, they claim that such a rule is required by "settled law" adopting the

two-stage model of healthcare competition, which (they argue) makes non-integrated insurers the *only* "Relevant Purchasers" in healthcare markets. *See* Pls. Br. 60, 65; Scholars Br. 3-4, 7-10.

The nature of competition—including whether vertically integrated firms are competitively significant—and the specifics of information available will vary with the industry in question, the nature of conduct being assessed, and the time period examined. There is no general principle that excludes vertically integrated firms from the market; to the contrary, in certain cases, they may be among the most important competitive constraints and thus proper market definition must include them. Since such issues are rarely (if ever) identical between two antitrust cases, the process of market definition must be re-examined in each individual case. Thus, market definition for this case cannot be prescribed from a previous case (or previous cases) and cannot plausibly be described as "settled antitrust law." *See* Appellee Br. 63-65 (arguing that Plaintiffs' case law does not in fact establish any "settled law" to the contrary).

The relevance of a particular market participant to a hypothetical monopolist's power to raise prices is a factual question to be assessed in each case. This Court should therefore not adopt Plaintiffs' novel, ex ante rule excluding end consumers and vertically integrated firms from healthcare markets as a matter of law.

**CONCLUSION**

For the foregoing reasons, the Court should reject Plaintiffs' invitation to impose a bright-line, ex ante rule predetermining the relevant market in healthcare cases.

Dated:  January 10, 2023          Respectfully submitted,

                                                *s/* Sarah M. Ray

Timothy Michael Snyder         Alfred C. Pfeiffer, Jr.
Jordan R. Goldberg              Christopher S. Yates
LATHAM & WATKINS LLP       Sarah M. Ray
555 Eleventh Street, NW, Suite 1000  LATHAM & WATKINS LLP
Washington, DC 20004           505 Montgomery Street, Suite 2000
(202) 637-2200                  San Francisco, CA 94111
                                          (415) 391-0600

                                   *Counsel for Amici Curiae*

16

**CERTIFICATE OF COMPLIANCE**

I hereby certify that pursuant to Fed. R. App. P. 32(a), and Ninth Circuit Rule 32-1, this brief complies with the type-face and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman; and it complies with the length requirement of Fed. R. App. P. 29(a)(5) because it contains 3,527 words, excluding the parts of the brief exempted by Rule 32(f).

January 10, 2023          *s/* Sarah M. Ray
                                 Sarah M. Ray

## CERTIFICATE OF SERVICE

I hereby certify that, on January 10, 2022, I electronically filed this brief with the Clerk of Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 January 10, 2023                  *s/* Sarah M. Ray _____
                                          Sarah M. Ray

## APPENDIX A

*Rosa M. Abrantes-Metz, PhD* is a Principal at The Brattle Group.

*Mary Coleman* is an Executive Vice President at Compass Lexecon.

*Kenneth G. Elzinga* is the Robert C. Taylor Professor of Economics at the University of Virginia.

*Richard Gilbert* is the Distinguished Professor Emeritus of Economics and Professor of the Graduate School at the University of California at Berkeley.

*Mark A. Israel* is a Senior Managing Director at Compass Lexecon.

*Joseph Kalt* is the Ford Foundation Professor (Emeritus) of International Political Economy and Co-Director of the Harvard Project on American Indian Economic Development at the John F. Kennedy School, Harvard University.

*Benjamin Klein* is a Professor Emeritus of Economics at the University of California at Los Angeles.

*Abbott B. Lipsky, Jr.* is an Adjunct Professor at the Antonin Scalia Law School, George Mason University.

*Kevin Murphy* is the George J. Stigler Distinguished Service Professor of Economics at The University of Chicago in the Booth School of Business and Department of Economics.

*Daniel Rubinfeld* is the Robert L. Bridges Professor of Law and Professor of Economics Emeritus at University of California at Berkeley and Professor of Law at New York University School of Law.

*Michael Salinger* is the Jacqueline J. and Arthur S. Bahr Professor of Management and Professor of Economics at the Boston University Questrom School of Business.

*Jeremy Sandford* is an Executive Vice President at Compass Lexecon.

*Richard Schmalensee* is Professor of Economics and Management Emeritus at the Massachusetts Institute of Technology.

*Marius Schwartz* a Professor of Economics at Georgetown University.

*Sean Sullivan* is a Professor of Law at the University of Iowa College of Law.

*Nathan Wilson* is an Executive Vice President at Compass Lexecon.

*Joshua D. Wright* is the University Professor and Executive Director of the Global Antitrust Institute at the Antonin Scalia Law School, George Mason University.