# 22-15634

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

➤➤◄◄

DJENEBA SIDIBE; JERRY JANKOWSKI; SUSAN HANSEN; DAVID HERMAN;
OPTIMUM GRAPHICS, INC.; JOHNSON POOL & SPA,
on Behalf of Themselves and All Others Similarly Situated,

*Plaintiffs-Appellants,*

*v.*

SUTTER HEALTH,

_____

*Defendant-Appellee.*

*On Appeal From the United States District Court*
*for the Northern District of California*
*Case No. 3:12-cv-04854-LB,*
*The Honorable Laurel D. Beeler, Magistrate Judge*

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

| | |
|---|---|
| Matthew L. Cantor | David C. Brownstein |
| *Counsel of Record* | David M. Goldstein |
| Jean Kim | FARMER BROWNSTEIN JAEGER |
| CONSTANTINE CANNON LLP | GOLDSTEIN KLEIN & SIEGEL LLP |
| 335 Madison Avenue, 9th Floor | 235 Montgomery Street, Suite 835 |
| New York, New York 10017 | San Francisco, California 94104 |
| 212-350-2700 | 415-795-2050 |
| | |
| James J. Kovacs | Allan Steyer |
| J. Wyatt Fore | D. Scott Macrae |
| CONSTANTINE CANNON LLP | STEYER LOWENTHAL BOODROOKAS |
| 1001 Pennsylvania Avenue, NW | ALVAREZ & SMITH LLP |
| Suite 1300N | 235 Pine Street, 15th Floor |
| Washington, D.C. 20004 | San Francisco, California 94104 |
| 202-204-3500 | 415-421-3400 |
| | |
| Azra Z. Mehdi | Jill Manning |
| THE MEHDI FIRM, PC | PEARSON, SIMON & WARSHAW, LLP |
| 95 Third Street, 2nd Floor, No. 9122 | 555 Montgomery Street, Suite 1205 |
| San Francisco, California 94103 | San Francisco, California 94111 |
| 415-905-88809 | 415-333-9000 |

*Attorneys for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................1

ARGUMENT ....................................................................4

    I.    THE EVIDENTIARY EXCLUSION ORDERS SHOULD BE
        REVERSED. ......................................................4

        A.    The Excluded Evidence Has Substantial Probative Value. ........6

              i.    Excluded Admissions ....................................10

              ii.    Excluded Economic Evidence .......................12

        B.    The Court Erroneously Excluded Pre-2006 Evidence Under
            Rule 403. ..................................................15

        C.    The Exclusion of This Evidence Was Prejudicial. ..................17

    II.    THE RULE OF REASON INSTRUCTIONS CONSTITUTE
        REVERSIBLE ERROR. ....................................................24

        A.    The Rule of Reason Instructions Contravened Settled Law.....24

        B.    The Rule of Reason Instructions Were Prejudicial..................26

    III.    THE COURT'S FAILURE TO IDENTIFY HEALTH PLANS AS
        THE RELEVANT PURCHASERS WAS REVERSIBLE ERROR. .27

        A.    The Court's Failure to Identify Health Plans as the Relevant
            Purchasers Was Erroneous.......................................27

        B.    The Court's Failure to Define the Relevant Purchaser Was
            Prejudicial. ................................................34

    IV.    THE COURT'S SPOLIATION RULINGS SHOULD BE
        REVERSED. ......................................................36

CONCLUSION ................................................................38

# TABLE OF AUTHORITIES

## Cases

*999 v. C.I.T. Corp.*,
  776 F.2d 866 (9th Cir. 1985) ...............................................................9

*Adams v. Ameritect Serv., Inc.*,
  231 F.3d 414 (7th Cir. 2000) ..............................................................14

*Akiona v. United States*,
  938 F.2d 158 (9th Cir. 1991) ..............................................................38

*Am. Unites for Kids v. Rousseau*,
  985 F.3d 1075 (9th Cir. 2021) ............................................................37

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ..............................................................13

*Ben-E-Lect v. Anthem Blue Cross Life and Health Ins.*,
  51 Cal. App. 5th 867 (2020) ................................................................5

*Blanton v. Mobil Oil*,
  721 F.2d 1207 (9th Cir. 1983) ............................................................14

*Brewer v. City of Napa*,
  210 F.3d 1093 (9th Cir. 2000) ............................................................29

*Chicago Bridge & Iron Co. N.V. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ..............................................................35

*City of Long Beach v. Standard Oil Co. of Cal.*,
  46 F.3d 929 (9th Cir. 1995) ................................................................15

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ........................................................................4, 5

*Conwood Co. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ..............................................................19

*Corwin v. L.A. Newspaper Serv. Bureau*,
  4 Cal. 3d 842 (1971) ........................................................................4, 25

*Corwin v. L.A. Newspaper Serv. Bureau,*
  22 Cal. 3d 302 (1978) ...............................................................................4

*CP Anchorage Hotel 2, LLC v. Unite Here! Loc. 878,*
  2022 WL 2953697 (9th Cir. July 26, 2022) ...........................................8

*Crawford v. City of Bakersfield*,
  944 F.3d 1070 (9th Cir. 2019) ...............................................................18

*Exxon Corp v. Super Ct.,*
  51 Cal. App. 4th 1672 (1997) .................................................................26

*Feldman v. Sacramento Bd. of Realtors*,
  119 Cal. App. 3d 739 (1981) ..................................................................26

*Fisherman's Wharf Bay Cruise Corp v. Super. Ct.*,
  114 Cal. App. 4th 309 (2003) .................................................................19

*Frost v. BSNF Ry. Co.*,
  914 F.3d 1189 (9th Cir. 2019) ....................................................... 20, 23

*FTC v. Advoc. Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) 7)..............................................................31

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) ...................................................................30

*Gametech Int'l Inc. v. Trend Gaming Sys., L.L.C.*,
  232 F. App'x 676 (9th Cir. 2007) .............................................................6

*Higgs v. Costa Crociere S.p.A.*,
  720 F. App'x 518 (11th Cir. 2017)............................................................6

*In re Cipro Cases I & II*,
  61 Cal. 4th 116 (2015) ................................................................ 5, 25, 26

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ....................................................................5

iii

*Ixchel Pharma, LLC v. Biogen*,
   9 Cal.5th 1130 (2020) ........................................................................26

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984).......................................................................7, 35

*Jerden v. Amstutz*,
   430 F.3d 1231 (9th Cir. 2005) ...............................................17

*Lam v. City of San Jose*,
   869 F.3d 1077 (9th Cir. 2017) ...............................................29

*Louis Vuitton Malletier v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011) .................................................29

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
   200 Cal. App. 4th 480 (2011) ...............................................26

*MCI v. AT&T*,
   708 F.2d 1081 (7th Cir. 1983) ...............................................12

*Medical Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
   817 F.3d 934 (6th Cir. 2016) .................................................11

*Medical Laboratory Management Consultants v. American Broadcasting Companies, Inc.*,
   306 F.3d 806 (9th Cir. 2002) .................................................37

*Monsanto Co. v. David*,
   516 F.3d 1009 (Fed. Cir. 2008) ............................................14

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021)............................................................5

*Olean Wholesale Grocery Coop, Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .................................................28

*PLS.com, LLC v. Nat'l Assoc. of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .......................................... 19, 31

*S.E.C. v. Peters*,
   978 F.2d 1162 (10th Cir. 1992) ..............................................6

iv

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ........................................................... 27, 32

*Sauers v. Alaska Barge*,
    600 F.2d 238 (9th Cir. 1979) ....................................................................9

*Sprint/United Mgmt. Co. v. Mendelsohn*,
    552 U.S. 379 (2008)....................................................................................6

*UFCW & Emps. Benefit Trust v. Sutter Health*,
    Case No. CGC-14-538451 (Super. Ct. Sept. 12, 2022)........................25

*U.S. v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) .................................................................5, 32

*U.S. v. Hall*,
    552 F.2d 273 (9th Cir. 1977) .................................................................29

*U.S. v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................19

*UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*,
    169 Cal. App. 4th 357 (2008) .............................................................7, 19

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) .....................................................................36

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ..................................................................19

## Other Authorities

AM. JUR. 2d § 751 (2d ed. 2023) .............................................................15

AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW,
    ¶ 520b3 (4th ed. 2022) ...........................................................................35

CAL. OFFICE OF THE ATT'Y GEN., SUPPLEMENTAL REPORT: AN EVALUATION
    OF THE PROPOSED CHANGE IN CONTROL OF ST. MARY MEDICAL CENTER,
    at 88 n.222 (Nov. 11, 2021) ...................................................................33

MCCORMICK ON EVIDENCE § 254 (8th ed. 2022)......................................................15

3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 16.78[3],
    at 16-210 (3d ed. 2022)...........................................................................................9

## Rules

Fed. R. Civ. P. 49 ...................................................................................................20

Fed. R. Evid. 401 ...................................................................................................11

Fed. R. Evid. 402 ............................................................................................. 2, 5, 6

Fed. R. Evid. 403 ...........................................................................................*passim*

**INTRODUCTION**

In the late 1990s/early 2000s, Sutter decided to force systemwide contracts on health plans, requiring them to contract for "all" of its hospitals or get "none" of them for their networks. Through these "all or nothing" contracts, Sutter imposed clauses that suppressed health plans' ability to steer their insureds away from Sutter to lower-cost hospitals with effective (i.e., low-premium) narrow and tiered networks. AB 11-23.[1] Sutter's conduct forced higher pricing on these plans and shielded it from competitive constraints. That higher pricing was passed on to millions of Class Members in the form of higher health insurance premiums. *See* AB 7.

Sutter primarily defends by denying that it "forced" health plans to do anything: it lacked that power, Sutter says, because (a) the Class Health Plans were much too large and (b) of competition from Kaiser hospitals. Sutter contends that Kaiser prevented it from forcing health plans into restraints, even though Kaiser did not offer hospital services to health plan networks, and they could not switch to Kaiser hospitals when Sutter raised price or demanded onerous contract terms.

---

[1] "SB" and "AB" refer to Sutter's Brief and Appellants' Brief. Unless otherwise indicated, all emphasis is added, and internal quotation marks and citations are omitted.

1

Critical evidence, including Sutter *admissions*, that it intended to and did "force" health plans to submit to its systemwide contracts refute that story. But the jury never got to see or hear *any* of these admissions or the evidence of how and why Sutter adopted its "all or nothing" contracts, because the court issued "arbitrary" rulings excluding all pre-2006 evidence under Federal Rules of Evidence 402 and 403. Those rulings contravene established law and the court's own, heavy reliance on pre-2006 evidence in denying summary judgment – something the court disregarded once faced with Sutter's massive spoliation of pre-2006 evidence. These rulings plainly compromised the jury's analysis of the Verdict Form, particularly the question that asked whether Sutter "forced" contracts on health plans. AB 30-38.

The court made other errors that frustrated the jury's evaluation of Sutter's market, or forcing, power and tying. It failed, contrary to black letter law, to direct the jury to (a) find that Sutter's restraints were anticompetitive if they were spurred by an anticompetitive purpose, or (b) define the direct purchaser health plans as the relevant purchasers for determining whether Sutter exercised market power over them or tied multiple hospitals together.

Sutter denies error but fails to offer *even one case* that, like the court did, (1) excluded evidence of the purpose or implementation of restraints, (2) held that restraints designed with anticompetitive purpose do not violate the Cartwright Act,

2

or (3) defined hospital (or any) markets, or assessed hospital market power or tying, from the view of indirect, rather than direct, purchasers.

So, as it has no law, Sutter concocts a strawman. In its counterfactual, Plaintiffs never put Sutter's systemwide contracting at issue; thus, the excluded evidence of why and how systemwide contracting was imposed had no probative value. Moreover, in Sutter's fantasy, Plaintiffs claim that Sutter prevented *all* steering and the formation of *any* narrow or tiered network – a claim that Sutter says was necessarily defeated by its evidence that it participated in some narrow and tiered networks. Sutter then argues that, because the jury must have found for it on the "steering" issue, any evidentiary or instructional errors related to an evaluation of Sutter's "forcing" was harmless.

None of that is remotely correct. As the court's *summary judgment and pretrial Orders confirm*, Plaintiffs always argued that Sutter's systemwide contracting was the mechanism it used to reap higher prices and impose anticompetitive clauses. And Plaintiffs never claimed that Sutter precluded health plans from all steering or launching any narrow or tiered network. Rather, Plaintiffs claimed, *as the jury instructions confirm*, that Sutter's anticompetitive contracts impeded health plans from launching "*effective*" narrow and tiered networks that would have offered consumers lower premiums. Sutter's contracts did this by imposing punitive costs on narrow and tiered networks for steering

3

away from Sutter, causing premiums to be kept high for them no matter what. But for Sutter's contracts, more consumers would have purchased these networks and health plans would have, in turn, steered more consumers away from Sutter. The evidence confirmed this.

Sutter's strawman should be rejected. The court's errors prejudiced Plaintiffs' case. Reversal is required.

## ARGUMENT

## I.  THE EVIDENTIARY EXCLUSION ORDERS SHOULD BE REVERSED.

Evidence from "before and after" the imposition of restraints, including of their "purpose" and "history," is central to antitrust analysis. *Corwin v. L.A. Newspaper Serv. Bureau*, 4 Cal. 3d 842, 854 (1971), and 22 Cal. 3d 302, 310, 314 (1978). By depriving Plaintiffs of this "clearly material," unique evidence of Sutter's market power and the anticompetitive purposes and consequences of its behavior, the court's evidentiary exclusions substantially prejudiced Plaintiffs. *E.g.*, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709-10 (1962) (reversing defense jury verdict); AB 47-58.

Sutter argues otherwise, asserting that the excluded evidence is just too old. SB 30-48. But Sutter offers no case excluding evidence on that ground. Sutter notes that *Continental Ore* states that a court can "set a reasonable [evidentiary]

cut-off date." SB 45. But it did not hold that it was "reasonable" to set an evidentiary cut-off that fell after the subject restraints were imposed. *Continental Ore*, rather, reversed on the ground that such a cut-off date must be set well before then. 370 U.S. at 709-10. Given this, antitrust courts routinely admit evidence from a decade or more before a case was filed. *See, e.g.*, *In re Cipro Cases I & II*, 61 Cal. 4th 116, 132-33 (2015) (fourteen years prior to filing); *Ben-E-Lect v. Anthem Blue Cross Life and Health Ins.*, 51 Cal. App. 5th 867, 870-87 (2020) (thirteen years prior to filing); *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 450-53 (9th Cir. 1990) (twenty-year old evidence relevant to intent); *U.S. v. Aluminum Co. of Am.*, 148 F.2d 416, 422-23 (2d Cir. 1945) ("*Alcoa*") (whether monopoly "continued for [] twenty-eight years"); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2148-51 (2021).

Sutter also asserts that the court's Orders only precluded evidence under Rule 403, not as irrelevant under Rule 402. SB 30, n.9. But the court repeatedly stated that "my preclusion order is absolute . . . . I don't think [pre-2006] evidence is relevant." AB 35-36. By failing to address that ruling, Sutter concedes error.

Had the court blanketly precluded pre-2006 evidence under Rule 403, as Sutter suggests, that would be obvious error. Rule 403 requires courts to weigh the probative value of each piece of potentially excludable evidence against the

substantial likelihood that it would cause confusion or waste time.[2]  Categorically

excluding evidence per se under Rule 403 is disfavored.  *See Sprint/United Mgmt.*

*Co. v. Mendelsohn*, 552 U.S. 379, 383-87 (2008).

### A.    The Excluded Evidence Has Substantial Probative Value.

The excluded evidence verifies Sutter's anticompetitive conduct and thus

has substantial probative value under Rule 403 (and Rule 402).  Sutter argues

otherwise.  But that is based on a false re-crafting of Plaintiffs' claims and is belied

by a plain reading of the excluded evidence.

Plaintiffs' tying claims alleged that Sutter forced health plans to enter into

systemwide contracts for *all* Sutter Hospitals, including Tied Hospitals, if they

wanted *any* Sutter Tying Hospital in network.  AB 12-14, 27-29.  These

systemwide contracts contained terms related to the sale of all Tying and all Tied

Hospitals, whether placed in-network or out-of-network (when Sutter's non-par

penalty rate clause would operate).  Sutter tries to change that.  According to

Sutter, this case was not about "the purchase of hospital services" until closing

argument, but, instead, about whether Sutter conditioned Tied Hospital network

---

[2] Sutter suggests that Rule 403 is only used "sparingly" in criminal, not in civil, cases.  SB  29, n.8.  That is wrong.  *See Gametech Int'l Inc. v. Trend Gaming Sys., L.L.C.*, 232 F. App'x 676, 678 (9th Cir. 2007), cited at AB 56; *S.E.C. v. Peters*, 978 F.2d 1162, 1171 (10th Cir. 1992); *Higgs v. Costa Crociere S.p.A.*, 720 F. App'x 518, 520 (11th Cir. 2017).

participation on Tying Hospital network participation. SB 13, 16-20. Sutter

further claims that this case was never about its systemwide contracting, but only

about specific terms in Sutter's contracts. SB 13. That is all false. Plaintiffs

always challenged Sutter's systemwide contracts as (1) illegal tying arrangements

because they "link" together the terms of sale of its Tying and Tied Hospital

services, and (2) *the* mechanism that Sutter used to impose anticompetitive terms

upon health plans. *See UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal.

App. 4th 357, 369 (2008) (reversing judgment on tying claim where sale of

hospital services was "linked" through hospital/health plan contract).[3]

At summary judgment, Sutter also argued that this case was not about the

sale of hospital services or systemwide contracting. Plaintiffs opposed that. *See,*

*e.g.*, 4-ER-691:24–692:2 ("[Sutter counsel] says there's no linkage between the

tying and the tied hospitals. That is untrue. The system-wide agreements have

terms of sale relevant to the tying hospital services, and relevant to the tied hospital

---

[3] Sutter contends that *UAS* is distinguishable because the contract there *de jure* required that the tied services be "in network," unlike Sutter's contracts. SB 12. But *UAS* does not hold that hospital/health plan contracts only offend antitrust law when they have this requirement. Antitrust law is violated when purchasers are forced to buy a second service that they "might have preferred to purchase elsewhere on *different terms.*" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). Here, the sale of Tied and Tying Hospital services were linked through Sutter's contracts on terms that health plans did not want, which governed the supply of both their in-network and out-of-network services. AB 17-22.

services."); 4-ER-693:7-10.  And the court rejected Sutter's argument, holding that

material factual issues existed over whether Sutter's systemwide contracts

constituted a tie or restrained trade: in fact, the very "first" reason it denied

summary judgment was that "the contracts [are] systemwide."  3-ER-476:6-7.[4]

Unsurprisingly, because it reflects Plaintiffs' claims, the summary judgment

Order relies on substantial pre-2006 evidence concerning Sutter's systemwide

contracting.  Sutter seeks to diminish that, describing such evidence as mere

"background."  SB 44.  But the law is clear: "[a] court can . . . consider [only]

admissible evidence" when ruling on a summary judgment motion.  *See CP*

*Anchorage Hotel 2, LLC v. Unite Here! Loc. 878*, 2022 WL 2953697, at *2 (9th

Cir. July 26, 2022).  The pre-2006 evidence "considered" in this Order must

therefore be deemed admissible, showing that categorical exclusion of pre-2006

evidence regarding Sutter's restraints was error.

Sutter also tries to confuse by contending that Plaintiffs' pre-discovery

Complaint did not state that their tying claims were premised on how Sutter's

systemwide contracts joined together the sale of in and out-of-network services

provided by distinct Sutter hospitals.  SB 12.  This too is wrong: the Complaint

---

[4] Sutter's systemwide contracting practices were a central issue at trial.  *See, e.g.*, 3-SER-644:1–646:2; 9-SER-2615:25–2619:13; 10-SER-2812:19–2813:14; 17-SER-4843:25–4845:20; 17-SER-4871:8–4876:9.

details how Sutter sold Tying and Tied Hospitals together via contract.  *See, e.g.*, 3-ER-585–86 ¶¶ 126, 134.  Moreover, as the court's Orders – including Pretrial Orders – prove, Sutter was on notice that its systemwide contracting practices were at issue.  *See* 1-ER-105 ("claims . . . are [] reflected in summary-judgment order" and Proposed Pretrial Order); 1-FER-56–75; *see also* 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 16.78[3], at 16-210 (3d ed. 2022); *999 v. C.I.T. Corp.*, 776 F.2d 866, 870-71 (9th Cir. 1985); *Sauers v. Alaska Barge*, 600 F.2d 238, 244 (9th Cir. 1979) (treating "pleadings . . . [as] amended" where "[f]acts . . . before [] court").

Given Plaintiffs' claim that Sutter's systemwide contracting was the lynchpin by which it extracted higher prices and imposed anticompetitive terms on health plans, the court should have followed black-letter law and admitted "before" and "after" evidence, including evidence of the "purpose" and "history," of systemwide contracting.  Instead, it categorically excluded over 100 pieces of evidence – only a few of which Sutter discusses – based upon an evidentiary cut-off that the court acknowledged was "arbitrary."  AB 30, 32-35.  But for these rulings, witnesses would have testified about unique, substantially probative matters, including how Sutter first exercised its systemwide market power.  That testimony would have recounted how (i) Anthem attempted to resist, but "folded" to that systemwide power in 2001, and (ii) the health plans objected, but yet

submitted, to the first, pre-2006 imposition of each anticompetitive term. It also would have described how these contracts stunted health plan attempts to launch effective narrow and tiered networks pre-2006. And it would have confirmed how Sutter's pre-2006 actions caused its prices to skyrocket. AB 12-21; 32-35.[5]

Sutter tries to justify the exclusion of certain of its admissions and Plaintiffs' pre-2006 economic evidence. SB 30-44. But a review of that evidence shows its substantial probative value.

### i. Excluded Admissions

Sutter's pre-2006 admissions plainly show that it exercised market power and intended to cause anticompetitive effects through systemwide contracting. Contrary to Sutter's contention, its 1997 memorandum confirms this:

> [Anthem] can be expected to resist system-wide negotiations *because of the increased leverage that twenty-one hospitals can achieve by working together* . . . No [] HMO [] plan has ever attempted to compete in . . . Northern California [] without all or most . . . Sutter Health facilities in their network.

2-ER-177–179.[6] Moreover, CFO Reed's 1998 admissions quantified how Sutter would earn almost $200 million more each year, once systemwide contracts were

---

[5] Sutter suggests that other hospitals used contracting practices and clauses similar to Sutter's. *See* SB 10-11; Am. Hospital Assoc. Br. at 24. Non-party hospitals testified otherwise. *See* 4-SER-949:7–950:4; 4-SER-995:15–1000:4; 9-SER-2421:2–2424:4; 13-SER-3685:21–3689:13; 13-SER-3722:19–3725:23.

[6] Highlighted citations reference excluded evidence.

==forced on all health plans==.  AB 14-15.  ==And his testimony verified that Sutter==

==moved from individual to systemwide contracting to reap "better pricing."==  *Id.*[7]  It

is hard to imagine more probative evidence.

Sutter argues that these admissions were correctly excluded because they

only concern Sutter's plans to impose a systemwide contract, and not any specific,

anti-steering clause.  SB 32.  Similarly, it argues ==that 2006 admissions made by==

==future Sutter CEO, Sarah Krevans, that Sutter "force[d]" health plans "to pay us==

==more . . .  because we could"== (AB 15) were properly excluded because they do not

refer to tying or steering.  SB 42-43.  But evidence need not reference every aspect

of a claim to be admissible.  "[E]vidence is relevant if it . . . make[s] the existence

of *any fact* [] of consequence . . . more or less probable."  FED. R. EVID. 401.

Sutter also suggests that Ms. Krevans' admissions were properly excluded

because "there is [] reason to doubt [she] made" them.  SB 43.  But they were

contemporaneously documented by a Sutter agent (Strategy Advantage); and the

court acknowledged that "the business-records foundation could be laid" for them.

1-ER-111–12.  *See Medical Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,

---

[7] Sutter argues the exclusion was harmless because Reed testified that systemwide contracting led to "better results."  SB 48.  That does not substitute for his admission that Sutter deployed systemwide contracting to achieve "better *prices*."  Sutter's *prices* are what this case is about.

817 F.3d 934, 944 (6th Cir. 2016) (reversing antitrust judgment where defendant admissions to consultant excluded); *MCI v. AT&T*, 708 F.2d 1081, 1143 (7th Cir. 1983).

These admissions go right to whether Sutter had the ability to "force," i.e., to exercise market power. They concern the restraint's "purpose" and "history." And they are critical to a proper evaluation of Verdict Form Question #5, which asked whether Sutter "forced" health plans to enter into its anticompetitive contracts. *See* 1-ER-9. They should have been admitted.

ii. Excluded Economic Evidence

The court erroneously excluded highly probative economic evidence analyzing pre-2006 pricing. Sutter specifically argues that Dr. Chipty's analysis comparing Sutter and other Northern California hospital prices (i.e., net patient revenues) before and after Sutter imposed its systemwide restraints, shown below, was properly excluded. SB 36-37; AB 21. That is wrong.

12



2-ER-412.  This verifies how the imposition of Sutter's restraints (by 2002) caused

Sutter's prices to be (and stay) higher than its competitors.[8]  1-FER-93–95.  It is

direct evidence of Sutter's "market power," which "is the ability to raise prices

above those [] charged in a competitive market."  *Aya Healthcare Servs., Inc. v.*

*AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021); *see also* AB 50.[9]  The

---

[8] For evidence of Sutter's higher pricing, see AB 21-22, 34; 5-ER-1067
(Sutter admits it has "more expensive product offering"); 6-SER-1458:5–1462:9;
6-SER-1474:18–1477:3; 1-FER-169 (Sutter "costs were on average 30% higher
than" competitors); 6-SER-1746:20–7-SER-1751:4; 7-SER-1766:25–1767:10; 1-
FER-178; 4-SER-1077:24–1078:3; 3-SER-833:17-22; 9-SER-2516:5-14.

[9] Without any authority, Sutter wrongly argues that this analysis was
properly excluded because it was not a regression analysis.  SB 36-37.  *But see,*

court's exclusion of this was particularly egregious, given its recognition, a few months before trial, that this "before" and "after" economic evidence was admissible. *Compare* 1-ER-121 ("a *before-and-after analysis* of . . . how [Sutter's] revenues *increased after Sutter moved to systemwide contracting*" would be admissible) *with* 1-ER-92–93; *see, e.g.*, *Blanton v. Mobil Oil*, 721 F.2d 1207, 1216 (9th Cir. 1983) (crediting before and after analysis).

Sutter also claims that the court correctly excluded Dr. Steven Tenn's analysis showing how Sutter raised its prices to health plans by up to 72% per procedure at its Summit Hospital between 2002 and 2004, despite the nearby presence of Kaiser Oakland. SB 40; AB 53-54. That analysis proves that Kaiser hospitals did not constrain Sutter's market power and are not part of the relevant market. Nevertheless, Sutter wrongly argues that "it would have been improper for Dr. Chipty to testify" about Tenn's analysis "because she conducted no independent analysis of" it. SB 40. Not so. An economist can rely on the work of another. *See Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("numerous courts have held that [] scientific test results prepared by others may constitute . . . evidence [] reasonably relied upon by experts"). Notably, Dr.

_____

*e.g.*, *Adams v. Ameritect Serv., Inc.*, 231 F.3d 414, 425-26 (7th Cir. 2000) (reversing expert exclusion when no regression performed).

Gowrisankaran testified about other economists' analysis that he did not "independently analyze."  *See, e.g.*, 15-SER-4217:6-23.[10]

### B. The Court Erroneously Excluded Pre-2006 Evidence Under Rule 403.

The court erred in excluding pre-2006 evidence under Rule 403 as "cumulative" and "confusing."  Sutter argues, however, that its admissions of systemwide forcing systemwide contracts on health plans duplicate health plan testimony asserting the same.  SB 41.  But the excluded evidence came from Sutter executives: it was powerful, conflicted with Sutter's arguments, and would have damaged Sutter's credibility.  *See* AM. JUR. 2d § 751 (2d ed. 2023) ("A party's admissions are always competent evidence"); MCCORMICK ON EVIDENCE § 254 (8th ed. 2022).  Sutter does not identify any other Sutter admissions of its forcing power or the higher prices that it caused.[11]

---

[10] Sutter baselessly argues that Plaintiffs waived any attempt to have Dr. Chipty testify about the Tenn study because it was not included in an offer of proof.  SB 40.  But the court repeatedly admonished Plaintiffs not to proffer pre-2006 evidence.  *See* AB 35.  Dr. Chipty, thus, did not testify about the Tenn study, and Plaintiffs redacted references to it in an article used to cross-examine Dr. Gowrisankaran.  *See* 15-SER-4318:6–4320:18.

[11] Sutter relies on *City of Long Beach v. Standard Oil Co. of Cal.*, 46 F.3d 929 (9th Cir. 1995).  There, the excluded evidence of defendants' intent was, unlike here, shown by evidence other than the excluded evidence.  *Id.* at 937.

The pre-2006 evidence of forcing also concerns unique events, such as how Anthem attempted to resist Sutter's 2001 systemwide demands, but ultimately "folded." *See* AB 13; *supra* part I.A.i. That, too, should have been admitted.

Sutter also wrongly asserts that the court correctly excluded as "cumulative" its pre-2006 admissions that emphasized the price-constraining benefits of narrow and tiered networks, which Sutter made to defend the challenge to its acquisition of Summit Hospital. SB 37-40; *see* AB 27. These admissions went beyond Sutter's "acknowledge[ment]" at trial that steering "can reduce [patient] volume and constrain [hospital] pricing" (SB 38): they *quantified* that only a little bit of steering – "about an additional 1 patient per day [at each of the Sutter merging] hospitals" – would "prevent" Sutter from imposing a "5% price increase." 2-ER-189-90; AB 17.

Sutter also argues that the exclusion of these admissions was appropriate because the Alta Bates/Summit merger case involved evidence not in this case. SB 39. But the court admitted – over Plaintiffs' objections – Sutter's evidence of the outcomes of (a) a Sutter arbitration with Kaiser Health Plan over rates for emergency services provided to Kaiser insureds, and (b) unrelated litigation not involving Sutter. But unlike Sutter's admissions on steering from the merger litigation, those matters had nothing to do with the restraints at issue here. *See* 12-SER-3375:16–3380:5; 13-SER-3563:17–3571:13; 13-SER-3590:22–3591:7.

16

Last, Sutter asserts, again without authority, that pre-2006 evidence was properly excluded because its admission would have "created the risk of the jury [] seizing upon" pre-limitation events "as a basis for [] damages." SB 37. That has no merit. Dr. Chipty calculated damages only from 2011 to 1Q-2020. AB 22-23. A limiting instruction could have cleared up any potential confusion that admission of this evidence may have caused. AB 57; FED. R. EVID. 403 Advisory Committee Notes to 1972 Proposed Rules ("limiting instructions" should be "considered").

## C. The Exclusion of This Evidence Was Prejudicial.

Sutter does not dispute that, when error is established, prejudice is presumed and that it, as the party defending the verdict, has the burden to show that the error was harmless. Nor does it dispute that "cumulative error . . . may [] warrant a new trial even if each error standing alone may not be prejudicial." *Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir. 2005). This Court should assess these errors collectively even though each was prejudicial. *See* AB 46-47.

Here, Question #5 asked whether Sutter "forced" health plans to submit to its contracts. The excluded evidence goes to the heart of that issue. Sutter, nonetheless, suggests that any error related to the exclusion of "forcing" evidence was harmless. But that is belied by Sutter's closing, which emphasized, contrary to the excluded admissions, that Sutter "did not *force* these insurers to do anything. [They] are some of the largest companies in the [U.S.]." 17-SER-4954:7-9;

17

*Crawford v. City of Bakersfield*, 944 F.3d 1070, 1080 (9th Cir. 2019) (error not harmless where excluded evidence "would have deprived [d]efendants of a powerful component of their closing").

To support its harmless error argument, Sutter notes that Question #5 not only asks the jury whether Sutter "force[d] the class health plans to agree to contracts," but also whether these contracts "had terms that prevented the plans from steering." *See* 1-ER-9. It then says that its "evidence of narrow and tiered networks defeated Plaintiffs' contention that Sutter's contract terms prevented steering," showing that any evidentiary error must have been harmless. SB 47.

This wholly mischaracterizes Plaintiffs' course-of-conduct claim. Plaintiffs did not allege that Sutter's contracts prevented *all* narrow and tiered networks products. Instead, Plaintiffs alleged – as confirmed by the jury instruction below – that Sutter contracts:

> [p]revented the insurance companies from creating *effective* narrow network [] or tiered products that would have allowed the insurance companies to steer patients to lower cost non-Sutter hospitals . . .

1-ER-20; 1-FER-57. Sutter attempts to erase the word "effective" from this claim, but it undoubtedly has salient meaning. That is demonstrated by the court's addition of "effective" to its original course-of-conduct instruction. *Compare* 1-FER-22 *with* 1-FER-12. Plaintiffs asked the court to add this term to describe their claims accurately and in accordance with their burden under the Rule of Reason.

18

That Rule is violated when restraints are unreasonable – i.e., when they are anticompetitive in purpose *or* effect, like when they facilitate supra-competitive prices. *See infra* part II.A; *PLS.com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (anticompetitive effects can be shown through price increases). Restraints need not shut out (or, in antitrust parlance, foreclose) competitors from getting any business, as Sutter suggests, to offend the Rule. *See UAS*, 169 Cal. App. 4th at 366, 370 n.6 (defense judgment reversed even though contractual restraint "did not prohibit purchase of services from [competitors]," but "limited [] ability to compete"); *Fisherman's Wharf Bay Cruise Corp v. Super. Ct.*, 114 Cal. App. 4th 309, 336-39 (2003) (foreclosure of only 20% of market sufficient); *see also U.S. v. Microsoft*, 253 F.3d 34, 64 (D.C. Cir. 2001) (antitrust law violated when rivals continue to compete, but receive less business because restraints foreclose the "cost-efficient . . . means of distribution").[12]  Plaintiffs therefore did not have to show that Sutter prevented all steering to other hospitals in order to prevail.

---

[12] "The test is [] not total foreclosure . . . ." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012); *see also Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-90 (6th Cir. 2002) (antitrust liability even where plaintiff's market share increased).

The law presumes that juries follow the court's instructions (*see Frost v. BSNF Ry. Co.*, 914 F.3d 1189, 1198 (9th Cir. 2019)), particularly when filling out Verdict Forms because "instructions [] enable the jury to make [] findings." FED. R. CIV. P. 49. Accordingly, this Court should reject Sutter's invitation to ignore the term "effective" in the jury instructions when considering Plaintiffs' claims and evidence of steering suppression.

Specifically, Plaintiffs' course-of-conduct claim alleges that Sutter imposed restraints that raised health plan costs for excluding Sutter hospitals from a narrow network or placing them in a disfavored tier. It further alleges that this caused premiums for these narrow and tiered networks to go up, thereby suppressing their *effectiveness* and health plans' ability to steer away from Sutter. *See, e.g.*, 3-SER-646:3–649:23; 17-SER-4875:2–4886:13.

Sutter ignores this and the substantial evidence supporting Plaintiffs' claim, including that:

(a) narrow and tiered networks, as Sutter's expert admitted, "must" have "low premiums" to be "successful." 17-SER-4754:5–4757:22 (Sutter expert acknowledging "procompetitive benefits" of narrow networks); 9-SER-2609:9–2614:18 (Chipty);

(b) Northern California consumers had substantial demand for these lower-priced networks. *See, e.g.*, 1-FER-175;

20

(c) Sutter forced contracts on health plans that drove up the cost of excluding or tiering Sutter hospitals so much that health plans could not offer many narrow and tiered networks at the low premiums consumers demanded. This crippled their effectiveness and repeatedly destroyed the business case for health plans to exclude or tier Sutter hospitals. *See* AB 16-20; 1-FER-97 (*Health Net*: Sutter's contractual terms limited Health Net from "developing Tailored Networks"); 2-FER-181–83; 1-FER-162–63 (*UHC*: Sutter's contracts "limit health plans from offering tiered benefits or narrow networks"); 9-SER-2367:6–2369:5 (Anthem); 4-SER-1087:16–1092:5 (Blue Shield); 7-SER-2019:7–2024:24, 19-SER-5176:20–5178:25 (Aetna); 3-ER-476; 9-SER-2619:14–2626:19, 10-SER-2736:3–2739:6 (Chipty);

(d) Sutter often refused to participate in networks where health plans sought to place its hospitals in non-preferred tiers. *See, e.g.*, 4-SER-856:21–861:5 (HealthNet); 9-SER-2372:6–2374:16 (Anthem); 8-SER-2065:1–2070:1 (former S.F. health system head testifying that Sutter refused to allow its S.F. hospital to be placed in disfavored tier);

(e) as a result of Sutter's actions, far fewer consumers were steered away from Sutter to lower-priced hospitals, limiting the constraint that steering otherwise would have had on Sutter pricing. AB 16-23.

21

Economic evidence supported Plaintiffs' steering suppression claims. Dr. Chipty analyzed the penetration of Anthem narrow and tiered networks (or "steered networks") in Northern California (where Sutter's restraints were at issue) and in Southern California (where they were not). That analysis, presented below, confirms health plan testimony that, due to Sutter's restraints, they were far less successful in launching these products in Northern California.



*See* 7-ER-1602; 10-SER-2739:7–2741:25, 19-SER-5235:1-25; 4-SER-878:17–

881:1 (*Health Net:* "Launching tailored networks in Northern California [was] a

challenge . . . due to the restrictions . . . in our agreement with Sutter.")

Sutter points out that health plans attempted to launch some narrow and

tiered networks that included some Sutter hospitals, as if that disposes of Question

#5. SB 7-8. But most of these were not pertinent to the damages caused to Class

Members (who purchased fully-insured products and are located in Northern

California). 3-SER-589:4-21. While Sutter touts a chart that purports to show

narrow and tiered networks in which it participated (SB 17), the evidence shows

that a vast number of those were (1) self-insured, not fully-insured, networks,

and/or (2) built for people located in Southern California who rarely visited Sutter

hospitals. And, importantly, Sutter failed to show that any of these products was

effective or successful. 12-SER-3495:18–3509:18.

Given the substantial evidence of effective narrow and tiered network

suppression, Sutter's assertion that the jury answered Question #5 in its favor

based on the "steering," rather than "forcing," issue should be dismissed as sheer

speculation. *See Frost*, 914 F.3d at 1198-99 (harmless error not proven by

"speculation" and "[b]ecause [court did] not know how the jurors" decided). That

does not rebut the presumption that Plaintiffs were prejudiced by the erroneous

exclusion Orders.

23

Sutter, similarly, cannot rebut the presumption that the exclusion of evidence materially affected the jury's analysis of Question # 1, which asked whether Sutter sold "inpatient [] services [at]…tying hospitals only if the buyer also purchased inpatient [] services at…tied hospitals."  1-ER-7.  But for the court's Orders, Plaintiffs would have compared Sutter's individual hospital contracts that did not contain anticompetitive clauses with Sutter's systemwide contracts that did. *Compare*, *e.g.*, 1-FER-99–161, 5-ER-995–1036, 5-ER-1042–66 *with* 9-ER-1757-1997, 11-ER-2249–2490.  That would have shown that Sutter's systemwide contracts constitute a tie.  *See* 2-ER-177–79 (Sutter) (health plans "valued their individual relationships with [Sutter] hospitals and did not want to negotiate through Sutter");  AB 52.

## II. THE RULE OF REASON INSTRUCTIONS CONSTITUTE REVERSIBLE ERROR.

### A. The Rule of Reason Instructions Contravened Settled Law.

The Cartwright Act, *Corwin,* and CACI Model Instructions demonstrate that it was error to eliminate the issue of "anticompetitive purpose" from this case. Sutter argues that anticompetitive purpose alone can never satisfy a Cartwright Act claim.  SB 50-52.  But that is wrong.  Cartwright Act liability attaches when there is anticompetitive purpose *or* effect.  AB 49-50.

The Cartwright Act's principal enforcer – the California Attorney General ("AG") – agrees that the court did not "properly instruct the jury" when it "excised the need to consider Sutter's purposes for . . . challenged restraints," confirming that "consideration of a restraint's purpose is critical to [] the [] statute's goals." AG Br. at 14, 17, 18 ("[U]nguarded early statements that . . . conduct is intended to reduce competition can be of great usefulness"). Indeed, the AG confirmed that Sutter "documents…showed that [it] adopted its contracting strategy [] to undermine . . . competition." *Id.* at 19.[13]

Sutter argues that in *Cipro*, 61 Cal. 4th at 157, the California Supreme Court held that the "reasons for the restraint" only become "a factor in evaluating whether the anticompetitive effects outweigh any benefits," effectively overruling *Corwin*. SB 51-52. That is false. *Cipro*, which follows *Corwin* (61 Cal. 4th at 146), concerned "reverse payments" from a brand drug to a generic drug manufacturer made – ostensibly to settle a patent case – for the generic's agreement not to compete. *Cipro* holds that a *prima facie* case that a reverse payment

---

[13] Sutter contends that the claims in the *AG/UEBT* case, where it agreed to a $575 million and injunctive settlement, and the claims here "asserted different theories of liability." SB 26, n.7. Sutter, however, recently admitted that this and the AG's case are "parallel lawsuits," even contending that the injunction from the AG's case should be modified, due, in part, to the jury verdict here. Motion to Modify the Injunction at 18, *UFCW & Emps. Benefit Trust v. Sutter Health*, Case No. CGC-14-538451 (Super. Ct. Sept. 12, 2022).

25

agreement violates the Cartwright Act is made by analyzing its purposes. 61 Cal.

4th at 152-58 (reverse payment *prima facie* anticompetitive if made out of a

"desire to maintain . . . monopoly profits"); *Ixchel Pharma, LLC v. Biogen*, 9

Cal.5th 1130, 1154 (2020) (in *Cipro*, "we found contracts [] invalid when their

purpose was to restrain trade"). This is determined before considering

justifications for the conduct. *Id.*

      Sutter's other Cartwright Act cases did not consider whether liability can be

found when restraints are imposed for an anticompetitive purpose. They are

inapposite. *See, e.g.*, *Exxon Corp v. Super. Ct.*, 51 Cal. App. 4th 1672, 1680-87

(1997) (dismissed on market definition); *Marsh v. Anesthesia Servs. Med. Grp.,*

*Inc.*, 200 Cal. App. 4th 480, 497 (2011) (no antitrust injury); *Feldman v.*

*Sacramento Bd. of Realtors*, 119 Cal. App. 3d 739, 743-74 (1981) (same).

### B.    The Rule of Reason Instructions Were Prejudicial.

      The erroneous Rule of Reason instructions do not constitute harmless error.

They confirm that the court failed to appreciate Cartwright Act law that requires an

assessment of purpose, and that this likely motivated the court's exclusion of pre-

2006 evidence. Here, if the jury was instructed to assess Sutter's purposes, it

would have confronted evidence of Sutter's intent to use systemwide contracts to

"increase[] leverage" and get "higher prices." *See supra* part I.A.i; AB 45. This

admission of Sutter's desire and ability to force its contracts on health plans was central to an assessment of Question #5.

Had the jury been instructed to focus on whether Sutter had anticompetitive intent, it would have likely found that Sutter intended to harm consumers with its restraints (by forcing higher prices on them). This would have materially impacted juror credibility assessments of Sutter witnesses and its arguments, and their ultimate findings on Plaintiffs' course-of-conduct claim.

## III. THE COURT'S FAILURE TO IDENTIFY HEALTH PLANS AS THE RELEVANT PURCHASERS WAS REVERSIBLE ERROR.

### A. The Court's Failure to Identify Health Plans as the Relevant Purchasers Was Erroneous.

This Court has held that the "accepted model" of healthcare competition is the "two-stage model" and "antitrust analysis focuses on the first stage," where "providers compete for inclusion in insurance plans." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 784 n.10 (9th Cir. 2015). In other words, the law requires that, to assess a hospital's market power, one focuses on the views and actions of direct purchaser health plans rather than indirect purchaser premium payers. AB 61-65. Moreover, Cartwright Act law holds that, in an indirect purchaser case, it is first determined whether the direct purchasers paid an overcharge due to seller exercises of market power over them. It is then determined whether that overcharge was "passed on" to the indirect

27

purchasers.  AB 62 (*citing Olean Wholesale Grocery Coop, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 684 (9th Cir. 2022)).  Despite this law, the court's jury instructions failed to identify health plans as the relevant direct purchasers.

Sutter argues that the instructions on market definition, market power, and tying were proper because they followed the CACI models, which do not specify the identity of the relevant purchaser.  SB 53-54.  But Sutter also confirms that "courts have departed from [CACI] model[s] [] when they are erroneous, confusing, and misleading."  SB 52.  Here, there were two problems with giving unmodified, vague CACI instructions regarding the relevant purchaser.

First, those instructions do not account for cases, like this one, that implicate both direct purchasers (i.e., health plans) *and* indirect purchasers (i.e., those that pay for hospital services through insurance premiums).  Second, the CACI instructions are not healthcare specific, and so fail to follow appellate precedent identifying health plans as the relevant purchasers in hospital market power cases.  AB 65-67.  Thus, to avoid jury confusion and ensure appropriate assessments of market definition and power, the court should have modified the CACI models to define health plans as the relevant purchasers.[14]

---

[14] Sutter argues that Plaintiffs did not "object to the [] instructions on the ground that [they] failed to distinguish between direct and indirect purchasers."

Sutter also argues that it was appropriate for the court to keep the term "customers" and "consumers" vague, because market definition is a "fact intensive inquiry." SB 54, 57-58. But Sutter's cases do not hold that the identity of the relevant buyer, particularly in a hospital market power case, is an issue of fact. Rather, they show that the scope of the market *from the perspective of a particular relevant buyer* is a fact question. *See* AB 65-69.

Hospital market power cases, like this one, require that juries assess market definition and power from the perspective of direct purchaser health plans as a matter of law. They hold that, to define markets, a hypothetical monopolist test ("HMT") should be performed to assess the responses of health plans to a price increase. AB 25-27, 66; *see also* Scholars of Healthcare and Economics in Support of Plaintiffs-Appellants Br. at 10-12.[15]

---

SB 66. That is wrong. *See* 1-FER-38–41; 1-FER-25:21–31:3 (proposed instructions stating direct purchaser health plans were relevant purchasers).

[15] In none of Sutter cases was a requested instruction supported by law or the given instruction vague, as here. *See Lam v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017) (no error "by declining to single out [] factor in" relevant "inquiry"); *Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000) (no error by refusing inapplicable instruction); *see also U.S. v. Hall*, 552 F.2d 273, 275 (9th Cir. 1977) (rejecting instruction where question of fact). *Louis Vuitton Malletier v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942-43 (9th Cir. 2011), supports Plaintiffs: the court there narrowed the instruction to be more *specific*. That is just what Plaintiffs sought here.

The court's summary judgment Order followed this law as "binding," acknowledging that the relevant purchaser issue is a legal, not factual, one. Sutter, however, points out that the court later disclaimed that it rendered this holding. SB 66. But the summary judgment Order is clear:

> Sutter . . . argue[s] that distinguishing between health plans versus patients as the relevant consumers is "an argument about semantics" . . . But . . . distinguishing between health plans and patients is [not] "semantics". . . , such as in the context of a [HMT] . . . to define a geographic market for [] selling hospital services to health plans. [Sutter's argument is] not [] controlling in light of the . . . binding opinion in *St. Luke's* . . . .

7-ER-1442, n.196.

Sutter repeats that failed "semantics" argument here, asserting that whether the relevant purchasers are health plans or patients does not matter because health plan demand for hospitals is informed by patient demand. SB 64. Caselaw rejects that:

> The Hospitals argue that there is no [] difference between analyzing the likely response of consumers through the patient or [insurer] perspective. We disagree . . . when we apply the [HMT], we must [] do so through the lens of insurers.

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342-43 (3d Cir. 2016). Sutter also argues that Plaintiffs' hospital market power cases do not govern because they do not concern a "vertically integrated" entity, like Kaiser, which owns hospitals and a health plan. Sutter says that, given Kaiser's vertical integration, the market

30

should be defined from patient perspectives. And its *amici* theorize that indirect

purchaser insurance enrollees, rather than direct purchaser health plans, can be the

purchasers whose substitution options and patterns are assessed in the HMT,

calling Plaintiffs' request to identify direct purchasers as the relevant purchasers

"novel." Economists and Antitrust Scholars in Support of Defendant-Appellee Br.

at 3.[16]

     But neither Sutter nor its *amici* reference *any* legal or economic authority

that ever held that a court should look to the substitution patterns of indirect, rather

than direct, purchasers to conduct a SSNIP or HMT test.[17]  Recent Ninth Circuit

authority, however, recognizes that upstream buyers (that sell further downstream)

are the relevant consumers for antitrust purposes.  *See PLS.com*, 32 F.4th at 832*;*

*see also FTC v. Advoc. Health Care Network*, 841 F.3 460, 475 (7th Cir. 2016)

("insurers are [] most relevant buyers.").

---

[16] Ten of these seventeen *amici* are affiliated with Compass Lexecon, a firm that Sutter paid about $16 million in this case.  16-SER-4519:4-19; *see also* https://www.compasslexecon.com/all-professionals/ (last visited Feb. 23, 2023).

[17] Sutter's *amici* rely on Section 4.1.3 of the FTC/DOJ's *Horizontal Merger Guidelines*, which states that "[i]n considering *customers' responses* to higher prices," regulators account for "the influence of downstream competition faced by [these] *customers* in *their* output markets."  The "customers" at issue in that section, however, are *direct purchasers*: it is their "responses" that must be assessed.  This makes Plaintiffs' point.

Notably, Dr. Gowrisankaran, whose opinion should have been excluded for not considering market definition from the health plan view (AB 69-70), did not follow the approach proposed by Sutter's *amici*. Unlike Dr. Chipty, he did not conduct an HMT assessing consumer responses to a price increase at all. *Compare* 10-SER-2665:17–2666:20; 5-ER-1070–74 *with* 15-SER-4339:12–4341:7.[18]

Sutter, nonetheless, suggests that, if health plans were defined as the relevant purchasers, vertically integrated providers would be ignored in the market definition analysis. That is untrue. Sutter Health is vertically integrated: it has a hospital arm and health insurance arm. *See* 6-SER-1528:1–1529:12. And Sutter was included in Plaintiffs' market analysis because, unlike Kaiser, Sutter sells its hospitals services to health plan purchasers.[19]

The AG recognizes that hospital markets should be defined from the health plan perspective, notwithstanding Kaiser's presence. It recently excluded Kaiser hospitals from merger analysis, in part, "because commercial payers cannot

---

[18] Dr. Gowrisankaran's charts of Sutter and Kaiser "market shares" do not consider Sutter prices; they merely calculate the "shares" these entities would possess *if* Kaiser was in the market. *See* 18-SER-5151. They do not analyze whether a SSNIP would succeed. 15-SER-4286:19–4289:14; *see St. Luke's*, 778 F.3d at 785 (referencing SSNIP test).

[19] Sutter, not Kaiser, resembles the vertically integrated defendant in *Alcoa*. 148 F.2d at 423. Sutter, like Alcoa, and unlike Kaiser, sold its product/services to external customers and were thus considered in market definition analysis.

32

substitute Kaiser providers into their networks in place of non-Kaiser providers who seek to raise price." CAL. OFFICE OF THE ATT'Y GEN., SUPPLEMENTAL REPORT: AN EVALUATION OF THE PROPOSED CHANGE IN CONTROL OF ST. MARY MEDICAL CENTER, at 88 n.222 (Nov. 11, 2021).[20]

Regardless, Plaintiffs did not ignore Kaiser, notwithstanding that Kaiser cannot be in the market for sales to health plans. Dr. Chipty recognized that there is "indirect competition" between Sutter and Kaiser hospitals, as Sutter patients can substitute to Kaiser hospitals *if* they first purchase Kaiser insurance. She performed analyses that determined that this indirect competition did not significantly constrain Sutter's behavior or prices.[21] Former CFO Reed admitted this. *See* 5-ER-898:25–901:24 ("Q. You didn't think [] lowering prices for Sutter was going to make you more competitive with Kaiser? A. . . . That's correct"). And the excluded Tenn analysis confirmed it. AB 54. Dr. Chipty also accounted for Kaiser in analyses regarding the pass-on of Sutter overcharges to Class Members. 10-SER-2797:25–2801:13.

---

[20] Available at https://oag.ca.gov/system/files/media/smmc-impact-report-2021-redacted.pdf.

[21] *See, e.g.*, 9-SER-2637:2–2641:24; 2-FER-184–185 (showing large percentages of premium payors not located within 30-minute drive of Kaiser hospitals); 9-SER-2642:4–2643:17; 1-FER-179 (showing most patients serviced by new Kaiser hospital came from other Kaiser, rather than non-Kaiser, hospitals).

Finally, Sutter argues that the court "amply covered plaintiffs' theory that insurers are the buyers" for the purposes of instructing the jury on how to assess market definition, market power, and tying. SB 55. Sutter does so by referencing preliminary instructions that summarized Plaintiffs' claims in only three sentences, four weeks before specific, substantive instructions were given (3-SER-587–88), and stating that the course-of-conduct instruction refers to "contracts with insurance companies." SB 55. These statements, however, did not identify that health plans were the relevant "buyers" or "consumers" *for the purpose of analyzing markets or tying*. The court intentionally left this term vague in its market definition and power instructions (AB 42-43), knowing that this would not inform jurors of Plaintiffs' market theory. 1-ER-95–96; AB 41-43. The jury was not asked to decide whether a market for inpatient hospital services *sold to health plans*, per Plaintiffs' theory, existed. It should have been.

**B.      The Court's Failure to Define the Relevant Purchaser Was Prejudicial.**

The court's failure to define health plans as the relevant direct purchasers was prejudicial. Question #5 required jurors to determine whether Sutter "forced" health plans to enter into systemwide agreements. To decide that issue, the jury had to properly define the market and assess Sutter's power in it. *See supra* part III.A; AB 62-63.

Sutter argues that "the jury never reached (and did not need to reach) any questions regarding market definition [or] market power," and suggests that the ability to force is different from the ability to exercise market power. SB 1, 69. It claims that market power was not an independent and necessary element of Plaintiffs' Rule of Reason claim, but only relevant as a subsidiary finding that the jury "may" have considered on the second prong (concerning anticompetitive effect) or third prong (concerning weighing of effects and benefits) of that claim. *See* SB 68-69.

That is obviously wrong. In ruling on jury instructions, the court adopted Sutter's position that "market power is a *threshold element*" (1-ER-99) and held that "market power is *a necessary element* of both [of plaintiffs'] claims," not just an optional subsidiary consideration. 1-ER-94; *see also* AB 41.

 Market power and forcing power are synonymous. "Market power" is the ability "*to force a purchaser* to do something that [it] would not do in a competitive market." *Jefferson Parish*, 466 U.S. at 13-14; *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 439 (5th Cir. 2008) (defendant "utilized [] market power to force [] contracts"); AREEDA & HOVENKAMP, FUNDAMENTALS OF ANTITRUST LAW, ¶ 520b3 (4th ed. 2022) ("Some [] practices . . . could not be forced except as an exercise of market power"). Accordingly, failure to properly

instruct on how to analyze market definition and power compromised the jury's assessment of "forcing."

Sutter repeats its speculation that the jury did not decide the "forcing" issue because it must have concluded that Sutter contracts did not prevent steering. SB 69. That does not rebut the presumption that the "relevant purchaser" error caused prejudice. *See supra* part I.C.

Finally, Sutter asserts that the court's vague reference to "buyer" in its tying instructions was harmless, despite Sutter's argument that health plans are not buyers of hospital services and only patients are. SB 57-67. That cannot be right. The instruction permitted the jury to erroneously assess Plaintiffs' tying claim from patient perspectives, contrary to *UAS*.

The court failed to provide legally correct instructions that would have explained how to go about the complex market definition and market power analyses. AB 41-42, 62-63. That failure allowed for these issues to be "tried in a manner [] fundamentally at odds" with settled law. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2d Cir. 2019).

## IV. THE COURT'S SPOILATION RULINGS SHOULD BE REVERSED.

Three years into this case and after Sutter placed a litigation hold, Sutter's Melissa Brendt ordered the destruction of 192 boxes of pre-2006 contracting department records related to the implementation of its restraints. In the *AG/UEBT*

case, Judge Karnow held that Sutter's spoliation was intentional, "done knowing []
the evidence was relevant to antitrust issues," and that "there is no good
explanation" for the destruction. 3-ER-450–53. Judge Massullo – who succeeded
Judge Karnow – then ruled that she would consider an adverse jury instruction
after admitting the spoliation evidence at trial. 3-ER-462–63. However, the court
here denied Plaintiff's sanctions motion holding that Sutter's document destruction
was irrelevant; and, when faced with this document destruction, held that pre-2006
evidence formerly deemed material was suddenly irrelevant too. AB 71-72. This
should be reversed.

Sutter wrongly argues that *de novo* review should not be applied to the
sanctions Order because the court correctly held that spoliation sanctions require a
finding of "bad faith," rather than mere notice of the destroyed documents'
relevance. Sutter's caselaw does not support that. *See, e.g.*, *Am. Unites for Kids v.
Rousseau*, 985 F.3d 1075, 1089-90 (9th Cir. 2021) (addressing punitive sanctions
for non-spoliation misconduct, not corrective sanctions for spoliation).

Sutter then argues that it had no duty to preserve the destroyed documents.[22]
Sutter's litigation hold and the email of Ms. Brendt's assistant, worrying that "the

---

[22] Sutter cites *Medical Laboratory Management Consultants v. American
Broadcasting Companies, Inc.*, 306 F.3d 806, 824 (9th Cir. 2002). That case
concerned an "inadverten[t]," not intentional, destruction, like Sutter's.

FTC will hunt me down" for relaying the directive to destroy (AB 40) prove otherwise – as does Sutter's auto-disclosure stating it would rely on pre-2006 documents produced in *UEBT*. 1-FER-79–82. Unlike in *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991), cited by Sutter, "the [destroyed] records had potential relevance to th[is] litigation" and Sutter knew it.

Finally, Sutter argues that the remediation sanction imposed in *AG/UEBT* cured its document destruction. But Sutter conceded that its remediation attempts were, at best, "guesswork," demonstrating that destroyed documents were likely never recovered. 1-FER-86, 1-FER-91:13-24.

## CONCLUSION

Even with all the errors in its favor, Sutter admitted that this was a "close case." 17-SER-4908:12-13. Had those errors not been made, the verdict would have been different. The Final Judgment should be reversed, and this case should be remanded for further proceedings.

February 23, 2023

Respectfully submitted,

| | |
|---|---|
| */s/ Matthew L. Cantor* | David C. Brownstein |
| Matthew L. Cantor | David M. Goldstein |
| Jean Kim | FARMER BROWNSTEIN JAEGER |
| CONSTANTINE CANNON LLP | GOLDSTEIN KLEIN & SIEGEL LLP |
| 335 Madison Avenue, 9th Floor | 235 Montgomery Street, Suite 835 |
| New York, New York 10017 | San Francisco, California 94104 |
| 212-350-2700 | 415-795-2050 |
| | |
| James J. Kovacs | Allan Steyer |
| J. Wyatt Fore | D. Scott Macrae |
| CONSTANTINE CANNON LLP | STEYER LOWENTHAL BOODROOKAS |
| 1001 Pennsylvania Avenue, NW | ALVAREZ & SMITH LLP |
| Suite 1300N | 235 Pine Street, 15th Floor |
| Washington, D.C. 20004 | San Francisco, California 94104 |
| 202-204-3500 | 415-421-3400 |
| | |
| Azra Z. Mehdi | Jill Manning |
| THE MEHDI FIRM, PC | PEARSON, SIMON & WARSHAW LLP |
| 201 Mission Street, Suite 1200 | 555 Montgomery Street, Suite 1205 |
| San Francisco, California 94105 | San Francisco, California 94111 |
| 415-293-8039 | 415-333-9000 |

*Attorneys for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15634

I am the attorney or self-represented party.

**This brief contains** | 8,379 | **words,** including | 117 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.

    ☒ a party or parties are filing a single brief in response to multiple briefs.

    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated     .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Matthew L. Cantor | **Date** | February 23, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**        *Rev. 12/01/22*